UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

_____
)
UNITED STATES OF AMERICA,                 )
)
                    Plaintiff,            )
)
          v.                              )          Civil Action No. 1:18-cv-7198
)
AUX SABLE LIQUID PRODUCTS L.P.,           )
)
                    Defendant.            )
)
_____)

## COMPLAINT

Plaintiff, the United States of America, by and through the Attorney General of the

United States and through his undersigned attorneys, acting at the request and on behalf of the

Administrator of the United States Environmental Protection Agency ("EPA"), files this

Complaint and alleges as follows:

## NATURE OF ACTION

1.      This is a civil action brought by the United States against Aux Sable Liquid

Products, L.P. ("Aux Sable") pursuant to Section 113(b) of the Clean Air Act (the "CAA"), 42

U.S.C. § 7413(b), for alleged environmental violations at Aux Sable's natural gas processing

plant located in Aux Sable Township, Grundy County, Illinois ("Facility").  The United States is

seeking injunctive relief and the assessment of civil penalties for the alleged violations.

2.      The United States alleges that Aux Sable violated and/or continues to violate the

following federal and state statutory and regulatory requirements that are applicable to the

Facility:

a.   The Nonattainment New Source Review ("NNSR") provisions of Part D of Title I of the CAA, 42 U.S.C. §§ 7501–7515 and the Implementing Regulations of 35 Ill. Adm. Code 203 under the Illinois State Implementation Plan ("SIP");

b.   The New Source Performance Standards ("NSPS") for Volatile Organic Compounds ("VOC") emissions from Synthetic Organic Chemical Manufacturing Industry ("SOCMI") Distillation Operations, 40 C.F.R. Part 60, Subpart NNN; for VOC emissions from SOCMI Reactor Processes, 40 C.F.R. Part 60, Subpart RRR; and for monitoring and operating a flare pilot flame pursuant to 40 C.F.R. § 60.18 (General Control Device and Work Practice Requirements), and Part 60, Subparts Kb (Standards of Performance for Volatile Organic Liquid Storage Vessels), KKK (Standards of Performance for Equipment Leaks of VOC from Onshore Natural Gas Processing Plants), NNN, and RRR;

c.   Leak Detection and Repair ("LDAR") requirements, including those found at 40 C.F.R. Part 60, Subpart KKK, and, by reference, certain provisions of 40 C.F.R. Part 60, Subpart VV, and 40 C.F.R. Part 60, Appendix A-7, Method 21;

d.   The requirements of the Illinois Emissions Reduction Market System as codified under the Illinois SIP at 35 Ill. Adm. Code 205; and

e.   The requirements of the Illinois Annual Emissions Reporting Program as codified under the Illinois SIP at 35 Ill. Adm. Code 254.

3.   The United States alleges that Aux Sable violated and/or continues to violate the following permit conditions applicable to the Facility:

a.   Construction permit (No. 98080090) conditions regarding Volatile Organic Material ("VOM") fugitive emissions established according to 35 Ill. Adm. Code § 201.156 of the Illinois SIP;

2

b.      CAA Title V/Illinois Clean Air Act Permit Program ("CAAPP") permit (No. 01120007) conditions for VOM fugitive emissions, requirements to monitor a flare pilot flame, and applicable LDAR requirements; and

c.      Fractionation expansion project construction permit (No. 14120019) conditions for oxides of nitrogen ("NOx") emissions and fuel usage operational limits established according to 35 Ill. Adm. Code § 201.156 of the Illinois SIP.

4.      While the CAA and federal regulations use the term Volatile Organic Compounds ("VOC") and the Illinois SIP and state regulations use the term VOM, the two terms are synonymous for the purposes of this Complaint.

5.      As a result of Aux Sable's operation of the Facility in the absence of appropriate controls and while repeatedly exceeding VOM and NOx limitations as set forth in its construction permits and in federally enforceable provisions of the Illinois SIP, significant amounts of VOM and NOx pollution each year have been, and continue to be, released into the atmosphere.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 113(b) of the CAA, 42 U.S.C. § 7413(b).

7.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)–(c), 1395(a), and under Section 113(b) of the CAA, 42 U.S.C. § 7413(b), because Defendant resides within this District and because the violations that constitute the basis of the Complaint occurred and are occurring at a facility located in this District.

3

## NOTICE

8.      The United States has provided notice of the commencement of this action to the State of Illinois as required by Section 113(b) of the CAA, 42 U.S.C. § 7413(b).

9.      EPA issued Aux Sable a Finding of Violation on September 4, 2014, a Notice and Finding of Violation on April 14, 2015, and a Notice of Violation on August 23, 2016.  EPA provided copies of each of the three Notices and Findings to the State of Illinois, as required by Section 113(a)(1) of the CAA, 42 U.S.C. § 7413(a)(1).  Each of the three Notices and Findings are included as Attachment 1.

10.      More than thirty days have elapsed since EPA provided notice to Aux Sable pursuant to Section 113(a) of the CAA, 42 U.S.C. § 7413(a), of all violations of federally-enforceable aspects of the Illinois SIP alleged herein.

## AUTHORITY

11.      The United States Department of Justice has authority to bring this action on behalf of the Administrator of EPA under 28 U.S.C. §§ 516 and 519 and Section 305(a) of the CAA, 42 U.S.C. § 7605(a).

## DEFENDANT

12.      Aux Sable is a Delaware limited partnership that is registered to do business in the State of Illinois.  Aux Sable owns and operates an onshore natural gas processing plant at 6155 East U.S. Route 6, Morris, Illinois.  At the Facility, Aux Sable processes field gas from production wells to extract and produce methane, natural gas liquids ("NGLs"), and chemicals derived from NGLs for sale.  Aux Sable fractionates the NGLs to ethane, propane, and butanes.

4

13.     Aux Sable is a "person" within the meaning of Sections 113(b) and 302(e) of the CAA, 42 U.S.C. §§ 7413(b) and 7602(e) and applicable federal and state regulations promulgated pursuant to the CAA.

## STATUTORY  BACKGROUND

14.     The Clean Air Act establishes a regulatory scheme designed to protect and enhance the quality of the nation's air resources so as to promote the public health and welfare and the productive capacity of its population.  42 U.S.C. § 7401(b)(1).

## I.     National Ambient Air Quality Standards

### A.     General Provisions

15.     Section 108(a) of the CAA, 42 U.S.C. § 7408(a), requires EPA to list, and issue air quality criteria for, each air pollutant, the emissions of which may endanger public health or welfare and the presence of which results from numerous or diverse mobile or stationary sources.

16.     Section 109(a) of the CAA, 42 U.S.C. § 7409(a), requires EPA to promulgate regulations establishing primary and secondary national ambient air quality standards ("NAAQS") for those air pollutants for which air quality criteria have been issued pursuant to Section 108 of the CAA.  Under Section 109(b) of the CAA, 42 U.S.C. § 7409(b), the primary NAAQS are to be adequate to protect the public health with an adequate margin of safety, and the secondary NAAQS are to be adequate to protect the public welfare from any known or anticipated adverse effects associated with the presence of the air pollutant in the ambient air.

17.     Pursuant to Section 108 and 109 of the CAA, 42 U.S.C. §§ 7408 and 7409, EPA has listed and issued air quality criteria and NAAQS for ozone.  The NAAQS for ozone are set forth in 40 C.F.R. Part 50.

18.     Section 107(d) of the CAA, 42 U.S.C. § 7407(d), requires each state to designate those areas within its boundaries that do not meet the NAAQS (known as "nonattainment" areas), areas that meet the NAAQS (known as "attainment" areas), and areas that cannot be classified as meeting or not meeting the NAAQS (known as "unclassifiable" areas).  Air quality designations can be found at 40 C.F.R. Part 81.

19.     In 2000, at the time of its construction and initial startup, the Facility, located in Aux Sable Township, Grundy County, Illinois, was within an ozone nonattainment area designated as in "severe" nonattainment under the 1979 1-hour ozone standard.  This area is currently designated as in "moderate" nonattainment under the 2008 8-hour ozone standard.

### State Implementation Plans

20.     Section 110 of the CAA, 42 U.S.C. § 7410, requires each state to adopt and submit to EPA for approval a plan that provides for the attainment and maintenance of the NAAQS in each air quality control region within each state.  This plan is known as a State Implementation Plan ("SIP").

21.     Once EPA approves a SIP, the SIP is also independently enforceable by the federal government under Section 113 of the CAA, 42 U.S.C. § 7413.

22.     Of relevance to this Complaint, Section 110(a)(2)(C) of the CAA, 42 U.S.C. § 7410(a)(2)(C), requires each SIP to include "regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that national ambient air quality standards are achieved, including a permit program."

23.     Any limitation or condition contained within a permit issued by a federally approved program that is incorporated in a SIP is a requirement of the SIP and is federally enforceable under Section 113.  40 C.F.R. § 52.23.

II.     **Non-Attainment New Source Review**

    A.     **General Provisions**

24.     Part D of Title I (Sections 171 through 193 of the CAA, 42 U.S.C. §§ 7501-7515), sets forth SIP requirements for those areas designated as nonattainment for purposes of meeting the NAAQS.

25.     Part D directs states to include in their SIPs requirements providing for reasonable progress towards attainment of the NAAQS in nonattainment areas. 42 U.S.C. § 7502(c)(2).

26.     Part D includes provisions for implementation of a NNSR Program, which is intended to reduce emissions of air pollutants in areas that have not met the NAAQS so that the areas make progress towards meeting the NAAQS.  Section 172(c)(5) of the CAA, 42 U.S.C. § 7502(c)(5), describes the core of the NNSR Program.  Under Section 172(c)(5), all state SIPs must require permits for the construction and operation of new or modified major stationary sources anywhere in a nonattainment area within the state.  These NNSR permits must be issued in accordance with Section 173 of the CAA, 42 U.S.C. § 7503.

27.     Section 173 of the CAA, 42 U.S.C. § 7503, sets forth a series of requirements for the issuance of permits for new major sources or major modifications to major stationary sources within nonattainment areas.  These requirements include: (1) securing sufficient emission offsets from existing sources in the nonattainment area; (2) complying with the Lowest Achievable Emission Rate ("LAER"); (3) demonstrating that all major stationary sources in the state under common ownership or control by the new or modified source's owner or operator are in compliance with all applicable requirements of the CAA; (4) ensuring that the Administrator of EPA has not determined that the applicable SIP for the nonattainment area is not being adequately implemented; and (5) analyzing the alternatives to the particular project, to determine

whether the benefits of the project outweigh the environmental and social cost. Section 173(a)(l)–(5) of the CAA, 42 U.S.C. § 7503(a)(l)–(5).

28. The CAA was amended in 1990 to add provisions under Section 182(c)(6), (7), and (8), 42 U.S.C. § 7511a(c)(6), (7), and (8), revising certain NNSR requirements for major stationary sources or major modifications of existing sources in ozone nonattainment areas classified as serious, severe, or extreme. Of relevance to this Complaint, these amendments also tightened thresholds for determining what constitutes a major source or major stationary source and established specific emission offset ratios that must be met depending upon the nonattainment area designation. For severe ozone nonattainment areas, Section 182(d) of the CAA, 42 U.S.C. § 7511a(d), was added to provide that the terms "major source" and "major stationary source" as applied under the CAA include any stationary source or group of sources located within a contiguous area and under common control that emits, or has the potential to emit, at least 25 tons per year of VOCs. Section 182(d)(2) of the CAA, 42 U.S.C. § 7511a(d)(2), was added to provide that, for the purpose of satisfying the offset requirements for NNSR in severe nonattainment areas, the ratio of tota1 emission reductions of VOC in the nonattainment area to total increased emission of VOC by the new source or major modification shall be at least 1.3 to 1.

**B.    Illinois SIP Provisions**

**i.    General**

29. Illinois's NNSR program was first promulgated in 1988, 12 Ill. Reg. 6118 (March 22, 1998), and is codified at 35 Ill. Adm. Code 203. In 1995, EPA approved a revision to the Illinois SIP amendments that provides the Illinois NNSR rules, including the adoption of the 25

tons-per-year of VOC threshold for determining major sources and the 1.3-to-l offset ratio

applicable to severe ozone nonattainment areas.  60 Fed. Reg. 49,780 (Sept. 27, 1995).

30.     The Illinois SIP provides that:

In any nonattainment area, no person shall cause or allow the construction of a new major stationary source or major modification that is major for the pollutant for which the area is designated a nonattainment area, except as in compliance with this Part for that pollutant.  In areas designated nonattainment for ozone, this prohibition shall apply to new major stationary sources or major modifications of sources that emit VOM or nitrogen oxides ("NOx").

35 Ill. Adm. Code 203.201.

31.     The Illinois SIP defines a "major stationary source" within an area designated as

nonattainment for ozone as "a stationary source which emits or has the potential to emit [VOM]

in an amount equal to or greater than … 25 tons per year in an area classified as severe

nonattainment for ozone."  35 Ill. Adm. Code 203.206(b).  In addition, "in areas that are

classified as serious, severe, or extreme nonattainment, the fugitive emissions of a stationary

source shall be included in determining whether it is a major stationary source."  35 Ill. Adm.

Code 203.206(d).

32.     The Illinois SIP defines "potential to emit" as:

the maximum capacity of a stationary source to emit a pollutant under its physical and operational design.  Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design only if the limitation or the effect it would have on emissions is federally enforceable.

35 Ill Adm. Code 203.128.

33.     The Illinois SIP provides that "[n]o person shall cause or allow the operation of a

new major stationary source or major modification subject to the requirements of Subpart C

(Requirements for Major Stationary Sources in Nonattainment Areas), except as in compliance

with applicable LAER provisions established pursuant to Section 203.301 for such source or

modification." 35 Ill. Adm. Code 203.601. LAER is defined as:

> the more stringent rate of emissions based on the following: (1) The most stringent
> emission limitation which is contained in the implementation plan of any state for such
> class or category of stationary source, unless it is demonstrated that such limitation is not
> achievable; or (2) The most stringent emission limitation which is achieved in practice by
> such a class or category of stationary source.

35 Ill. Adm. Code 203.301(a); *see* 42 U.S.C. § 7501(3).

34.     The Illinois SIP also requires that:

> The owner or operator of a new major source or major modification shall provide
> emission offsets equal to or greater than the allowable emissions from the source …
> sufficient to allow the Agency to determine that the source or modification will not
> interfere with reasonable further progress as set forth in Section 173 of the [CAA].

35 Ill. Adm. Code 203.302. In areas classified as in severe nonattainment for ozone, emission

offsets for VOM and NOx must be acquired at a ratio of 1.3 to 1. 35 Ill. Adm. Code

203.302(a)(1)(D).

35.     Emission offsets must be obtained before submitting a permit application, and the

emission offsets must be effective before the new source begins to operate. 35 Ill. Adm. Code

203.303(a). Further requirements for what constitutes an emission offset and how emissions

reductions are measured are provided for in the Illinois SIP at 35 Ill. Adm. Code 203.303.

36.     The Illinois SIP provides that:

> No person shall cause or allow the operation of a new major stationary source or major
> modification where the owner or operator has demonstrated that it would not interfere
> with reasonable further progress by providing emission offsets pursuant to Section
> 203.302 without maintaining those emission offsets or other equivalent offsets.

35 Ill. Adm. Code 203.602. In addition, for sources that provide emission offsets to a

nonattainment area, 35 Ill. Adm. Code 203.701 specifies that "[n]o person shall cease to maintain

emission offsets which were provided for a source or modification which is subject to this Part."

### ii.  Synthetic Minor Emission Limitation/Illinois SIP Construction Permit Program

37.     EPA approved 35 Ill. Adm. Code 201, "Permits and General Provisions," as part of the federally enforceable SIP for the State of Illinois.  37 Fed. Reg. 10,862 (May 31, 1972).

38.     The Illinois SIP at 35 Ill. Adm. Code 201.156 provides that the Illinois Environmental Protection Agency ("Illinois EPA") may impose such conditions in a construction permit as may be necessary to accomplish the purposes of, among other things, the provisions of Title 35 of the Illinois Administrative Code.

39.     When determining if a new facility qualifies as a major new source, potential to emit emission levels can be lowered through federally enforceable restrictions, such as permit conditions.  35 Ill. Adm. Code 203.128.  By accepting and satisfying such permit conditions, facilities otherwise subject to NNSR requirements can avoid them.  EPA refers to permits with limits intentionally established to avoid NNSR requirements as "synthetic minor" permits.

40.     The Illinois SIP provides that:

(a) No person shall cause or allow the operation of a source so as to exceed any enforceable limitation which affects or defines the applicability of the requirements of this Part to a stationary source or modification by specifying the permissible emission rate, operating hours, the type or amount of material processed, stored or combusted, or other aspects of source operation.

(b) At such time that a particular source or modification becomes a major stationary source or major modification solely by virtue of a relaxation in, or expiration of, any enforceable limitation which was established after August 7, 1980, on the capacity of the source or modification otherwise to emit a pollutant, such as a restriction on hours of operation, then the requirements of this Part shall apply as though construction had not yet commenced on the source or modification.

35 Ill. Adm. Code 203.210.

### iii.  Illinois Emissions Reduction Market System

41.     In 2001, EPA approved as a revision to the Illinois SIP, 35 Ill. Adm. Code 205, which consists of the regulations establishing the Illinois Emissions Reduction Market System ("ERMS") program, a cap-and-trade market system designed to reduce VOM emissions in the Chicago area. 66 Fed. Reg. 52,343 (Oct. 15, 2001). The ERMS program was revised in 2008, in response to the reclassification of the Chicago nonattainment area from severe to moderate, in order to maintain major source status of regional VOM sources. 73 Fed. Reg. 38,328 (July 7, 2008).

42.     For CAA nonattainment purposes, the "Chicago area" means the area composed of Cook, DuPage, Kane, Lake, McHenry, and Will Counties and Aux Sable Township and Goose Lake Township in Grundy County and Oswego Township in Kendall County. 35 Ill. Adm. Code 205.130.

43.     The ERMS program defines "New Participating Sources" as including any source not operating prior to May 1, 1999, located in the Chicago area, that: (1) emits or has the potential to emit 25 tons per year or more of VOM or is required to obtain a CAAPP permit; and (2) has or will have emissions during the May–September ozone season of at least 10 tons of VOM. 35 Ill. Adm. Code 205.210.

44.     Each New Participating Source must hold "Allotment Trading Units" ("ATUs"), as specified in Section 205.150(d). 35 Ill. Adm. Code 205.210(b). 35 Ill. Adm. Code 205.150(d) provides that:

> At the end of each reconciliation period, beginning with the reconciliation period immediately following the seasonal allotment period in which the source first becomes a new participating source … each new participating source shall: (1) … hold ATUs in an amount not less than 1.3 times its VOM emissions during the preceding seasonal allotment period; or (2) If the new participating source is not a new major source

pursuant to 35 Ill. Adm. Code 203, hold ATUs in an amount not less than its VOM emissions during the preceding seasonal allotment period ….

35 Ill. Adm. Code 205.150(d).

45. The owner or operator of a facility that will be a New Participating Source when it commences construction, and that is also a major new source under 35 Ill. Adm. Code 203 based on VOM emissions, shall submit to the Illinois EPA an ERMS application at the time a construction permit application is submitted or due for the source, whichever occurs first. 35 Ill. Adm. Code 205.310(a).

46. 35 Ill. Adm. Code 205.310(g) sets out the requirements for an ERMS application from a new participating source:

(1) A description of methods and practices that will be used to determine seasonal emissions for purposes of demonstrating compliance with this Part, in accordance with Sections 205.330 and 205.335 of this Subpart;

(2) A certification by the owner or operator recognizing that the source will be required to hold ATUs by the end of each reconciliation period in accordance with Section 205.150(d) of this Part for each seasonal allotment period in which it is operational; and

(3) If the source is a new major source subject to 35 Ill. Adm. Code 203, a plan explaining means by which it will obtain such ATUs for the first three seasonal allotment periods in which it is operational.

35 Ill. Adm. Code 205.310(g).

47. The ERMS program has reporting requirements that supplement sources' obligations under Illinois's Annual Emissions Reporting program. The additional ERMS reporting requirements, codified at 35 Ill. Adm. Code 205.300(b), include reporting of actual seasonal emissions of VOM from the source and a description of the methods and practices used to determine VOM emissions, including any supporting documentation and calculations.

13

48.     In the event of non-compliance, the ERMS program has provisions for emission excursion compensation.  35 Ill. Adm. Code 205.720 provides that Illinois EPA shall obtain emissions excursion compensation from any participating source or new participating source that does not hold ATUs in accordance with Section 205.150(c) or (d) by the conclusion of the reconciliation period.  To achieve this, the Illinois EPA shall issue an Excursion Compensation Notice to any such source when an apparent emissions excursion is identified by Illinois EPA. 35 Ill. Adm. Code 205.720(a).  The notice shall require the source to provide compensation in the following manner: (1) for the first seasonal allotment period in which an emissions excursion occurred, the new participating source shall purchase ATUs from the Alternative Compliance Market Account ("ACMA") in an amount equivalent to 1.2 times the emissions excursion; and (2) for the second consecutive seasonal allotment period in which an emissions excursion occurred, the source shall purchase ATUs from the ACMA in an amount equivalent to 1.5 times the emissions excursion; or (3) if the ACMA balance is not sufficient to cover the required amount, the Agency shall deduct the equivalent amount of ATUs from the source's next allotment.  35 Ill. Adm. Code 205.720(b).

49.     Nothing in 35 Ill. Admin. Code 205 limits the State's authority to seek penalties and injunctive relief for any violation of any applicable State law or regulation or any permit condition.  35 Ill. Adm. Code 205.740.  Further, Section 205.740 provides that nothing in Part 205 limits the right of the federal government or any person to directly enforce against actions or omissions that constitute violations of permits required by the CAA or applicable federal environmental laws and regulations.

### iv.    **Illinois Emissions Reporting Requirements**

50.     Section 182(a)(3)(B) of the CAA, 42 U.S.C. § 7511a(a)(3)(B), requires states to adopt emissions reporting requirements for owners or operators of each stationary source of NOx and VOCs, to be submitted at least every year (hereinafter, an "Annual Emission Report" or "AER").  The Illinois emission reporting requirements implementing this statutory provision are codified at 35 Ill. Adm. Code 254, and were approved by EPA as a revision to the Illinois SIP. 67 Fed. Reg. 34,614 (May 15, 2002).

51.      Subpart B of 35 Ill. Adm. Code 254, applies to:

> (1) Owners or operators of any source required to have an operating permit in accordance with 35 Ill. Adm. Code 201 that is permitted to emit 25 tons per year or more of any combination of regulated air pollutants, excluding greenhouse gases; (2) Owners or operators of any source required to have an operating permit in accordance with Section 39.5 of the [Illinois] Environmental Protection Act; and (3) Owners or operators of sources in ozone nonattainment areas that have a potential to emit 25 tons per year or more of either VOM or NOx from all emission units.

35 Ill. Adm. Code 254.102.

52.     The required contents of an AER for a large source are delineated at 35 Ill. Adm. Code 254.203, and include an obligation to submit information regarding actual VOM emissions from the source.

53.     As set forth in 35 Ill. Adm. Code 254.132(a), the failure to file a complete AER by the applicable deadlines shall be a violation of 35 Ill. Adm. Code 254 and 35 Ill. Adm. Code 201.302(a).  35 Ill. Adm. Code 254.132(a).  And, as set forth in 35 Ill. Adm. Code 254.132(b), the failure to file a complete Seasonal Emissions Report by the applicable deadlines shall be a violation of 35 Ill. Adm. Code 254 and 35 Ill. Adm. Code 205.300 (ERMS reporting requirements).  35 Ill. Adm. Code 254.132(b).  Further, the failure to receive the Source

Inventory Report from the Agency does not relieve an owner or operator from the obligation to file a complete AER. 35 Ill. Adm. Code 254.132(c).

## III. New Source Performance Standards

### A. General Provisions

54. Section 111(b)(1)(A) of the CAA, 42 U.S.C. § 7411(b)(1)(A), requires EPA to publish and periodically revise a list of categories of stationary sources including those categories that, in EPA's judgment, cause or contribute significantly to air pollution that may reasonably be anticipated to endanger public health or welfare.

55. Once a source category is included on the list, Section 111(b)(1)(B) of the CAA, 42 U.S.C. § 7411(b)(1)(B), requires EPA to promulgate a federal standard of performance for new sources within the category, also known as a New Source Performance Standard ("NSPS").

56. Section 111(e) of the CAA, 42 U.S.C. § 7411(e), prohibits an owner or operator of a "new source" from operating that source in violation of an NSPS after the effective date of the NSPS applicable to such source.

57. "Standard of performance" is defined as a standard for emissions of air pollutants that reflects the degree of emission limitation achievable through the application of the best system of emission reduction, which (taking into account the cost of achieving such reduction and any non-air quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated. 42 U.S.C. § 7411(a)(1).

58. "New source" is defined as any stationary source, the construction or modification of which is commenced after the publication of the NSPS regulations or proposed NSPS regulations applicable to such sources. 42 U.S.C. § 7411(a)(2).

16

59.    "Stationary source" is defined as a building, structure, facility, or installation which emits or may emit any air pollutant.  42 U.S.C. § 7411(a)(3).

60.    "Modification" means any physical change in, or change in the method of operation of, a stationary source that increases the amount of any air pollutant emitted by such source or which results in the emissions of any air pollutant not previously emitted.  42 U.S.C. § 7411(a)(4).

61.    "Owner or operator" is defined as any person who owns, leases, operates, controls, or supervises a stationary source.    42 U.S.C. § 7411(a)(5).

62.    The NSPS are located in Part 60 of Title 40 of the Code of Federal Regulations.

**B.    NSPS Part 60, Subpart A**

63.    Pursuant to Section 111(b)(1)(B) of the CAA, 42 U.S.C. § 7411(b)(1)(B), EPA promulgated regulations that contain general provisions applicable to all NSPS sources. 40 C.F.R. Part 60, Subpart A, §§ 60.1–60.19 ("Subpart A").

64.    Under Subpart A, the provisions of 40 C.F.R. Part 60 apply to "the owner or operator of any stationary source which contains an affected facility, the construction or modification of which is commenced after the publication [in Part 60] of any standard (or, if earlier, the date of publication of any proposed standard) applicable to that facility." 40 C.F.R. § 60.1.

65.    "Affected facility" is defined as "any apparatus to which a standard is applicable." 40 C.F.R. § 60.2.

**i.    NSPS Part 60, Supbart A: 40 C.F.R. § 60.7 (Notification and record keeping)**

66.    Within Subpart A, EPA promulgated specific regulations that require an owner or operator subject to Part A to "furnish the Administrator written notification … [including] a

notification of the actual date of initial startup of an affected facility postmarked within 15 days after such date." 40 C.F.R. § 60.7(a)(3).

### ii. NSPS Part 60, Subpart A: 40 C.F.R. § 60.8 (Performance Tests)

67. Within Subpart A, EPA promulgated specific regulations that require, and provide procedure for, the use of performance tests for affected facilities.

68. 40 C.F.R. § 60.8(a) provides that no "later than 180 days after initial startup of such facility … the owner or operator of such facility shall conduct performance test(s) and furnish the Administrator a written report of the results of such performance test(s)."

69. While 40 C.F.R. § 60.8 provides general requirements for the proper execution of performance tests, this section also requires adherence to the more specific provisions found in later subparts. 40 C.F.R. § 60.8(b).

### iii. NSPS Part 60, Subpart A: 40 C.F.R. § 60.18 (Requirements related to Flares Used as Control Devices)

70. Within Subpart A, EPA promulgated specific regulations that apply whenever flares are used as control devices. 40 C.F.R. §§ 60.18(b)–(f).

71. Of relevance to this Complaint are the following provisions: flares shall be operated with a flame present at all times, as determined by the methods specific under 40 C.F.R. § 60.18(f), *see* 40 C.F.R. § 60.18(c)(2); and that the presence of a flare pilot flame shall be monitored using a thermocouple or any other equivalent device to detect the presence of a flame, *see* 40 C.F.R. § 60.18(f)(2).

### C. NSPS Part 60, Subpart KKK

72. On June 24, 1985, EPA promulgated NSPS Subpart KKK ("Subpart KKK"*).* 50 Fed. Reg. 26,124.

73.     Subpart KKK, at 40 C.F.R. § 60.630(a)(1), states that the provisions of this subpart apply to affected facilities in onshore natural gas processing plants.

74.     The affected facilities subject to standards under Subpart KKK include compressors in VOC service or in wet gas service and the group of all equipment except compressors within a process unit. 40 C.F.R. § 60.630(a).

75.     Subpart KKK, at 40 C.F.R. § 60.630(b), states that any affected facility under paragraph (a) of this section that commences construction, reconstruction, or modification after January 20, 1984, and on or before August 23, 2011, is subject to the requirements of this subpart.

76.     Subpart KKK, at 40 C.F.R. § 60.631, defines "equipment" as "each pump, pressure relief device, open-ended valve or line, valve, compressor, and flange or other connector that is in VOC service, and any device or system required by this subpart."

77.     Subpart KKK, at 40 C.F.R. § 60.631, defines "field gas" as "feedstock gas entering the natural gas processing plant."

78.     Subpart KKK, at 40 C.F.R. § 60.631, defines "in light liquid service" to mean "the piece of equipment [that] contains a liquid that meets the conditions specified in § 60.485(e) or § 60.633(h)(2)."

79.     Subpart KKK, at 40 C.F.R. § 60.631, defines "natural gas liquids" as "the hydrocarbons, such as ethane, propane, butane, and pentane, that are extracted from field gas."

80.     Subpart KKK, at 40 C.F.R. § 60.631, defines "natural gas processing plant (gas plant)" as "any processing site engaged in the extraction of natural gas liquids from field gas, fractionation of mixed natural gas liquids to natural gas products, or both."

19

81.     Subpart KKK, at 40 C.F.R. § 60.631, defines "onshore" as "all facilities except those that are located in the territorial seas or on the outer continental shelf."

82.     Subpart KKK, at 40 C.F.R. § 60.631, defines "process unit" as "equipment assembled for the extraction of natural gas liquids from field gas, the fractionation of the liquids into natural gas products, or other operations associated with the processing of natural gas products."

83.     Subpart KKK, at 40 C.F.R. § 60.632, states that each owner or operator subject to the provisions of this subpart shall comply with the requirements of §§ 60.482-1(a), (b), and (d) and 60.482-2 through 60.482-10, except as provided in § 60.633, as soon as practicable, but no later than 180 days after initial startup.

84.     Subpart KKK, at 40 C.F.R. § 60.632(d), further provides that each owner or operator subject to the provisions of Subpart KKK shall comply with the test methods and procedures of § 60.485 under Subpart VV, including Method 21, and 40 C.F.R. § 60.485(c).

85.     Subpart KKK, at 40 C.F.R. § 60.633(g), provides that "[f]lares used [as a control device] shall comply with the requirements of § 60.18."

**D.     NSPS Part 60, Subpart VV**

86.     On October 18, 1983, EPA promulgated NSPS Subpart VV ("Subpart VV"). 48 Fed. Reg. 48,334.

87.     Subpart VV applies to affected facilities in the synthetic organic chemicals manufacturing industry ("SOCMI"). 40 C.F.R. § 60.480(a)(1).

88.     Subpart VV at 40.C.F.R. § 60.482-1(a), (b) and (d), §§ 60.482-2 through 60.482-10, and §§ 60.485, 60.486 and 60.487, with limited exceptions, apply to affected facilities in onshore natural gas processing plants. 40 C.F.R. §§ 60.630(a), 60.632(a), (d), and (e).

89.     Subpart VV, at 40 C.F.R. § 60.482-1, sets forth general standards for owners and operators subject to Subpart VV and, among other things, specifies at 40 C.F.R. § 60.482-1(b) that methods of compliance determination include review of records and reports, review of performance test results, and inspection using the methods and procedures specified in 40 C.F.R. § 60.485.

90.     Subpart VV, at 40 C.F.R. § 60.482-6, sets forth standards for open-ended valves or lines, including the requirement at § 60.482-6(a)(2) that a cap, blind flange, plug, or second valve shall seal the open end at all times except during operations requiring process fluid flow through the open-ended valve or line.

91.     Subpart VV, at 40 C.F.R. § 60.482-7, sets forth standards for valves in gas/vapor and in light liquid service, including the requirement at 40 C.F.R. § 60.482-7(a)(1) that each valve be monitored monthly to detect leaks by the methods specified in 40 C.F.R. § 60.485(b) and that each valve shall comply with 40 C.F.R. § 60.482-7(b)–(e). 40 C.F.R. § 60.482-7(a)(1).

92.     Subpart VV, at 40 C.F.R. § 60.482-7(f), provides that:

Any valve that is designated, as described in § 60.486(e)(2), for no detectable emissions, as indicated by an instrument reading of less than 500 ppm above background, is exempt from the requirements of paragraph (a) if the valve: (1) Has no external actuating mechanism in contact with the process fluid, (2) Is operated with emissions less than 500 ppm above background as determined by the method specified in § 60.485(c), and (3) Is tested for compliance with paragraph (f)(2) of this section initially upon designation, annually, and at other times requested by the Administrator.

40 C.F.R. § 60.482-7(f).

93.     Subpart VV, at 40 C.F.R. § 60.485(c), requires, among other things, that owners and operators determine compliance with the no detectable emission standards in § 60.482-7(f) using Method 21.  The NSPS Appendix A, at 40 C.F.R. Part 60, Method 21 §§ 8.3.1 and 8.3.1.1, sets forth the technique which must be used to determine if there is a leak from a valve.  The

NSPS Appendix A, at 40 C.F.R. Part 60, Method 21, §§ 8.1.1.1, 8.2, and 10.1, specify the calibration procedures for the instrument used to detect leaks.

94.     Subpart VV, at 40 C.F.R. § 60.482-7(c)(2), specifies that any valve that is required to be monitored quarterly that is found to be leaking must be monitored monthly until a leak is not detected for two successive months.

95.     Subpart VV, at 40 C.F.R. § 60.485(b), requires owners and operators to determine compliance with applicable standards using Method 21.

96.     Subpart VV, at 40 C.F.R. § 60.482-4(c), provides that monitoring requirements for pressure relief devices must be performed unless that pressure relief device "is routed to a process or fuel gas system or equipped with a closed vent system capable of capturing and transporting leakage through the pressure relief device to a control device as described in § 60.482-10."

97.     Subpart VV, at 40 C.F.R. § 60.482-10(d), provides for the use of flares as control devices and requires compliance with 40 C.F.R. § 60.18.

98.     Subpart VV, at 40 C.F.R. § 60.482-10(m), provides that closed vent systems and control devices used to comply with the provisions of this subpart shall be operated at all times when emissions may be vented to them.

     **E.**    **NSPS Part 60, Subpart NNN**

99.     On June 29, 1990, EPA promulgated NSPS Subpart NNN ("Subpart NNN") to address new, modified, or reconstructed SOCMI distillation units.  55 Fed. Reg. 26,942.

100.     Subpart NNN, at 40 C.F.R. § 60.660(a), states that this NSPS applies to each affected facility designated in paragraph (b) of this section that is part of a process unit that

produces any of the chemicals listed in 40 C.F.R. § 60.667 as a product, co-product, by- product, or intermediate, except as provided in paragraph (c).

101.     Subpart NNN, at 40 C.F.R. § 60.660(b), states the affected facility is any of the following for which construction, modification, or reconstruction commenced after December 30, 1983:

>   a.   Each distillation unit not discharging its vent stream into a recovery system.
>
>   b.   Each combination of a distillation unit and the recovery system into which its vent stream is discharged.
>
>   c.   Each combination of two or more distillation units and the common recovery system into which their vent streams are discharged.

102.     Subpart NNN, at 40 C.F.R. § 60.661, defines "Distillation operation" as:

an operation separating one or more feed stream(s) into two or more exit stream(s), each exit stream having component concentrations different from those in the feed stream(s). The separation is achieved by the redistribution of the components between the liquid and vapor-phase as they approach equilibrium within the distillation unit.

40 C.F.R. § 60.661.

103.     Subpart NNN, at 40 C.F.R. § 60.661, defines "Distillation unit" as "a device or vessel in which distillation operations occur, including all associated internals (such as trays or packing) and accessories (such as reboiler, condenser, vacuum pump, steam jet, etc.), plus any associated recovery system."

104.     Subpart NNN, at 40 C.F.R. § 60.662, requires that

Each owner or operator of any affected facility shall comply with paragraph (a), (b), or (c) of this section for each vent stream on and after the date on which the initial performance test … is completed, but not later than 60 days after achieving the maximum production rate at which the affected facility will be operated, or 180 days after the initial start-up, whichever date comes first. Each owner or operator shall either: (a) Reduce emissions of [Total Organic Compounds ("TOC")] (less methane and ethane) by 98 weight-percent, or to a TOC (less methane and ethane) concentration of 20 ppmv, on a

dry basis corrected to 3 percent oxygen, whichever is less stringent. If a boiler or process heater is used to comply with this paragraph, then the vent stream shall be introduced into the flame zone of the boiler or process heater; or (b) Combust the emissions in a flare that meets the requirements of § 60.18; or (c) Maintain a [Total Resources Effectiveness ("TRE")] index value greater than 1.0 without use of VOC emission control devices.

105.    Subpart NNN, at 40 C.F.R. § 60.663, sets forth the monitoring of emissions and operations for control devices including flares, boilers or process heaters, and condensers used as a final recovery device in a recovery system.  One requirement is the use of a flow indicator "that provides a record of vent stream flow to the flare at least once every hour." 40 C.F.R. § 60.663(b)(2).

106.    Subpart NNN, at 40 C.F.R. § 63.663(b)(1), requires subject owners or operators that rely upon a flare for compliance with Subpart NNN to install, calibrate, maintain, and operate according to manufacturer's specifications a heat sensing device, such as an ultra-violet beam sensor or thermocouple, at the pilot light to indicate the continuous presence of a flame.

107.    Subpart NNN, at 40 C.F.R. § 60.664, sets forth requirements for conducting an initial performance test to demonstrate compliance.

108.    Subpart NNN, at 40 C.F.R. § 60.665(a), states that each owner or operator subject to § 60.662 shall notify the Administrator of the specific provisions of 40 C.F.R. § 60.662 with which the owner or operator has elected to comply.  Notification shall be submitted with the notification of initial start-up required by 40 C.F.R. § 60.7(a)(3).

109.    Subpart NNN, at 40 C.F.R. § 60.665(b), requires that each owner or operator subject to the provisions of this subpart shall keep an up-to-date, readily accessible record of the certain data measured during each performance test, and also include the data in the report of the initial performance test required under 40 C.F.R. § 60.8.

F.  **NSPS Part 60, Subpart RRR**

110.  On August 31, 1993, EPA promulgated NSPS Subpart RRR ("Subpart RRR") to address new, modified, or reconstructed SOCMI reactor processes.  58 Fed. Reg. 45,962.

111.  Subpart RRR, at 40 C.F.R. § 60.700(a), provides that this NSPS applies to each affected facility designated in 40 C.F.R. § 60.700(b) that is part of a process unit that produces any of the chemicals listed in 40 C.F.R. § 60.707 as a product, co-product, by-product, or intermediate, except as provided in 40 C.F.R. § 60.700(c).

112.  Subpart RRR, at 40 C.F.R. § 60.700(b), provides that

The affected facility is any of the following for which construction, modification, or reconstruction commenced after June 29, 1990: (1) Each reactor process not discharging its vent stream into a recovery system. (2) Each combination of a reactor process and the recovery system into which its vent stream is discharged. (3) Each combination of two or more reactor processes and the common recovery system into which their vent streams are discharged.

40 C.F.R. § 60.700(b).

113.  Subpart RRR, at 40 C.F.R. § 60.701, defines "Reactor processes" as "unit operations in which one or more chemicals, or reactants other than air, are combined or decomposed in such a way that their molecular structures are altered and one or more new organic compounds are formed."

114.  Subpart RRR, at 40 C.F.R. § 60.702, requires that

Each owner or operator of any affected facility shall comply with paragraph (a), (b), or (c) of this section for each vent stream on and after the date on which the initial performance test … is completed, but not later than 60 days after achieving the maximum production rate at which the affected facility will be operated, or 180 days after the initial start-up, whichever date comes first. Each owner or operator shall either: (a) Reduce emissions of TOC (less methane and ethane) by 98 weight-percent, or to a TOC (less methane and ethane) concentration of 20 ppmv, on a dry basis corrected to 3 percent oxygen, whichever is less stringent. If a boiler or process heater is used to comply with this paragraph, then the vent stream shall be introduced into the flame zone of the boiler or process heater; or (b) Combust the emissions in a flare that meets the requirements of

25

§ 60.18; or (c) Maintain a TRE index value greater than 1.0 without use of VOC emission control device.

40 C.F.R. § 60.702.

115. Subpart RRR, at 40 C.F.R. § 60.703, sets forth the monitoring of emissions and operations for control devices including flares, incinerators, boilers or process heaters, and condensers used as a final recovery device in a recovery system. Under 40 C.F.R. § 60.703(a), a subject owner or operator that is using an incinerator to comply with Subpart RRR is required to install, calibrate, maintain, and operate, according to manufacturer's specifications, a temperature monitoring device equipped with a continuous recorder that meets certain accuracy specifications and a flow indicator that provides a record of vent stream flow diverted from being routed to the incinerator that meets certain specifications.

116. Subpart RRR, at 40 C.F.R. § 60.703(b)(1), provides that a subject owner or operator that uses a flare to seek to comply with § 60.702(b) shall install, calibrate, maintain, and operate according to manufacturer's specifications a heat sensing device, such as an ultraviolet beam sensor or thermocouple, at the pilot light to indicate the continuous presence of a flame.

117. Subpart RRR, at 40 C.F.R. § 60.704, sets forth requirements for conducting an initial performance test to demonstrate compliance.

118. Subpart RRR, at 40 C.F.R. § 60.705(a), states that each owner or operator subject to § 60.702 shall notify the Administrator of the specific provisions of 40 C.F.R. § 60.702 with which the owner or operator has elected to comply. Notification shall be submitted with the notification of initial start-up required by 40 C.F.R. § 60.7(a)(3).

119. Subpart RRR, at 40 C.F.R. § 60.705(b), states that each owner or operator subject to the provisions of this subpart shall keep an up-to-date, readily accessible record of the following data measured during each performance test, and also include certain data in the report

26

of the initial performance test required under 40 C.F.R. § 60.8.  When demonstrating compliance

with 40 C.F.R. § 702(a) through the use of either a thermal or catalytic incinerator, the owner or

operator must keep a record of: (i) The average firebox temperature of the incinerator (or the

average temperature upstream and downstream of the catalyst bed for a catalytic incinerator),

measured at least every 15 minutes and averaged over the same time period of the performance

testing; and (ii) The percent reduction of TOC determined as specified in § 60.704(b) achieved

by the incinerator, or the concentration of TOC (ppmv, by compound) determined as specified

in § 60.704(b) at the outlet of the control device on a dry basis corrected to 3 percent oxygen.

40 C.F.R. § 60.705(b)(1).

120.     Subpart RRR, at 40 C.F.R. § 60.705(c), provides that each subject owner or

operator shall keep up-to-date, readily accessible continuous records of the equipment operating

parameters specified to be monitored under § 60.703(a) and (c) as well as up-to-date, readily

accessible records of periods of operation during which the parameter boundaries established

during the most recent performance test are exceeded.  Where a thermal incinerator is used to

comply with § 60.702(a), periods of operation during which parameter boundaries established

during the most recent performance test are exceeded are defined as all 3-hour periods of

operation during which the average combustion temperature was more than 28° C (50° F) below

the average combustion temperature during the most recent performance test at which

compliance with § 60.702(a) was determined.

121.     Subpart RRR, at 40 C.F.R. § 60.705(d), provides that each subject owner or

operator shall keep records of the flow indication specified under § 60.703, as well as up-to-date,

readily accessible records of all periods and the duration when the vent stream is diverted from

the control devices.

122.     Subpart RRR, at 40 C.F.R. § 705(e), provides that each subject owner or operator shall keep up-to-date, readily accessible continuous records of the flare pilot flame monitoring specified under § 60.703(b), as well as up-to-date, readily accessible records of all periods of operations in which the pilot flame is absent.

**G.     NSPS Part 60, Subpart Kb**

123.     On April 8, 1987, EPA promulgated NSPS Subpart Kb ("Subpart Kb") to address Volatile Organic Liquid ("VOL") storage vessels (including petroleum liquid storage vessels) for which construction, reconstruction, or modification commenced after July 23, 1984.  52 Fed. Reg. 11,429.

124.     Subpart Kb, at 40 C.F.R. § 60.110b(a), applies to each storage vessel with a capacity greater than or equal to 75 cubic meters that is used to store VOL for which construction, reconstruction, or modification is commenced after July 23, 1984.  40 C.F.R. § 60.110b(a).

125.     Subpart Kb, at 40 C.F.R. § 60.112b(a), provides certain control requirement options to comply with the NSPS that are applicable to a storage vessel either with a design capacity great than or equal to 151 cubic meters ($m^3$) containing a VOL that, as stored, has a maximum true vapor pressure equal to or great than 5.2 kilopascals (kPa) but less than 76.6 kPa or with a design capacity greater than or equal to 75 $m^3$ but less 151$m^3$ containing a VOL that, as stored, has a maximum true vapor pressure equal to or great than 27.6 kPa but less than 76.6 kPa.

126.     Subpart Kb, at 40 C.F.R. § 60.112b(a)(3), provides that one option to satisfy the control requirement is the use of a "closed vent system and control device" meeting the following specifications:

The closed vent system shall be designed to collect all VOC vapors and gases discharged from the storage vessel and operated with no detectable emissions as indicated by an

28

instrument reading of less than 500 ppm above background and visual inspections, as determined in Part 60, Subpart VV, 40 C.F.R. § 60.485(b). (ii) The control device shall be designed and operated to reduce inlet VOC emissions by 95 percent or greater. If a flare is used as the control device, it shall meet the specifications described in the general control device requirements (40 C.F.R. § 60.18) of the General Provisions.

## IV.    Title V

127.    Title V of the Clean Air Act, 42 U.S.C. §§ 7661–7661f, establishes an operating permit program for certain sources, including major sources, sources subject to the NSPS program at Section 111 of the CAA, or any source required to have a NNSR Permit. 42 U.S.C. § 7661a(a).  The purpose of Title V is to ensure that all "applicable requirements" that a source is subject to under the CAA, including SIP requirements, are collected in one permit.  42 U.S.C. § 7661c(a).

128.    Pursuant to Section 502(b) of the CAA, 42 U.S.C. § 7661a(b), EPA promulgated regulations implementing the requirements of Title V and establishing the minimum elements of a Title V permit program to be administered by any state or local air pollution control agency. 57 Fed. Reg. 32,250 (July 21, 1992).  These regulations are codified at 40 C.F.R. Part 70.

129.    EPA granted final full approval to the Illinois Title V operating permit program on December 4, 2001.  66 Fed. Reg. 62946.  The program became effective on November 30, 2001.  40 C.F.R. Part 70, Appendix A.  The Title V permits that Illinois EPA issues under its program are also known as CAAPP permits.

130.    Section 502(a) of the CAA, 42 U.S.C. § 7661a(a), the implementing regulations at 40 C.F.R § 70.7(b), and the CAAPP program and regulations of Illinois provide that, after the effective date of the state Title V permit program, no person may violate any requirement of a Title V permit or operate a source subject to a Title V permit except in compliance with a Title V permit.

29

131.     Under the federal Title V program and regulations, and CAAPP, any applicant who fails to submit any relevant facts or who has submitted incorrect information in a permit application must, upon becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts or corrected information.  40 C.F.R. § 70.5(b); 35 Ill. Adm. Code 201.208.

132.     All terms and conditions of a Title V permit are federally enforceable.  42 U.S.C. § 7413(b); 40 C.F.R. § 70.6(b).

## V.     Enforcement of the CAA

133.     Sections 113(a)(1) and (a)(3) of the CAA, 42 U.S.C. §§ 7413(a)(1) and (a)(3), authorize EPA to bring a civil action under Section 113(b) if EPA finds that any person is in violation of any requirement or prohibition of a SIP, NNSR permit programs, an NNSR permit, the NSPS program, the Title V permit program, or a Title V permit.

134.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes the Court to enjoin a violation, to require compliance, to assess and recover a civil penalty, and to award any other appropriate relief for each violation.

135.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes civil penalties of up to $25,000 per day for each violation of the CAA.  The Civil Penalties Inflation Act of 1990, 28 U.S.C. § 2461 *et seq.*, as amended by the Debt Collection Improvements Act of 1996, 31 U.S.C. § 3701 *et seq.*, requires EPA to periodically adjust its civil penalties for inflation.  On December 31, 1996, February 13, 2004, December 11, 2008, January 12, 2017, and January 10, 2018, EPA adopted and revised regulations entitled "Adjustment of Civil Monetary Penalties for Inflation," 40 C.F.R. Part 19, to upwardly adjust the maximum civil penalty under the CAA.  For each violation that occurs between January 31, 1997, and March 15, 2004, inclusive, penalties of up to

30

$27,500 per day may be assessed; for each violation that occurs between March 16, 2004, and January 12, 2009, inclusive, penalties of up to $32,500 per day may be assessed; for each violation that occurs between January 13, 2009 and November 2, 2015, penalties of up to $37,500 per day may be assessed; and for each violation that occurs after November 2, 2015, where penalties are assessed on or after January 15, 2018, penalties of up to $97,229 per day per each violation may be assessed. 61 Fed. Reg. 69,360 (Dec. 31, 1996); 69 Fed. Reg. 7,121 (Feb. 13, 2004); 73 Fed. Reg. 75,340 (Dec. 11, 2008); 82 Fed. Reg. 3,633 (Jan. 12, 2017); 83 Fed. Reg. 1,190 (Jan. 10, 2018).

## GENERAL ALLEGATIONS

136.     Aux Sable is the "owner or operator" of the Facility within the meaning of the CAA and applicable Illinois regulations.

137.     At the Facility, Aux Sable processes field gas from production wells to extract and produce methane, natural gas liquids ("NGLs"), and chemicals derived from NGLs for sale. Aux Sable fractionates the NGLs to ethane, propane, and butanes.

138.     The Facility is the largest natural gas processing plant in terms of production capacity in the United States.

139.     The Facility operates two processing trains in parallel with a rated capacity of 1 billion cubic feet per day for each train. Each train consists of a 5-bed dehydration system.  The exiting stream from the dehydration system goes through the following in series: de-methanizer; de-ethanizer; de-propanizer; and a debutanizer, also known as the isomerization unit.

140.     Aux Sable operates both a High Pressure Flare and a Low Pressure Flare as emissions control devices at the Facility.

31

141.    The Facility is a "major emitting facility," a "source," a "stationary source," a "major stationary source," a "major source," and a "new participating source" within the meaning of the CAA, applicable New Source Review permit programs and regulations (including the NNSR, ERMS, and AER programs), the NSPS program and regulations, the Title V program and regulations, and the Illinois SIP that adopts, incorporates, and/or implements these programs and regulations.

142.    On June 1, 1999, Illinois EPA issued Construction Permit No. 98080090 to Aux Sable for the Facility (the "1999 Permit"). The 1999 Permit provides, at Condition 21, that no more than 10.2 tons per year of VOM fugitive emissions shall be emitted from the Facility applicable to "Fugitive VOM Emissions from Individual Fittings." The 10.2 tons-per-year limitation was established pursuant to 35 Ill. Adm. Code 203 to create a federally enforceable limitation to the Facility's potential to emit to avoid NNSR requirements. Operations at the Facility began in December 2000.

143.    Illinois EPA issued a Title V/CAAPP permit to Aux Sable on August 28, 2002 (Permit No. 0112007) (the "2002 CAAPP Permit"). The 2002 CAAPP Permit was revised and reissued on May 16, 2006. The CAAPP Permit includes the following conditions relevant to this Complaint:

- Condition 7.11.6: incorporating the fugitive emission limit from individual fittings at 10.2 tons of VOM per year as established in the 1999 Permit;

- Conditions 7.5.7 and 7.12.5: incorporating applicable NSPS flare requirements within 40 C.F.R. § 60.18 to both High and Low Pressure Flares;

- Condition 7.11.5.q: requiring the use of valves that are designated for and operated with "no detectable emissions" as provided for in 40 C.F.R. § 60.482-7(f);

- Condition 7.11.5.1: incorporating the standards for open-ended valves or lines under 40 C.F.R. § 60.482-6; and

- Condition 7.11.7: incorporating the Method 21 monitoring provisions under 40 C.F.R. § 60.485(c).

144.    In 2016, Illinois EPA issued to Aux Sable a renewed and revised Title V/CAAPP Permit (No. 0112007, issued Dec. 27, 2016, and revised on Nov. 20, 2017) (the "2016 CAAPP Permit").  The 2016 CAAPP Permit states, as Condition 4.9.2.a.i.G., that pursuant to the 1999 Permit, VOM emissions from individual fittings associated with the project permitted by the 1999 Permit shall not exceed 60 pounds per day and 10.2 tons per year.

145.    On September 9 through 11, 2013, EPA conducted a Method 21 leak detection monitoring inspection at the Facility that revealed violations of Subpart KKK (and, by reference, certain provisions of Subpart VV), and provisions of Aux Sable's CAAPP Permit.  Present during the inspection was EMS, Inc., the consulting company that Aux Sable employed to run the LDAR program at the Facility, and Aux Sable staff, who could confirm any leaks found by EPA during the inspection.  EPA identified a number of violations during the inspection and from a subsequent review of records provided by Aux Sable during the inspection.  These violations were cited in a September 4, 2014, Finding of Violation that EPA issued to Aux Sable. *See* Attachment 1.

146.    Ongoing investigative activities since issuance of EPA's 2014 Finding of Violation uncovered additional CAA violations detailed in two subsequent violation notices issued by EPA in 2015 and 2016.  *See* Attachment 1.  Those EPA notices identify violations of NNSR, SIP, 1999 Permit, 2002 CAAPP Permit, and NSPS requirements.

### FIRST CLAIM FOR RELIEF
(Violation of the NNSR Provisions of Part D of the CAA
and 35 Ill. Adm. Code 203 under the Illinois SIP)

147.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 146 as if fully set forth herein.

148.     Aux Sable's synthetic minor limitation within its 1999 Permit established a limit of 10.2 tons per year of VOM fugitive emissions.  The Facility's 1999 Permit also imposed a synthetic minor limit on non-fugitive VOM emissions at 12 tons per year, making the total allowable emissions from the Facility less than the NNSR applicability threshold of 25 tons per year of VOM.

149.     The calculations submitted by Aux Sable to qualify for a synthetic minor limitation were based on significant errors, leading to a substantial underestimation of VOM emissions at the Facility.  These errors include undercounting the number of valves and leak-prone components to be used at the Facility, and using an incorrect control-efficiency factor for the valves and components.  Aux Sable's revised calculations show the Facility's VOM fugitive emissions to be approximately 40.5 tons per year, nearly four times the limit found in Condition 21 of the Facility's 1999 Permit.  Based on the revised calculation, the Facility could not have qualified for synthetic minor status when it was constructed in 2000.

150.     Based on the revised VOM fugitive emission estimate, the Facility—as originally constructed—emitted, or had the potential to emit, VOM in an amount equal to or greater than 25 tons per year.  Thus, as of the date of its construction, the Facility was a new major stationary source subject to applicable LAER and emission offset requirements under 35 Ill. Adm. Code 203.

151.     Aux Sable, at its Facility, has not complied with LAER requirements, has not secured offsets, and has never applied for a NNSR permit as required by 35 Ill. Adm. Code 203.

152.     Aux Sable has violated and/or continues to violate the NNSR Provisions of Part D of Title I of the CAA, 42 U.S.C. §§ 7501–7515, and the Implementing Regulations of 35 Ill.

Adm. Code 203 under the Illinois SIP, including the requirements to comply with LAER and securing emission offsets under 35 Ill. Adm. Code 203.

## SECOND CLAIM FOR RELIEF

(Violation of the Permit Limit for VOC fugitive emissions under 35 Ill. Adm. Code 203.210)

153.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 146 as if fully set forth herein.

154.    Based on Aux Sable's revised fugitive VOM emissions estimate, Aux Sable has also violated, since startup of the natural gas processing plant in the year 2000, Condition 21 of its 1999 Permit limiting its VOM fugitive emissions to 10.2 tons per year.

155.    By violating the VOM fugitive emissions limit within Condition 21 of the 1999 Permit, Aux Sable has violated and continues to violate the Illinois SIP at 35 Ill. Adm. Code 203.210(a).

## THIRD CLAIM FOR RELIEF

(Violation of Title V/CAAPP Permit Conditions for VOC Fugitive Emissions)

156.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 146 as if fully set forth herein.

157.    Both the Facility's original CAAPP Permit (issued in 2002) and its revised CAAPP Permit (reissued in 2006) incorporate the fugitive VOM emissions limit established in the 1999 Permit as 10.2 tons per year at Condition 7.11.6.  The 2002 CAAPP Permit states that this limitation was established in the 1999 Permit pursuant to 35 Ill. Adm. Code 203 and this limit ensures that the construction addressed in the aforementioned permit does not constitute a new major source pursuant to Title I of the CAA and the Illinois SIP, specifically 35 Ill. Adm. Code 203.

158. In the 2016 CAAPP Permit, (issued Dec. 27, 2016, and revised on Nov. 20, 2017), Condition 4.9.2.a.i.G., requires that pursuant to the 1999 Permit, VOM emissions from individual fittings associated with the project permitted by the 1999 Permit shall not exceed 60 pounds per day and 10.2 tons per year.

159. Based on the revised fugitive VOM emissions calculations, Aux Sable has been emitting approximately 40.5 tons of VOM from the Facility on an annual basis since the startup of the natural gas processing plant in the year 2000—thus violating Condition 7.11.6 of its CAAPP Permit since the permit's issuance in August 2002 and Condition 4.9.2.a.i.G. of its reissued and revised 2016 CAAPP Permit since the permit's issuance in December 2016.

160. By violating Condition 7.11.6 of the Facility's 2002 CAAPP Permit and Condition 4.9.2.a.i.G. of its current, 2016 CAAPP Permit, Aux Sable has violated and continues to violate Section 502(a) of the CAA, 42 U.S.C. § 7661a(a).

## FOURTH CLAIM FOR RELIEF
(Violation of NSPS for VOC Emissions from SOCMI Distillation Operations,
40 C.F.R. Part 60, Subpart NNN)

161. Plaintiff realleges and incorporates by reference Paragraphs 1 through 146 as if fully set forth herein.

162. At the Facility, Aux Sable produces chemicals that make it subject to 40 C.F.R. Part 60, Subpart NNN. Since start-up in 2000, Aux Sable has produced propane and n-butane, each listed in 40 C.F.R. § 60.667 as a product, co-product, by-product, and intermediate in Unit 03, the Gas Treatment Units process. Since April 2007, Aux Sable has produced n-butane, butanes, mixed and/or isobutene, all listed in 40 C.F.R. § 60.667 as a product, co-product, by-product, or intermediate in Unit 12, the Butamer process unit.

163.    Aux Sable has affected facilities that were subject to Subpart NNN when the Facility started up in 2000, then added additional affected facilities in 2007 with the instillation of Unit 12, the Butamer process unit.  In total, Aux Sable operates six distillation units subject to Subpart NNN at the Facility: (1) deethanizer distillation unit and recovery system (construction May 1999, startup December 2000); (2) depropanizer distillation unit and recovery system (construction May 1999, startup December 2000); (3) debutanizer distillation unit and recovery system (construction May 1999, startup December 2000); (4) butane splitter distillation unit and recovery system (construction May 1999, startup December 2000); (5) V645 stabilizer distillation unit (construction July 2005, startup April 2007); and (6) the V650 deisobutanizer distillation unit and recovery system (construction July 2005, startup April 2007).  These six affected facilities are collectively referred to hereinafter as the "Subpart NNN Units."

164.    Aux Sable did not timely submit notification of compliance status and election of control option under Subpart NNN, as required by 40 C.F.R. §§ 60.7 and 60.665(a), until June 2015.

165.    Aux Sable submitted an initial notification to EPA and Illinois EPA in June 2015, which identified the use of a flare as the compliance option election, pursuant to 40 C.F.R. § 60.662(b), for the Subpart NNN Units.

166.    While using a flare as a control device, Aux Sable failed to timely conduct a performance test for each flare relied upon to control emissions from the Subpart NNN Units as required by 40 C.F.R. §§ 60.8, 60.662, and 60.664(d) and (e).

167.    Aux Sable also failed to timely comply with Subpart NNN's flow indicator flare monitoring requirements at 40 C.F.R. § 60.663(b)(2) for both of the Facility's flares until 2016.

168.     By violating the provisions of Subpart NNN related to performance testing, flare monitoring, and reporting, Aux Sable has violated and/or continues to violate Section 111(e) of the CAA, 42 U.S.C. § 7411(e),

**FIFTH CLAIM FOR RELIEF**
(Violation of NSPS for VOC Emissions from SOCMI Reactor Processes,
40 C.F.R. Part 60, Subpart RRR)

169.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 146 as if fully set forth herein.

170.     At the Facility, Aux Sable produces chemicals that make it subject to 40 C.F.R. Part 60, Subpart RRR.  Since August 1999, Aux Sable produces propane and n-butane, each listed in 40 C.F.R. § 60.707, as a product, co-product, by-product, and intermediate in Unit 03, the Gas Treatment Units process.  Since April 2007, Aux Sable produces n-butane and butanes (mixed and/or isobutene), all listed in 40 C.F.R. § 60.707, as a product, co-product, by-product, or intermediate in Unit 12, the Butamer process unit.

171.     Aux Sable has affected facilities that were subject to Subpart RRR when the Facility started up in 2000, then added additional affected facilities in 2007 with the instillation of Unit 12, the Butamer process Unit.  Aux Sable operates three reactor processes subject to Subpart RRR at the Facility:  (1) the COS reactor (construction May 1999, startup December 2000); (2) the V643/V644 catalytic reactors (construction July 2005, startup April 2007); and (3) the Propane extractor and Merox system, mixed butanes extractor and Merox system, pentane extractor and Merox system and common recovery system (construction May 1999, startup December 2000).

172.    Aux Sable did not timely submit notification of compliance status and election of control options under Subpart RRR, as required by 40 C.F.R. §§ 60.7 and 60.665(a), until June 2015.

173.    Aux Sable submitted an initial notification to EPA and Illinois EPA in June 2015, which identifies the use of a flare as the compliance option election, pursuant to 40 C.F.R. § 60.702(b), for the COS reactor and the V643.V644 catalytic reactors.  The 2015 notification also identifies Aux Sable's election to use an off-gas incinerator to meet the 98 weight-percent emissions reduction requirement, as provided at 40 C.F.R. § 60.702(a), for the Propane extractor and Merox system, mixed butanes extractor and Merox system, pentane extractor and Merox system and common recovery system.

174.    While using flares as a control device, Aux Sable failed to timely conduct a performance test of such flares, as required by 40 C.F.R. §§ 60.8 and 60.704.  Through this violation, and by not notifying Illinois EPA of its intention to use both flare and incinerator as control devices for the affected facilities at their initial startup, Aux Sable failed to comply with reporting and recordkeeping requirements under 40 C.F.R. § 60.705.

175.    As noted above, the Merox reactor system uses an off-gas incinerator to meet the emission reduction requirement under 40 C.F.R. § 60.702(a).  As such, Aux Sable should have conducted an incinerator performance test no later than 180 days after triggering applicability of Subpart RRR under 40 C.F.R. § 60.8.  Aux Sable failed to timely conduct a performance test on the Merox off-gas incinerator until 2017, in violation of 40 C.F.R. §§ 60.8 and 60.704.

176.    By not timely conducting a performance test, Aux Sable failed to timely set and maintain a minimum operating temperature boundary for its incinerator as required by 40 C.F.R.

§ 60.705(b)(1), and failed to timely comply with incinerator operating and inlet flow monitoring recordkeeping requirements of 40 C.F.R. §§ 60.705(c) and (d).

177.     By violating the provisions of Subpart RRR related to performance testing, monitoring recordkeeping, and reporting, Aux Sable has violated and/or continues to violate Section 111(e) of the CAA, 42 U.S.C. § 7411(e).

**SIXTH CLAIM FOR RELIEF**
(Violation of Requirements to Monitor the Presence of a Flare Pilot Flame
under the Title V/CAAPP Permit and NSPS, 40 C.F.R. Part 60,
Subparts Kb, KKK, NNN, and RRR)

178.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 146 as if fully set forth herein.

179.     Aux Sable relies on both the High Pressure Flare and Low Pressure Flare to control emissions from the affected facilities subject to Subpart NNN and Subpart RRR, as described in Paragraphs 165 and 173, above.

180.     The High Pressure Flare at the Facility is relied on to control emissions from pressure relief devices associated with the Butamer process to meet the control requirements of Subpart KKK.  The Low Pressure Flare is used to meet control requirements under Subpart Kb, applicable to Unit 05 (the V-704 Condensate (C5+) Liquid Storage Tank) at the Facility.

181.     The NSPS flare requirements of 40 C.F.R. § 60.18 are incorporated into Aux Sable's 2002 CAAPP Permit at Conditions 7.12.5 (for the High Pressure Flare) and 7.5.7 (for the Low Pressure Flare).

182.     In its 2015 CAAPP Annual Compliance Certification, Aux Sable indicated that it had malfunctioning thermocouples in both the High Pressure Flare and Low Pressure Flare for the entirety of 2014.  Thus, Aux Sable has failed to meet the requirement to monitor the presence of a flare pilot flame through a thermocouple or equivalent device as required under 40 C.F.R.

40

§ 60.18 and Aux Sable's CAAPP Permit. By reference, this is also a violation of NSPS Subparts Kb (40 C.F.R. § 60.112b), KKK (40 C.F.R. § 60.633(g)), VV (40 C.F.R. § 60.482-10(d)), NNN (40 C.F.R. § 60.663), and RRR (40 C.F.R. § 60.703).

183.    By violating the provisions of NSPS Subparts A, Kb, KKK, VV, NNN, and RRR related to flare pilot flame monitoring, Aux Sable has violated Section 111(e) of the CAA, 42 U.S.C. § 7411(e).

184.    By violating the conditions of its 2002 CAAPP Permit related to flare pilot flame monitoring, Aux Sable has violated Section 502(a) of the CAA, 42 U.S.C. § 7661a(a).

## SEVENTH CLAIM FOR RELIEF
(Violation of the Emissions Reduction Market System Requirements
under the Illinois SIP at 35 Ill. Adm. Code 205)

185.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 146 as if fully set forth herein.

186.    The Facility operates in the "Chicago area" as defined under 35 Ill. Adm. Code 205.

187.    Since startup, the Facility has had the potential to emit 25 tons or more of VOM per year and has emitted more than 10 tons of seasonal VOM emissions. Thus, the Facility is a "new participating source" subject to ATU requirements under 35 Ill. Adm. Code 205.

188.    Under 35 Ill. Adm. Code 205, Aux Sable was required to obtain ATUs beginning in 2001.

189.    Aux Sable did not purchase any ATUs or otherwise comply with the requirements of the ERMS program until 2013, when it began to purchase ATUs. The ATUs acquired in 2013 and 2014 were insufficient to cover the actual fugitive emissions potential for the original plant configuration.

41

190.     Aux Sable is subject to the emission excursion compensation requirements of the ERMS program for the period of deficiency and non-compliance between 2001 and 2014.

191.     By failing to participate in the ERMS program until 2013, and then failing to obtain sufficient ATUs in 2013 and 2014, Aux Sable has violated the ERMS program requirements under 35 Ill. Adm. Code 205 of the Illinois SIP.

## EIGHTH CLAIM FOR RELIEF
(Violation of the Illinois Annual Emissions Reporting Program
under the Illinois SIP at 35 Ill. Adm. Code 254)

192.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 146 as if fully set forth herein.

193.     While Aux Sable has submitted AER reports to Illinois EPA, these reports were based on the incorrect VOM fugitive emissions assumptions contained in the 1999 Permit.  The reports submitted by Aux Sable to Illinois EPA therefore were incomplete and did not reflect the actual emissions from the Facility, thus violating 35 Ill. Adm. Code 254.132 and 254.203 of the Illinois SIP.

194.     Under the reporting requirements of 35 Ill. Adm. Code 254.132, Aux Sable's failure to file a complete Seasonal Emissions Report, as required by the ERMS program, is a violation of 35 Ill. Adm. Code 205.300 of the Illinois SIP.

## NINTH CLAIM FOR RELIEF
(Violation of LDAR Requirements Established Under CAA Sections 111 and 502(a),
42 U.S.C. §§ 7411 and 7661a; 40 C.F.R. Part 60, Subpart KKK; by reference, certain provisions
of 40 C.F.R. Part 60, Subpart VV, and 40 C.F.R. Part 60, Appendix A-7,
Method 21; and Title V/CAAPP Permit Conditions)

195.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 146 as if fully set forth herein.

196. For regulatory purposes, 40 C.F.R. Part 60, Subpart KKK applies to the following units (within the Facility) with the estimated light liquid and/or gas vapor valve counts (as of September 2013): (1) 200 unit: train 1 and 2 (1,100 valves); (2) 300 unit: de-ethanizer (1,099 valves); (3) 600 unit: fractionation (4,364 valves); and (4) 700 unit: product storage (3,139 valves).

197. The valves identified by EPA as having leaks over 500 ppm above background during the September 2013 inspection, and the valves reported by Aux Sable with leaks over 500 above background, as identified in the Table 1, below, are violations of the no detectable emission standard under 40 C.F.R. § 60.632(a) (and by reference 40 C.F.R. § 60.482-7(f)(2)) and Aux Sable's CAAPP Permit at Condition 7.11.5.q.ii.

| Table 1. No Detectable Emission Leaks | Unit 200 | Unit 300 | Unit 600 | Unit 700 |
|---|---|---|---|---|
| November 19, 2010 Semi Annual Report (May 2010—Oct. 2010) | 72 leaks | 16 leaks | 100 leaks | 59 leaks |
| May 19, 2011 Semi Annual Report (Nov. 2010—Apr. 2011) | 76 leaks | 38 leaks | 176 leaks | 102 leaks |
| November 30, 2011 Semi Annual Report (May 2011—Oct. 2011) | 44 leaks | 56 leaks | 97 leaks | 123 leaks |
| May 30, 2012 Semi Annual Report (Nov. 2011—Apr. 2012) | 36 leaks | 40 leaks | 82 leaks | 63 leaks |
| November 30, 2012 Semi Annual Report (May 2012—Oct. 2012) | 47 leaks | 101 leaks | 94 leaks | 26 leaks |
| May 10, 2013 Semi Annual Report (Nov. 2012—Apr. 2013) | 8 leaks | 19 leaks | 20 leaks | 17 leaks |

198. Aux Sable failed to seal an open-ended valve, as demonstrated by a reading of at least 10,000 ppm VOC at component 6572 during the September 2013 inspection. The component, if sealed, would have a monitor reading of zero. This constitutes a violation of Subpart KKK, at 40 C.F.R. § 60.632(a) (and by reference § 60.482-6(a)(2)) and Aux Sable's 2002 CAAPP Permit at Condition 7.11.5.1.

43

199.    During two years of quarterly monitoring (2011–2013), Aux Sable reported an average leak rate of 0.84 percent.  Specifically, the following quarterly leak rates were reported by Aux Sable in the 600 process unit: 3rd Quarter 2011—1.51% (61 leaks); 4th Quarter 2011—0.91% (37 leaks); 1st Quarter 2012—1.01% (41 leaks); 2nd Quarter 2012—2.10% (85 leaks); 3rd Quarter 2012—0.35% (14 leaks); 4th Quarter 2012—0.25% (10 leaks); 1st Quarter 2013—0.25% (10 leaks); 2nd Quarter 2013—0.34% (12 leaks).

200.    On September 9–11, 2013, EPA found 27 valve leaks out of 898 valves monitored in the 600 process unit, resulting in a leak rate of 3.01%. The discrepancy in leak rates identified by EPA and Aux Sable reflects a failure by Aux Sable to use Method 21 properly on valves in the 600 process unit.

201.    Between 2011 and 2013, Aux Sable failed to perform Method 21 properly, in violation of 40 C.F.R. § 60.632(d) (by reference, 40 C.F.R. 60.485(c) and 40 C.F.R. Part 60, Appendix A-7, Method 21) and Aux Sable's 2002 CAAPP Permit at Condition 7.11.7.

202.    The September 2013 inspection found that insulated valves observed by the EPA inspectors at the Facility did not have direct access points for LDAR monitoring, meaning that Aux Sable failed to perform Method 21 properly, in violation of 40 C.F.R. § 60.632(d) (by reference, 40 C.F.R. 60.485(c) and 40 C.F.R. Part 60, Appendix A-7, Method 21 §§ 8.3.1 and 8.3.1.1) and Aux Sable's 2002 CAAPP permit at Condition 7.11.7.

203.    By violating the provisions of NSPS Subparts KKK and VV related to no detectable emission requirements and the other LDAR requirements described above, Aux Sable has violated Section 111(e) of the CAA, 42 U.S.C. § 7411(e).

204.    By violating the conditions of its 2002 CAAPP Permit related to no detectable emission requirements and the other LDAR requirements described above, Aux Sable has violated Section 502(a) of the CAA, 42 U.S.C. § 7661a(a).

### TENTH CLAIM FOR RELIEF
(Violation of the Fractionation Expansion Project Construction Permit
for NOx Emissions and Fuel Usage Operational Limits under the Illinois SIP)

205.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 146 as if fully set forth herein.

206.    Aux Sable was issued a construction permit pursuant to 35 Ill. Adm. Code 201 of the Illinois SIP from the Illinois EPA for a fractionation expansion project at the Facility in February 2015 (Construction Permit No. 14120019) (the "2015 Permit").  The 2015 Permit established synthetic minor permit conditions for NOx pursuant to 35 Ill. Adm. Code §§ 201.156 and 203.128 of the Illinois SIP, including permit conditions 6-2(b) and 6-2(c).

207.    Condition 6-2(b) of the 2015 Permit set operational and emissions limits that included a fuel usage limit and NOx emissions limit for several units combined: the gas turbine (1C201/1C202), HTF heaters (H-501A/H-501B), inlet regen gas heaters (1H-101/2H-101), regen gas heaters (H-601/H-602), and the ethane regen heater (H-309).  The combined fuel usage operational limit for these units was 4,250 million standard cubic feet per year (mmscf/year), determined from a running total of twelve months of data, and the combined NOx emission limit for these units was 144.0 tons/year, determined in the same fashion.  The 2015 Permit also contained permit condition 6-2(c), which required that "emissions of NOx from each HTF Heater (H-501A & H-501B) shall not exceed 0.030 lb/mmBtu heat input on a twelve month rolling average basis. Compliance with this emission limits [sic] shall be determined by continuous emission monitoring, as addressed by Condition 2(b)(iii), with daily records for fuel usage."

208.     In June, 2016, Illinois EPA issued to Aux Sable a revised construction permit under 35 Ill. Adm. Code. §§ 201.156 and 203.128 for the Facility's fractionation expansion project ("2016 Permit").  The operational and emission limits provided with permit condition 6-2(b) of the 2015 Permit were revised in the 2016 Permit according to the dual submission, by Aux Sable, of a deviation report and application for a revised construction permit in June, 2016. The deviation report stated that from March 2015 to May 2016, the rolling average for fuel usage ranged from 4,408 mmscf/year to 4,424 mmscf/year, and for NOx emissions ranged from 166.8 tons/year to 173.2 tons/year.  The revised limits provided in the 2016 Permit are 6,000 mmscf/year for fuel usage and 203.4 tons/year for NOx emissions.  Condition 6-2(c) remained unchanged.

209.     As shown by the deviation report submitted by Aux Sable, Aux Sable violated both the fuel usage and NOx emissions limits contained at permit condition 6-2(b) of the 2015 Permit up until the revised construction permit was issued in June 2016.

210.     Continuous emission monitoring data, provided by Aux Sable in response to an EPA request, shows that in the rolling 12-month period from April 2015 through March 2016, HTF heater H-501A experienced NOx emissions of 0.039 lb/mmBtu heat input.  This is a violation of permit condition 6-2(c), as provided in both the 2015 Permit and the 2016 Permit.

211.     By violating the NOx emission and fuel usage limits in the 2015 Permit and the 2016 Permit, Aux Sable has violated the Illinois SIP at 35 Ill. Adm. Code 203.210(a).

## CLEAN AIR ACT: REQUEST FOR RELIEF

212.    For the violations asserted in Claims 1 through 10, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, Aux Sable is subject to injunctive relief, including mitigation of the effects of excess emissions, and civil penalties of up to $27,500 per day for each violation between January 31, 1997, and March 15, 2004; up to $32,500 per day for each violation between March 16, 2004, and January 12, 2009; up to $37,500 per day for each violation between January 12, 2009 and November 2, 2015; and up to $97,229 per day for each violation that occurs after November 2, 2015.

## PRAYER FOR RELIEF

WHEREFORE, based upon all the allegations contained in Paragraphs 1 through 212 above, the United States of America requests that this Court:

1.    Permanently enjoin Aux Sable from operating its Facility except in accordance with the CAA and all applicable federal regulations and applicable federally enforceable state regulations;

2.    Order Aux Sable to operate its Facility in compliance with the CAA statutory and regulatory requirements set forth herein, the applicable SIP requirements, and the Title V and construction permits applicable to the Facility;

3.    Order Aux Sable to take other appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the CAA alleged herein;

4.    Assess a civil penalty against Aux Sable of up to $27,500 per day for each violation of the CAA occurring between January 31, 1997, and March 15, 2004; up to $32,500 for each violation occurring between March 16, 2004, and January 12, 2009; up to $37,500 per

day for each violation occurring between January 13, 2009 and November 2, 2015; and up to

$97,229 per day for each violation after November 2, 2015;

     5.     Award Plaintiff its costs of this action; and

     6.     Grant such other relief as the Court deems just and proper.


           Respectfully submitted,

           FOR THE UNITED STATES OF AMERICA:


Date: _10/23/18_

           JEFFREY H. WOOD
           Acting Assistant Attorney General
           Environment & Natural Resources Division
           United States Department of Justice


           ASHLEIGH G. MORRIS
           Trial Attorney
           Environment Enforcement Section
           Environment & Natural Resources Division
           United States Department of Justice
           P.O. Box 7611
           Washington, DC 20044-7611
           202-616-8834
           202-616-6584 (fax)

           JOHN R. LAUSCH, JR.
           United States Attorney for the Northern District of Illinois

           LINDA A. WAWZENSKI
           Assistant United States Attorney
           Northern District of Illinois
           Eastern Division
           219 S. Dearborn Street, Fifth Floor
           Chicago, IL 60604

OF COUNSEL
Mark J. Palermo
Attorney-Advisor, Air Enforcement Division
Office of Enforcement and Compliance Assurance
U.S. EPA
1200 Pennsylvania Avenue, N.W.
William Jefferson Clinton Federal Building Room 2117C
Washington, D.C. 20004

Erik H. Olson
Associate Regional Counsel
U.S. EPA Region 5
77 W. Jackson Blvd.
Chicago, IL 60604

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this day, I caused copies of this Complaint to be served on the following persons, by first-class mail postage prepaid, pursuant to Paragraphs 152 and 164 of the proposed Consent Decree lodged in this case:

Dean Hudson
Aux Sable
6155 E. US Route 6
Morris, IL 60450

Jeff White
Aux Sable
6155 E. US Route 6
Morris, IL 60450

Francis X. Lyons
Schiff Hardin LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606

Dated:  October 29, 2018                          <u>s/ *Ashleigh G. Morris*</u>
                                                  U.S. Dept. of Justice

ILND 44 (Rev. 09/07/18)

# CIVIL COVER SHEET

The ILND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(See instructions on next page of this form.)*

**I. (a) PLAINTIFFS**

**DEFENDANTS**

**(b)** County of Residence of First Listed Plaintiff _____
*(Except in U.S. plaintiff cases)*

County of Residence of First Listed Defendant _____
*(In U.S. plaintiff cases only)*
*Note: In land condemnation cases, use the location of the tract of land involved.*

**(c)** Attorneys *(firm name, address, and telephone number)*

Attorneys *(if known)*

**II. BASIS OF JURISDICTION** *(Check one box, only.)*

☐ 1 U.S. Government
     Plaintiff

☐ 3 Federal Question
     *(U.S. Government not a party)*

☐ 2 U.S. Government
     Defendant

☐ 4 Diversity
     *(Indicate citizenship of parties in Item III.)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(For Diversity Cases Only.)*
*(Check one box, only for plaintiff and one box for defendant.)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Check one box, only.)*

| CONTRACT | TORTS | | PRISONER PETITIONS | LABOR | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 510 Motions to Vacate Sentence 530 General | ☐ 710 Fair Labor Standards Act | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 530 General | ☐ 535 Death Penalty | ☐ 720 Labor/Management Relations | ☐ 376 Qui Tam (31 USC 3729 (a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **Habeas Corpus:** | ☐ 740 Railway Labor Act | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | ☐ 463 Alien Detainee | ☐ 751 Family and Medical Leave Act | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 530 General | ☐ 791 Employee Retirement Income Security Act | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | ☐ 535 Death Penalty | | ☐ 460 Deportation |
| ☐ 153 Recovery of Veteran's Benefits | ☐ 350 Motor Vehicle | | ☐ 540 Mandamus & Other | | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **PERSONAL PROPERTY** | ☐ 550 Civil Rights | **PROPERTY RIGHTS** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 370 Other Fraud | ☐ 560 Civil Detainee – Conditions of Confinement | ☐ 820 Copyrights | ☐ 485 Telephone Consumer Protection Act (TCPA) |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 371 Truth in Lending | | ☐ 830 Patent | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | ☐ 380 Other Personal Property Damage | | ☐ 835 Patent – Abbreviated New Drug Application | ☐ 850 Securities/Commodities/ Exchange |
| | | ☐ 385 Property Damage Product Liability | | ☐ 840 Trademark | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **BANKRUPTCY** | **FORFEITURE/PENALTY** | **SOCIAL SECURITY** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 422 Appeal 28 USC 158 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 861 HIA (1395ff) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 423 Withdrawal 28 USC 157 | ☐ 690 Other | ☐ 862 Black Lung (923) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | **IMMIGRATION** | | ☐ 864 SSID Title XVI | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 462 Naturalization Application | | ☐ 865 RSI (405(g)) | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 465 Other Immigration Actions | | **FEDERAL TAXES** | |
| | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| | | | | ☐ 871 IRS—Third Party 26 USC 7609 | |

**V. ORIGIN** *(Check one box, only.)*

☐ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from Another District *(specify)* ☐ 6 Multidistrict Litigation ☐ 8 Multidistrict Litigation Direct File

**VI. CAUSE OF ACTION** (Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)

**VII. PREVIOUS BANKRUPTCY MATTERS** (For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary.)

**VIII. REQUESTED IN COMPLAINT:**
☐ Check if this is a **class action** Under rule 23, F.R.CV.P. Demand $ _____

Check Yes only if demanded in complaint.
Jury Demand: ☐ Yes ☐ No

**IX. RELATED CASE(S) IF ANY** *(See instructions)*
Judge _____ Case Number _____

**X. Is this a previously dismissed or remanded case?** ☐ Yes ☐ No If yes, Case # _____ Name of Judge _____

Date _____
Signature of attorney of record _____

### Authority for Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.        (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

        (b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

        (c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.        Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; NOTE: federal question actions take precedence over diversity cases.)

**III.        Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.        Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.        Origin.** Place an "X" in one of the six boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

**VI.        Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. Do not cite jurisdictional statutes unless diversity. Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.        Previous Bankruptcy Matters** For nature of suit 422 and 423 enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this court. Use a separate attachment if necessary.

**VIII.        Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P. Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**IX.        Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**X.        Refiling Information.** Place an "X" in the Yes box if the case is being refiled or if it is a remanded case, and indicate the case number and name of judge. If this case is not being refiled or has not been remanded, place an "X" in the No box.

        **Date and Attorney Signature.** Date and sign the civil cover sheet.

Rev. 09/07/2018

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

_____
                                    )
UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )
                                    )
          v.                        )          Civil Action No. 1:18-cv-7198
                                    )
AUX SABLE LIQUID PRODUCTS L.P.,     )
                                    )
          Defendant.                )
                                    )
_____)

**UNITED STATES' NOTICE OF LODING OF PROPOSED CONSENT DECREE**

      The United States of America hereby lodges the accompanying proposed Consent Decree with this Court.

      1.     The United States has filed a Complaint in this action seeking civil penalties and injunctive relief from Defendant Aux Sable Liquid Products L.P. ("Aux Sable") for alleged violations of the Clean Air Act, 42. U.S.C. §§ 7401–7671q, at Aux Sable's natural gas processing plant located in Aux Sable Township, Grundy County, Illinois.  Among other things, the United States alleges that Aux Sable has violated and/or continues to violate statutory and regulatory requirements applicable to the facility arising under: (i) the Nonattainment New Source Review provisions of Part D of Title I of the CAA, 42 U.S.C. §§ 7501–7515 and the Implementing Regulations of 35 Ill. Adm. Code 203 under the Illinois State Implementation Plan ("SIP"); (ii) the New Source Performance Standards for Volatile Organic Compounds ("VOC") emissions from Synthetic Organic Chemical Manufacturing Industry ("SOCMI") Distillation

Operations, 40 C.F.R. Part 60, Subpart NNN; for VOC emissions from SOCMI Reactor

Processes, 40 C.F.R. Part 60, Subpart RRR; and for monitoring and operating a flare pilot flame

pursuant to 40 C.F.R. § 60.18 (General Control Device and Work Practice Requirements), and

Part 60, Subparts Kb (Standards of Performance for Volatile Organic Liquid Storage Vessels),

KKK (Standards of Performance for Equipment Leaks of VOC from Onshore Natural Gas

Processing Plants), NNN, and RRR; and (iii) Leak Detection and Repair requirements, including

those found at 40 C.F.R. Part 60, Subpart KKK, and, by reference, certain provisions of 40

C.F.R. Part 60, Subpart VV, and 40 C.F.R. Part 60, Appendix A-7, Method 21; (iv) the

requirements of the Illinois Emissions Reduction Market System as codified under the Illinois

SIP at 35 Ill. Adm. Code 205; and (v) the requirements of the Illinois Annual Emissions

Reporting Program as codified under the Illinois SIP at 35 Ill. Adm. Code 254.

2.      The accompanying proposed Consent Decree would require that Aux Sable, *inter
alia*, implement appropriate injunctive relief to control emissions from its facility and pay $2.7

million in civil penalties.

3.      Pursuant to Department of Justice policy, the United States will publish notice of

the lodging of the proposed Consent Decree in the Federal Register to commence a 30-day

public comment period.  The Court should not sign the proposed Consent Decree until the public

has had an opportunity to comment and the United States has addressed those comments, if any.

4.      The United States may withhold its consent to the proposed Consent Decree if the

comments disclose facts or considerations which indicate that the proposed Consent Decree is

improper, inappropriate, inadequate, or not in the public interest.

5.      At the conclusion of the public comment period, the United States will:  (i) file

with the Court any written comments received pertaining to the proposed Consent Decree; and

(ii) either notify the Court of its withdrawal of the proposed Consent Decree, or respond to

comments received and file a Motion asking the Court to approve and enter the proposed

Consent Decree.

Respectfully Submitted,

FOR THE UNITED STATES:


JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division


Dated October 29, 2018          *s/ Ashleigh G. Morris*
                                ASHLEIGH G. MORRIS
                                Trial Attorney
                                Environment Enforcement Section
                                Environment & Natural Resources Division
                                United States Department of Justice
                                P.O. Box 7611
                                Washington, DC 20044-7611
                                202-616-8834
                                202-616-6584 (fax)

                                JOHN R. LAUSCH, JR.
                                United States Attorney for the Northern District of Illinois

                                LINDA A. WAWZENSKI
                                Assistant United States Attorney
                                Northern District of Illinois
                                Eastern Division
                                219 S. Dearborn Street, Fifth Floor
                                Chicago, IL 60604

OF COUNSEL
Mark J. Palermo
Attorney-Advisor, Air Enforcement Division
Office of Enforcement and Compliance Assurance
U.S. EPA
1200 Pennsylvania Avenue, N.W.
William Jefferson Clinton Federal Building Room 2117C
Washington, D.C. 20004

Erik H. Olson
Associate Regional Counsel
U.S. EPA Region 5
77 W. Jackson Blvd.
Chicago, IL 60604

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this day, I caused copies of this Notice of Lodging (together with copies of the accompanying proposed Consent Decree) to be served on the following persons, by first-class mail postage prepaid, pursuant to Paragraphs 152 and 164 of the proposed Consent Decree lodged in this case:

Dean Hudson
Aux Sable
6155 E. US Route 6
Morris, IL 60450

Jeff White
Aux Sable
6155 E. US Route 6
Morris, IL 60450

Francis X. Lyons
Schiff Hardin LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606

Dated: October 29, 2018                        s/ *Ashleigh G. Morris*
                                               U.S. Dept. of Justice

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:18-cv-7198 |
| | ) |
| AUX SABLE LIQUID PRODUCTS LP, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**CONSENT DECREE**

TABLE OF CONTENTS

I.      JURISDICTION AND VENUE ................................................................................ 2

II.     APPLICABILITY .................................................................................................... 3

III.    DEFINITIONS ......................................................................................................... 3

IV.     CIVIL PENALTY .................................................................................................. 10

V.      COMPLIANCE REQUIREMENTS ...................................................................... 10

VI.     INJUNCTIVE RELIEF: LDAR PROGRAM ........................................................ 14

VII.    ENVIRONMENTAL MITIGATION PROJECTS .................................................. 26

VIII.   PERMITS .............................................................................................................. 28

IX.     EMISSION CREDIT GENERATION ................................................................... 30

X.      REPORTING REQUIREMENTS .......................................................................... 31

XI.     STIPULATED PENALTIES .................................................................................. 35

XII.    FORCE MAJEURE ............................................................................................... 47

XIII.   DISPUTE RESOLUTION ..................................................................................... 48

XIV.    INFORMATION COLLECTION AND RETENTION ........................................... 50

XV.     EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ................................. 51

XVI.    COSTS .................................................................................................................. 51

XVII.   NOTICES .............................................................................................................. 52

XVIII.  EFFECTIVE DATE ............................................................................................... 53

XIX.    RETENTION OF JURISDICTION ........................................................................ 53

XX.     MODIFICATION ................................................................................................... 53

XXI.    TERMINATION .................................................................................................... 53

XXII.   PUBLIC PARTICIPATION ................................................................................... 54

XXIII.  SIGNATORIES/SERVICE ................................................................................... 54

XXIV.   INTEGRATION .................................................................................................... 54

XXV.    FINAL JUDGMENT ............................................................................................. 55

XXVI.   APPENDICES ....................................................................................................... 55

ii

WHEREAS, Plaintiff the United States of America ("United States"), on behalf of the United States Environmental Protection Agency ("EPA"), has filed a Complaint in this action concurrently with this Consent Decree;

WHEREAS, Aux Sable Liquid Products LP ("Aux Sable") owns and operates a natural gas processing plant located at 6155 East U.S. Route 6, Morris, Illinois (the "Facility");

WHEREAS, the Complaint alleges that Aux Sable violated the Clean Air Act ("CAA") and its implementing regulations at Aux Sable's Morris, Illinois, Facility. Specifically, the Complaint alleges that Aux Sable violated: (1) the Nonattainment New Source Review ("NSR") provisions of Part D of Title I of the CAA, 42 U.S.C. §§ 7501–7515, and the implementing regulations of 35 Ill. Adm. Code Part 203 under the Illinois State Implementation Plan ("SIP"); (2) conditions of its construction permit (No. 98080090 issued by the Illinois Environmental Protection Agency ("Illinois EPA") on February 8, 1999) for volatile organic compound ("VOC") fugitive emissions established according to 35 Ill. Adm. Code § 201.156 of the Illinois SIP; (3) conditions of its Clean Air Act Permit Program ("CAAPP") permit (also known as a "Title V permit") (No. 01120007 issued August 28, 2002, revised May 16, 2006) for VOC fugitive emissions; (4) New Source Performance Standards ("NSPS") for VOC Emissions from Synthetic Organic Chemical Manufacturing Industry ("SOCMI") Distillation Operations at 40 C.F.R. Part 60, Subpart NNN; (5) NSPS for VOC Emissions from SOCMI Reactor Processes at 40 C.F.R. Part 60, Subpart RRR; (6) requirements to monitor the presence of a flare pilot flame under the CAAPP permit and NSPS Subparts Kb, KKK, NNN, and RRR; (7) requirements of Illinois's Emission Reduction Market System ("ERMS") under the Illinois SIP at 35 Ill. Adm. Code Part 205; (8) requirements of the Illinois Air Emission Report program under the Illinois SIP at 35 Ill. Adm. Code Part 254; (9) Sections 111 and 502(a) of the CAA, 42 U.S.C. §§ 7411 and 7661a; Title V of the CAA, 42 U.S.C. § 7661–7661(f), and its implementing regulations at 40 C.F.R. Part 60, Subpart KKK (National Emission Standards of Performance for Equipment Leaks of VOC from Onshore Natural Gas Processing Plants); and, by reference, certain provisions of 40 C.F.R. Part 60, Subpart VV, and 40 C.F.R. Part 60, Appendix A-7, Method 21; and (10) conditions of the Fractionation Expansion Project Construction Permit No. 14120019 for oxides of nitrogen ("NOx") emissions and fuel usage operational limits established according to 35 Ill. Adm. Code § 201.156 of the Illinois SIP;

WHEREAS, at Aux Sable's Facility, EPA identified alleged violations of the Clean Air Act and its implementing regulations and of the federally enforceable Illinois SIP in three violation notices: (1) a September 4, 2014, Notice of Violation; (2) an April 14, 2015, Notice of Violation; and (3) an August 23, 2016, Notice of Violation. The three violation notices are referred to collectively herein as the "EPA Violation Notices;"

WHEREAS, Aux Sable remains subject to a 10.2 tons per year limit for VOM fugitive emissions applicable to certain parts of the Facility established under Construction Permit no. 98080090. This emissions limit was intended to aid in establishing the Facility as a non-major stationary source under 35 Ill. Admin. Code 203. The Complaint alleges that Aux Sable has exceeded this emissions limit. Aux Sable has or will submit an application to Illinois EPA,

1

whether as a new permit or modification to an existing permit, pursuant to Section VIII of this Consent Decree, to modify or remove the 10.2 tons per year VOC emission limit.

WHEREAS, on January 4, 2017, Aux Sable conducted a performance test of the Merox Off-Gas Incinerator (IN601) at the Facility, and on January 5, 2017, Aux Sable conducted a performance test of the Merox Off-Gas Incinerator (IN602) at the Facility. During the tests, Aux Sable demonstrated compliance with the emission standard set forth in Paragraph 13.c at a three-hour rolling average operating temperature of 1,345 degrees Fahrenheit for IN601, and 1,424 degrees Fahrenheit for IN602. Based upon the performance tests, on July 14, 2017, Aux Sable submitted a notice of compliance to Illinois EPA as part of its semi-annual reporting;

WHEREAS, in conjunction with the negotiation of this Consent Decree and to comply with 40 C.F.R. Part 60, Subpart NNN and RRR, Aux Sable has, on October 19, 2016, installed and commenced operation of thermocouples on each of the Facility's HP and LP flares in accordance with 40 C.F.R. 60.18(f)(2);

WHEREAS, in conjunction with the negotiation of this Consent Decree, on March 10, 2017, Aux Sable applied to the Illinois EPA to purchase Allotment Trading Units ("ATUs") under the Illinois Emission Reduction Market System ("ERMS") program, 35 Ill. Adm. Code Part 205, in order to address the alleged failure to purchase sufficient ATUs for past ozone seasons 2001 through 2015;

WHEREAS, Aux Sable does not admit any liability to the United States arising out of the transactions or occurrences alleged in the Complaint or the EPA Violation Notices;

WHEREAS, the United States and Aux Sable recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest;

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b); and over the Parties. Venue lies in this District pursuant to Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b); and 28 U.S.C. §§ 1391(b)–(c) and 1395(a), because Aux Sable resides and is located in this judicial district, and certain violations alleged in the Complaint are alleged to have occurred in this judicial district. For purposes of this Consent Decree, or any action to enforce this Consent Decree, Aux Sable consents to the Court's jurisdiction over this Consent Decree and over Aux Sable and also consents to venue in this judicial district.

2. For purposes of this Consent Decree, Aux Sable agrees that the United States' Complaint states claims upon which relief may be granted pursuant to Clean Air Act Section 113, 42 U.S.C. § 7413.

3. Notice of the commencement of this action shall be given to the State of Illinois as required by Clean Air Act Section 113(b), 42 U.S.C. § 7413(b).

## II.      APPLICABILITY

4. The obligations of this Consent Decree apply to and are binding upon the United States and upon Aux Sable and any successors, assigns, or other entities or persons otherwise bound by law.

5. Aux Sable may transfer its interest in the Facility without relieving Aux Sable of its Consent Decree obligations, without consent, and without modification of the Consent Decree, so long as: (i) the transferee agrees in writing to comply with the obligations of the Consent Decree, and (ii) written notice of the transfer, together with a copy of the transferee's assumption of Consent Decree obligations, is provided to U.S. EPA Region 5, the United States Attorney for the Northern District of Illinois, and the United States Department of Justice, in accordance with Section XVII (Notices). Aux Sable may be relieved of its Consent Decree obligations only upon Court approval of a modification to the Consent Decree, substituting the transferee for the transferor, and providing that the transferee will implement the terms of the Consent Decree; provided, however, that the United States may refuse to approve such a modification to the Consent Decree if it determines that the proposed transferee does not possess the requisite technical abilities and/or financial means to implement the Consent Decree. If the United States opposes the substitution, the issue shall first be subject to dispute resolution pursuant to Section XIII (Dispute Resolution). If the United States agrees to the substitution, or upon approval of the substitution following dispute resolution, the parties will file an joint motion with the Court seeking such substitution.

6. Aux Sable shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Consent Decree, as well as to any contractor retained to perform work required under this Consent Decree. Aux Sable shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

7. In any action to enforce this Consent Decree, Aux Sable shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## III.      DEFINITIONS

8. The terms used in this Consent Decree that are defined in the CAA or in federal and state regulations promulgated pursuant to the CAA shall have the meaning assigned to them in the CAA or such regulations, unless otherwise provided in this Consent Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.    "Allotment Trading Unit" or "ATU" shall mean a tradable unit of volatile organic material ("VOM") emissions under the Illinois Emission Reduction Management System, 35 Ill. Admin. Code § 205.130.

b.    "Annual" or "annually" shall mean a calendar year, except as otherwise provided in applicable Leak Detection and Repair ("LDAR") regulations as set forth in 40 C.F.R. Part 60, Subparts KKK, VV, VVa, and OOOO.

c.    "Annual Emission Reports" shall mean the reports required pursuant to 35 Ill. Admin. Code Part 254.

d.    "Average" shall mean the arithmetic mean.

e.    "CAP" shall mean the Corrective Action Plan described in Paragraph 52 of this Consent Decree.

f.    "CEMS" or "Continuous Monitoring System" shall mean, consistent with the definition of Continuous Monitoring System in 40 C.F.R. § 60.2, the total equipment, required under this Consent Decree or an applicable regulation or permit, used to sample and condition (if applicable), to analyze, and to provide a permanent record of emissions or process parameters.

g.    "Complaint" shall mean the Complaint filed by the United States in this action.

h.    "Consent Decree" or "Decree" shall mean this Consent Decree and all appendices attached hereto, but in the event of any conflict between the text of this Consent Decree and any Appendix, the text of this Consent Decree shall control.

i.    "Covered Equipment" shall mean all Covered Types of Equipment in all Covered Process Units.

j.    "Covered Process Units" shall mean any Process Unit at the Facility that is, at the Date of Lodging, subject to, or, under the terms of this Consent Decree, becomes subject to 40 C.F.R. Part 60, Subpart OOOO, pursuant to Paragraph 12, including Areas 100 (Inlet Separation & Dehydration), 200 (Extraction), 300 (Ethane Recovery), 500 (Utilities & Flare), 600 (Fractionation Unit, including Butamer Isomerization Process & Merox Treatment Process), 700 (Product Storage, Distribution & Railcar Loading), and 900 (Inlet & Metering), except that the following Process Units shall not be considered Covered Process Units: (a) the fractionation unit constructed under Construction Permit No. 14120019 and known as Unit 600A, and (b) any Process Units installed at the Facility after the Date of Lodging.

k.  "Covered Types of Equipment" shall mean all valves in light liquid or gas/vapor service (but excluding pressure relief devices), all connectors in light liquid or gas/vapor service, and all pumps in light liquid or gas/vapor service, which are located in a Covered Process Unit and that are regulated under any "equipment leak" provision of 40 C.F.R. Part 60, Subparts KKK, VV, VVa, and OOOO.

l.  "Date of Lodging of this Consent Decree" or "Date of Lodging" shall mean the date that the United States files a "Notice of Lodging" of this Consent Decree with the Clerk of this Court for the purpose of providing notice and comment to the public.

m.  "Day" or "Days," for purposes of requirements uniquely imposed by the LDAR Program in Section VI, and not by any applicable LDAR regulation, shall mean a calendar day.  For all other purposes related to LDAR, such as complying with any related applicable and enforceable LDAR regulation, "day" shall have the meaning provided in such LDAR regulation.  "Working Day" shall mean a day other than a Saturday, Sunday, or federal or Illinois state holiday.  In computing any period of time under this Consent Decree for submittal of reports, where the last day would fall on a Saturday, Sunday, or federal or Illinois state holiday, the period shall run until the close of business on the next Working Day.  When a compliance date is specified in this Consent Decree, compliance must be achieved on or before that date.  For all other purposes, "Day" or "Days" shall mean a calendar day or days.

n.  "Defendant" shall mean Aux Sable Liquid Products LP.

o.  "DOR" shall mean Delay of Repair.

p.  "Effective Date" shall have the meaning given in Section XVIII (Effective Date).

q.  "Environmental Mitigation Projects" shall mean the requirements in Section VII and Appendix B to mitigate the alleged environmental harm caused by the alleged noncompliance at Aux Sable's Facility.

r.  "EPA" or "U.S. EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies.

s.  "Facility" shall mean Aux Sable's natural gas processing plant located at 6155 East U.S. Route 6, Morris, Illinois.

t.  "EPA Violation Notices" shall mean the three Finding and/or Notice of Violations issued by EPA Region 5 to Aux Sable dated September 4, 2014, April 14, 2015, and August 23, 2016.

5

u.  "LDAR Program" or "LP" shall mean the Leak Detection and Repair Program provisions specified in Section VI of this Decree required to come into compliance with the requirements of 40 C.F.R. Part 60, Subparts KKK, VV, OOOO, and VVa, as well as any applicable state or local equipment leak requirements, and that additionally mitigate the alleged environmental harm allegedly caused by noncompliance at the Covered Process Units and Covered Types of Equipment (including "drill and tap" requirements in Paragraphs 29–31 and the "valve replacement and improvement" requirements in Paragraphs 33–42).

v.  "LDAR" or "Leak Detection and Repair" shall mean the leak detection and repair activities required by any applicable "equipment leak" regulations set forth in 40 C.F.R. Part 60, Subparts KKK, VV, VVa, and OOOO.  LDAR also shall mean any state or local equipment leak regulations that require (i) the use of Method 21 to monitor for equipment leaks and also (ii) the repair of leaks discovered through such monitoring.

w.  "LDAR Audit Commencement Date" or "Commencement of an LDAR Audit" shall mean the first day of the on-site inspection that accompanies an LDAR audit.

x.  "LDAR Audit Completion Date" or "Completion of an LDAR Audit" shall mean 120 days after the LDAR Audit Commencement Date.

y.  "LDAR Personnel" shall mean all Aux Sable's contractors and employees who perform any of the following activities at the Facility:  LDAR monitoring, LDAR data input, maintenance of LDAR monitoring devices, leak repairs on equipment subject to LDAR, and/or any other field duties generated by LDAR regulations or the LP.

z.  "Low-Emissions Packing" or "Low-E Packing" shall mean either of the following:

(i)  A valve packing product, independent of any specific valve, for which the manufacturer has issued a written warranty that the packing will not emit fugitives at greater than 100 ppm, and that, if it does so emit at greater than 100 ppm at any time in the first five years after installation, the manufacturer will replace the product; provided, however, that no packing product shall qualify as "Low-E" by reason of written warranty unless the packing first was tested by the manufacturer or a qualified testing firm pursuant to generally-accepted good engineering practices for testing fugitive emissions and the results of the testing reasonably support the warranty; or

(ii)  A valve packing product, independent of any specific valve, that has been tested by the manufacturer or a qualified testing firm pursuant to generally-accepted good engineering practices for testing

6

fugitive emissions, and that, during the test, at no time leaked at greater than 500 ppm, and on average, during the test, leaked at less than 100 ppm.

aa. "Low-Emissions Valve" or "Low-E Valve" shall mean either of the following:

(i)      A valve (including its specific packing assembly or stem sealing component) for which the manufacturer has issued a written warranty that it will not emit fugitives at greater than 100 ppm, and that, if it does so emit at greater than 100 ppm at any time in the first five years after installation, the manufacturer will replace the valve; provided, however, that no valve shall qualify as "Low-E" by reason of written warranty unless the valve (including its specific packing assembly or stem sealing component) either:

      *(a)*    first was tested by the manufacturer or a qualified testing firm pursuant to generally-accepted good engineering practices for testing fugitive emissions; or

      *(b)*    is an "extension of another valve" that qualified as "Low-E" under Subparagraph (i)*(a)* above; or

(ii)     A valve (including its specific packing assembly) that:

      *(a)*    has been tested by the manufacturer or a qualified testing firm pursuant to generally-accepted good engineering practices for testing fugitive emissions and that, during the test, at no time leaked at greater than 500 ppm, and on average, during the test, leaked at less than 100 ppm; or

      *(b)*    is an "extension of another valve" that qualified as "Low-E" under Subparagraph (ii)*(a)* above.

(iii)    For purposes of Subparagraphs (i)*(b)* and (ii)*(b)* above, being an "extension of another valve" shall mean: (i) the tested and untested valve were produced by the same manufacturer to the same or essentially equivalent quality requirements; (ii) the characteristics of the valve that affect sealing performance (e.g. type of valve, stem motion, tolerances, surface finishes, loading arrangement, and stem and body seal material, design, and construction) are the same or essentially equivalent as between the tested and the untested valve; and (iii) the temperature and pressure ratings of the tested valve are at least as high as the temperature and pressure ratings of the untested valve.

bb. "Malfunction" shall mean, consistent with the definition of "Malfunction" in 40 C.F.R. § 60.2, any sudden, infrequent, and not reasonably

7

preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner. Failures that are caused in part by poor maintenance or careless operation are not malfunctions.

cc. "Method 21" shall mean the test method found at 40 C.F.R. Part 60, Appendix A-7, Method 21. To the extent that the Covered Equipment is subject to regulations that modify Method 21, those modifications shall be applicable.

dd. "Paragraph" shall mean a portion of this Consent Decree identified by an arabic numeral.

ee. "Parties" shall mean the United States and Aux Sable Liquid Products LP.

ff. "Process Unit," for purposes of this Consent Decree only, shall mean, consistent with the definition of "Process Unit" in 40 C.F.R. § 60.5430, components assembled for the extraction of natural gas liquids from field gas, the fractionation of the liquids into natural gas products, or other operations associated with the processing of natural gas products, including but not limited to butane isomerization. A Process Unit can operate independently if supplied with sufficient feed or raw materials and sufficient storage facilities for the products.

gg. "Process Unit Shutdown" shall mean, consistent with the definition of "Process Unit Shutdown" in 40 C.F.R. § 60.481a, a work practice or operational procedure that stops production from a Process Unit or part of a Process Unit during which it is technically feasible to clear process material from a Process Unit or part of a Process Unit consistent with safety constraints and during which repairs can be accomplished. The following are not considered Process Unit Shutdowns:

(i) An unscheduled work practice or operational procedure that stops production from a Process Unit or part of a Process Unit for less than 24 hours.

(ii) An unscheduled work practice or operational procedure that would stop production from a Process Unit or part of a Process Unit for a shorter period of time than would be required to clear the Process Unit or part of the Process Unit of materials and start up the unit, and would result in greater emissions than delay of repair of leaking components until the next scheduled Process Unit Shutdown.

(iii) The use of spare equipment and technically feasible bypassing of equipment without stopping production.

hh. "Project Dollars" shall mean Aux Sable's expenditures incurred or made in implementing the Environmental Mitigation Projects identified in

8

Section VII Subsection B (Locomotive Projects) and Appendix B to the extent that such expenditures or payments both: (i) comply with the requirements set forth in that Section VII Subsection B (Locomotive Projects) and Appendix B; and (ii) constitute Aux Sable's direct payments for such projects or Aux Sable's external costs for contractors, vendors, and equipment. Aux Sable shall not include as Project Dollars its own personnel costs in overseeing the implementation of the Projects.

ii.  "Quarter" or "quarterly" shall mean a calendar quarter (January through March, April through June, July through September, October through December) except as otherwise provided in applicable LDAR regulations.

jj.  "Repair Verification Monitoring" shall mean the utilization of monitoring (or other method that indicates the relative size of the leak) to be completed by no later than the next Working Day after each attempt at repair of a leaking piece of Covered Equipment in order to determine whether the leak has been eliminated or is below the applicable leak definition in the LP in Section VI (LDAR Program) of this Consent Decree.

kk.  "Screening Value" shall mean the highest concentration that is recorded at each piece of equipment as it is monitored in compliance with Method 21.

ll.  "Section" shall mean a portion of this Consent Decree identified by a Roman numeral.

mm.  "Subsection" shall mean a portion of a Section of this Consent Decree identified by a capital letter.

nn.  "United States" shall mean the United States of America, acting on behalf of EPA.

oo.  "Ultra-Low NOx Burners" or "ULNBs" shall mean those burners that are designed to achieve a NOx emission rate of less than or equal to 0.019 lb/mmBTU HHV when firing natural gas at 3% stack oxygen at full design load without air preheat, even if upon installation actual emissions exceed 0.019 lb/mmBTU HHV.

pp.  "Week" or "weekly" shall mean the standard calendar period, except as otherwise provided in applicable LDAR regulations.

qq.  "VOC" shall mean volatile organic compounds as that term is used under 40 C.F.R. § 60.2.

rr.  "VOM" shall mean volatile organic material as that term is used under 35 Ill. Admin. Code Part 205.

9

#### IV.    CIVIL PENALTY

9.    Within 30 days after the Effective Date of this Consent Decree, Aux Sable shall pay the sum of $2,700,000 as a civil penalty, together with interest accruing from the date the Consent Decree is lodged with the Court, at the rate specified in 28 U.S.C. § 1961 as of the Date of Lodging.

10.    Aux Sable shall pay the civil penalty due to the U.S. Department of Justice account by FedWire Electronic Funds Transfer ("EFT"), in accordance with instructions provided to Aux Sable after the Effective Date by the Financial Litigation Unit ("FLU") of the U.S. Attorney's Office for the Northern District of Illinois.  The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Aux Sable shall use to identify all payments required to be made in accordance with this Consent Decree.  The FLU will provide the payment instructions to:

> Katie Shepley, Controller
> Aux Sable
> 6155 E. US Route 6
> Morris, IL 60450
> Katie.Shepley@auxsable.com

on behalf of Aux Sable.  Aux Sable may change the individual to receive payment instructions on its behalf by providing written notice of such change to the United States and EPA in accordance with Section XVII (Notices).

At the time of payment, Aux Sable shall send notice that payment has been made to: (i) EPA via email at cinwd_acctsreceivable@epa.gov or via regular mail at EPA Cincinnati Finance Office, 26 W. Martin Luther King Drive, Cincinnati, Ohio 45268; and (ii) to the United States via email or regular mail in accordance with Section XVII (Notices).  Such notice shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in United States v. Aux Sable Liquid Products LP, and shall reference the civil action number, CDCS Number, and DOJ case number 90-5-2-1-11203.

11.    Aux Sable shall not deduct any penalties paid under this Decree pursuant to this Section or Section XI (Stipulated Penalties) in calculating its federal income tax.

#### V.    COMPLIANCE REQUIREMENTS

#### A. **INJUNCTIVE RELIEF: NSPS and Other**

12.    Applicability of 40 C.F.R. Part 60, Subpart OOOO.

a.    By no later than 60 Days after the Effective Date, Aux Sable shall accept the applicability of 40 C.F.R. Part 60, Subpart OOOO, ("Subpart OOOO") to all Covered Process Units.  At such time Aux Sable accepts applicability of Subpart OOOO to a Covered Process Unit, then the requirements of 40 C.F.R Part 60, Subpart KKK, shall no longer apply to that Covered Process Unit.  In accordance with the requirements of Section VIII (Permits), Aux Sable shall apply for a permit or permit

10

modification that will subject all Covered Process Units to Subpart OOOO, including any part of the Facility that was previously subject to Subpart KKK.

b.  Notwithstanding the applicability date for Subpart OOOO set forth in Paragraph 12.a, by no later than 365 Days after the Effective Date, Aux Sable shall complete initial Method 21 monitoring of connectors in all Covered Process Units at the Facility in accordance with 40 C.F.R. § 60.482-11a.

13.  <u>Merox Off-Gas Incinerators (IN601 and IN602).</u>

a.  As of the Effective Date, Aux Sable shall operate each of the Merox Off-Gas Incinerators (IN601 and IN602) at all times process gas is vented to them, such that Total Organic Compounds ("TOC") (as defined at 40 C.F.R. § 60.701) (less methane and ethane) are reduced by 99 weight percent, or to a TOC (less methane and ethane) concentration of 10ppmv, on a dry basis corrected to 3 percent oxygen, whichever is less stringent.

b.  By no later than 60 Days after the Effective Date, Aux Sable shall measure and record, in accordance with 40 C.F.R. §§ 60.703(a)(1)(i) and 60.705(b)(1)(i), the 15-minute average fire box temperature (as measured in the stack, downstream of the firebox, in a position before any substantial heat exchange is encountered) of each of the Merox Off-Gas Incinerators (IN601 and IN602).  These 15-minute averages shall then be used to calculate a three-hour rolling average, rolled every 15 minutes. The requirement of this Paragraph 13.b shall apply at all times during operation of either Merox Off-Gas Incinerator except during monitoring device breakdowns, repairs, periodic accuracy evaluations, calibration checks, and zero span adjustments.

c.  By no later than 60 Days after the Effective Date, at all times process gas is vented to either of the Merox Off-Gas Incinerators (IN601 or IN602), Aux Sable shall maintain a minimum operating temperature of 1,345 degrees Fahrenheit for IN601 and 1,424 degrees Fahrenheit for IN602 on a three-hour rolling average, rolled every 15 minutes, to demonstrate compliance with the 99 weight percent requirement or 10 ppmv TOC concentration set forth in Paragraph 13.a.  Aux Sable may conduct additional performance test(s) to set a new minimum operating temperature for each Merox Off-Gas Incinerator, but only if such additional performance test(s) is conducted in accordance with the requirements of Paragraph 13.a of this Consent Decree, and the results of such performance test(s), including supporting documentation, are submitted to EPA for review and approval, in accordance with Section X (Reporting Requirements).  Following incorporation of the requirements in this Paragraph 13 into a federally-enforceable non-Title V permit in accordance with Paragraph 73 of this Consent Decree, Aux Sable shall

11

submit for review and approval to Illinois EPA the results of any performance test conducted to set a new minimum operating temperature.

14.   <u>NSPS Subparts NNN and RRR</u>.  By no later than 90 days after the Effective Date, Aux Sable shall comply with the following:

    a.    <u>NSPS Subpart NNN</u>.  For the (i) deethanizer distillation unit and recovery system, (ii) depropanizer distillation unit and recovery system, (iii) debutanizer distillation unit and recovery system, (iv) butane splitter distillation unit and recovery system, (v) V645 Stabilizer distillation unit, and (vi) V650 Deisobutanizer distillation unit and recovery system, Aux Sable shall:

        (i)    Install, calibrate, maintain, and operate the applicable parametric monitoring and equipment in accordance with 40 C.F.R. § 60.663(b), with the exception that, in accordance with EPA's approval of an alternative monitoring request (ADI Determination Control No. 1500084), in lieu of complying with the flow indicator requirements of 40 C.F.R. § 663(b), Aux Sable shall (i) use a lock and seal configuration and (ii) comply with the monitoring requirements of 40 C.F.R. §§ 60.703(b)(2), 60.703(b)(2)(i), and 60.703(b)(2)(ii), and (iii) comply with the monitoring and recordkeeping requirements of 40 C.F.R. §§ 60.705(d)(2) and (s);

        (ii)    Comply with the applicable emission standards set forth in 40 C.F.R § 60.662(b) and with the applicable test methods and procedures set forth in 40 C.F.R. § 60.664(d); and

        (iii)    Comply with the applicable notification and recordkeeping requirements of 40 C.F.R. §§ 60.665(a)–(b), including 40 C.F.R. §§ 60.665(b)(3) and (f).

    b.    <u>NSPS Subpart RRR</u>.  For the (i) COS reactor; (ii) propane extractor and Merox system, mixed butanes extractor and Merox system, pentane extractor and Merox system, and common recovery system; and (iii) V643/V644 catalytic reactors, Aux Sable shall:

        (i)    Install, calibrate, maintain, and operate the applicable parametric monitoring and equipment in accordance with 40 C.F.R §§ 60.703(a) and (b);

        (ii)    Comply with the applicable emission standards set forth in 40 C.F.R. §§ 60.702(a) and (b) and the applicable test methods and procedures under 40 C.F.R. § 60.704; and

        (iii)    Comply with the applicable notification and recordkeeping requirements of 40 C.F.R. § 60.705, including in particular 40 C.F.R. §§ 60.705(b), (c), (d), (e), and (s).

    c.    <u>Flares</u>.

        (i)    By no later than 30 Days after the Effective Date, Aux Sable shall comply with 40 C.F.R. §§ 60.18(b)–(f) at the Low Pressure Flare (IN 507) and the High Pressure Flare (IN 501).

        (ii)    By no later than 90 Days after the Effective Date, Aux Sable shall perform a performance test on the IN 507 and IN 501 flares in accordance with 40 C.F.R. § 60.8.

        (iii)   By no later than 60 Days after the flare performance test in Paragraph 14.c(ii), above, Aux Sable shall submit to EPA a report that contains the results of the performance test (all test runs), with all appendices, including but not limited to, the process and operating parameters, production/processing rates at the time of the performance test, and all calculations.

## B. **Other**

15.    <u>Emission Reduction Marketing System</u>.  Beginning no later than the Date of Lodging, Aux Sable shall comply with the Illinois ERMS program as set forth in 35 Ill. Adm. Code Part 205.  Until termination of this Consent Decree pursuant to Section XXI (Termination), Aux Sable shall demonstrate compliance with the Illinois ERMS program by providing EPA, pursuant to Section X (Reporting Requirements), a copy of each year's ERMS Seasonal Emissions Report, including emissions calculations and information demonstrating that Aux Sable possesses sufficient ATUs to satisfy seasonal emissions.

16.    <u>Annual Emission Reports</u>.  Beginning no later than the Date of Lodging, Aux Sable shall comply with the Illinois Annual Emission Reports, in accordance with 35 Ill. Admin. Code Part 254, by submitting to Illinois EPA Annual Emission Reports that take into account Aux Sable's corrected VOM emissions at the Facility.  Until termination of this Consent Decree pursuant to Section XXI (Termination), Aux Sable shall demonstrate compliance with this Paragraph by providing EPA, as part of its Annual Compliance Report under Section X (Reporting Requirements), a copy of each year's Annual Emission Report submitted to Illinois EPA.

17.    <u>Environmental Management Program Audit</u>.  By no later than two years after the Effective Date, Aux Sable shall retain a third-party contractor with experience conducting Environmental Management Program ("EMP") audits to undertake an audit of the Facility's EMP as it relates to the Facility's compliance with the Clean Air Act and its implementing regulations.  By no later than 90 days after commencing the audit, the third-party contractor will complete the audit and prepare an audit report.  By no later than 60 days after receipt of the audit report, Aux Sable shall either accept the recommendations of the third-party contractor and incorporate the provisions into its EMP, or explain why it rejected or modified any recommendation.  Aux Sable shall submit all findings, reports, and recommendations made by the contractor(s) and a summary of any corrective actions by Aux Sable to EPA in its annual compliance reports pursuant to Section X (Reporting Requirements).

## VI.    INJUNCTIVE RELIEF: LDAR PROGRAM

18.    Aux Sable shall implement and comply with the requirements of the LP as set forth in this Consent Decree. The requirements of the LP are in addition to, not in lieu of, the requirements of any other LDAR regulation that may be applicable to each piece of Covered Equipment at the Facility.

### A.  Applicability of the LDAR Program (Subsection A)

19.    The requirements of this LP shall apply to all Covered Equipment and all Covered Process Units at the Facility.  The requirements of this LP are in addition to, and not in lieu of, the requirements of any other LDAR regulation that may be applicable to a piece of Covered Equipment.  If there is a conflict between an applicable LDAR regulation and this LP, Aux Sable shall follow the more stringent of the requirements.

### B.  Facility-wide LDAR Document (Subsection B)

20.    By no later than 90 Days after the Effective Date of this Consent Decree, Aux Sable shall develop a Facility-wide document that describes:  (i) the Facility's  LDAR program (*e.g.*, applicability of regulations to process units and/or specific equipment; leak definitions; monitoring frequencies); (ii) a tracking program (*e.g.*, Management of Change as provided in Paragraph 43) that ensures that any new piece of equipment added to the Facility for any reason is integrated into the Facility's LDAR program and that any pieces of equipment that are taken out of service are removed from the Facility's LDAR program; (iii) the roles and responsibilities of all LDAR Personnel; (iv) how the number of LDAR Personnel is sufficient to satisfy the requirements of the Facility's LDAR program; and (v) how Aux Sable plans to implement the LP in accordance with the requirement of this Consent Decree.  Once developed, Aux Sable shall review the Facility's LDAR program document annually and update it as needed by no later than December 31 of each year.

### C.  Monitoring Frequency and Equipment (Subsection C)

21.    Beginning no later than 90 days after the Effective Date, for all Covered Equipment, Aux Sable shall comply with the following periodic monitoring frequencies, unless: (i) more frequent monitoring is required by federal, state, or local laws or regulations; or (ii) the relevant Covered Process Unit has been permanently shut down:

      a.    Valves: quarterly;

      b.    Connectors: annually; and

      c.    Pumps: monthly.

Compliance with the monitoring frequencies in this Paragraph 21 is not required when one or more specific, applicable LDAR provisions (including 40 C.F.R. §§ 60.482-11a (pertaining to connectors) and 60.482-2a (pertaining to pumps)) excludes or exempts, fully or partially, monitoring at a periodic frequency for equipment that is designated as unsafe to monitor or difficult to monitor or for pumps that have no externally actuated shaft or for inaccessible,

14

ceramic, or ceramic-lined connectors, provided that Aux Sable satisfies all applicable conditions and requirements for the exclusion or exemption as set forth in the regulation.

22. <u>Alternative Monitoring Frequencies for Valves after Two Years</u>. At any time after two consecutive years of monitoring valves at the frequency specified in Paragraph 21.a, Aux Sable may elect to comply with the monitoring requirements set forth in this Paragraph 22 by notifying EPA no later than three months prior to changing to the monitoring frequency specified under this Paragraph. Aux Sable may elect to comply with the monitoring requirements of this Paragraph 22 at the Covered Process Units but may not make this election for anything less than all pieces of Covered Equipment in one entire Covered Process Unit. If Aux Sable elects to comply with the monitoring requirements of this Paragraph 22, below, it must comply with the following:

     a.    <u>For Valves that Have Not Leaked at Any Time for at Least Two Consecutive Years of Monitoring</u>. For valves that have not leaked at any time for at least the two years prior to electing this alternative, Aux Sable shall monitor valves one time per year. If any leaks are detected during this alternative monitoring schedule or during an LDAR audit or a federal, state, or local audit or inspection, Aux Sable immediately shall start monitoring the leaking valve (or valves) pursuant to the requirements of Subparagraph 22.b.

     b.    <u>For Valves that Have Leaked at Any Time in the Prior Two Years of Monitoring</u>. For valves that have leaked at any time in the prior two years of monitoring, Aux Sable shall monitor each such valve monthly from the date of the last leak until it shows no leaks for six consecutive months, at which time Aux Sable may commence monitoring at the frequency set forth in Subparagraph 22.a. The alternative monitoring schedule in Subparagraph 22.a shall continue to apply to non-leaking valves in the Covered Process Unit.

23. Beginning no later than 180 Days after the Effective Date, for all Covered Equipment, Aux Sable shall comply with Method 21 in performing LDAR monitoring, using an instrument attached to a data logger (or an equivalent instrument) that directly records electronically the Screening Value detected at each piece of Covered Equipment, the date and time that each Screening Value is taken, and the identification numbers of the monitoring instrument and the technician. Aux Sable shall transfer all of this monitoring data to an electronic database on at least a weekly basis for recordkeeping purposes.

24. If, during monitoring in the field, a piece of Covered Equipment is discovered that is not listed in the data logger, Aux Sable is permitted to monitor the piece of Covered Equipment and record, by any means available, the Screening Value, the date and time of the Screening Value, and the identification numbers of the monitoring instrument and technician. In such an instance, the failure to initially record the information electronically, in the data logger, does not constitute a violation of the requirement in Paragraph 23 to record the required information electronically, provided that Aux Sable thereafter promptly adds the piece of Covered Equipment and the information regarding the monitoring event to the LDAR database.

### D. Leak Detection and Repair Action Levels (Subsection D)

25.    Action Levels

a.    Beginning no later than 60 days after the Effective Date of this Consent Decree and continuing until termination, for all leaks from Covered Equipment detected at or above the leak definitions listed in Table 1, below, for each of the specific Covered Types of Equipment, Aux Sable shall perform repairs in accordance with Paragraphs 26–31.

Table 1:  Leak Definitions for Covered Types of Equipment

| Covered Type of Equipment | Lower Leak Definition (ppm) |
|---|---|
| Valves | 500 |
| Connectors | 500 |
| Pumps | 2,000 |

b.    For purposes of these lower leak definitions, Aux Sable may elect to adjust the monitoring instrument readings to account for background concentrations in accordance with applicable LDAR regulations that address background adjustment.

c.    Beginning no later than 180 Days after the Effective Date of this Consent Decree, for all Covered Equipment, and all valves, connectors, and pumps in heavy liquid service, if, at any time, including outside of periodic monitoring, evidence of a potential leak is detected through audio, visual, or olfactory sensing, Aux Sable shall comply with all applicable regulations and, if repair is required, with Paragraphs 26–31.

### E. Repairs (Subsection E)

26.    Except as provided in Subparagraph 37.d(i), by no later than five days after detecting a leak at a piece of Covered Equipment, Aux Sable shall perform a first attempt at repair.  By no later than 15 days after detection, Aux Sable shall perform a final attempt at repair of the leaking piece of Covered Equipment or may place the piece of Covered Equipment on the Delay of Repair ("DOR") list provided that Aux Sable has complied with all applicable regulations and with the requirements of Paragraphs 27–31 and 33 (valve replacement and improvement).

27.    Except as provided in Subparagraph 37.d(i), beginning no later than 180 Days after the Effective Date of this Consent Decree and continuing until termination, Aux Sable shall perform Repair Verification Monitoring following any repair attempt as required under this Consent Decree.

16

28.     Repair Attempt for Valves (other than Control Valves) with Screening Values greater than or equal to 250 ppm and less than 500 ppm.  For any valve, excluding control valves, that has a Screening Value greater than or equal to 250 ppm and less than 500 ppm, Aux Sable shall make an initial attempt to repair the valve and eliminate the leak by no later than five days after detecting the leak.  Repair Verification Monitoring shall be performed to determine if the initial repair has been successful.  If, upon Repair Verification Monitoring, the Screening Value is less than 500 ppm, no further repairs under the Repairs Section of this Consent Decree shall be required for that monitoring event for that valve.  If, upon Repair Verification Monitoring, the Screening Value is greater than or equal to 500 ppm, Aux Sable shall undertake the requirements for repair required by this Consent Decree (and all deadlines for such requirements shall be based on the date of the failed Repair Verification Monitoring).

29.     Drill and Tap for Valves (other than Control Valves and Needle Valves).

a.     Except as provided in Subparagraph 29.b, for leaking valves (other than control valves and needle valves), when other repair attempts have failed to reduce emissions below the applicable leak definition and Aux Sable is not able to remove the leaking valve from service, Aux Sable shall attempt at least one drill-and-tap repair (with a second injection of an appropriate sealing material if the first injection is unsuccessful at repairing the leak) before placing the valve (other than provisionally, as set forth in Subparagraph 29.c) on the DOR list.

b.     Drill-and-tap is not required when:

(i)     Subparagraph 37.d(i) applies; or

(ii)     when there is a major safety, mechanical, product quality, or environmental issue with repairing the valve using the drill-and-tap method, in which case, Aux Sable shall document the reason(s) why any drill-and-tap attempt was not performed prior to placing any valve on the DOR list.

c.     If a drill-and-tap attempt can reasonably be completed within the 15-day repair period, Aux Sable shall complete the drill-and-tap attempt in that time period.  If a drill-and-tap attempt cannot reasonably occur within the 15-day repair period (*e.g.*, if Aux Sable's drill-and-tap contractor is not local and must mobilize to the Facility), Aux Sable provisionally may place the valve on the DOR list pending attempting the drill-and-tap repair as expeditiously as practical.  In no event may Aux Sable take more than 30 days from the initial monitoring to attempt a drill-and-tap repair.  If upon Repair Verification Monitoring, drill-and-tap is deemed successful by reference to a Screening Value of less than 500 ppm, the valve shall be removed from the provisional DOR list and considered repaired.

30.     Except as provided in Subparagraph 37.d(i), for each leak, Aux Sable shall record the following information:  the date of all repair attempts; the repair methods used during each

17

repair attempt; the date, time, and Screening Values for all re-monitoring events; and, if applicable, documentation of compliance with Paragraphs 29 and 32 for Covered Equipment placed on the DOR list.

31.     Nothing in Paragraphs 26–30 is intended to prevent Aux Sable from taking a leaking piece of Covered Equipment out of service; provided, however, that prior to placing the leaking piece of Covered Equipment back in service, Aux Sable must repair the leak or must comply with the requirements of Subsection F (Delay of Repair) to place the piece of Covered Equipment on the DOR list.

**F.   Delay of Repair (Subsection F)**

32.     Beginning no later than the Effective Date of this Consent Decree for the requirements in Subparagraphs 32.b and 32.c(i), and beginning no later than 90 Days after the Effective Date of this Consent Decree for the other requirements set forth below in this Paragraph, for all Covered Equipment placed on the DOR list, Aux Sable shall:

      a.    Require sign-off from the relevant Process Unit supervisor or person of similar authority that the piece of Covered Equipment is technically infeasible to repair without a Process Unit Shutdown;

      b.    Undertake periodic monitoring of the Covered Equipment placed on the DOR list at the frequency specified in Paragraph 21 required for other pieces of Covered Equipment of that type in the Process Unit; and

      c.    Either:

          (i)    Repair the piece of Covered Equipment within the time frame required by the applicable LDAR regulation; or

          (ii)    if applicable under Subsection G, replace, repack, or improve the piece of Covered Equipment in accordance with and by the timeframes set forth in Subsection G.

**G.   Valve Replacement and Improvement Program (Subsection G)**

33.     Commencing no later than 180 Days after the Effective Date of this Consent Decree, and continuing until termination, Aux Sable shall implement the program set forth in Paragraphs 34–42 to improve the emissions performance of the valves that are Covered Equipment in each Covered Process Unit. All references to "valves" in Paragraphs 34–42 exclude pressure relief valves.

34.     List of All Existing Valves in the Covered Process Units.  In the first compliance status report required under Section X (Reporting Requirements), Aux Sable shall include a list of the tag numbers of all valves subject to this LP, broken down by Covered Process Unit, that are in existence as of the Effective Date. The valves on this list shall be the "Existing Valves" for purposes of Paragraphs 35–37.

35.     <u>Proactive Initial Valve Tightening Work Practices Relating to Each New Valve that Is Installed and Each Existing Valve that Is Repacked</u>.  Aux Sable shall undertake the following work practices with respect to each new valve that is subject to LDAR that is installed (whether the new valve replaces an Existing Valve or is newly added to a Covered Process Unit) and each Existing Valve that is repacked: Upon installation (or re-installation in the case of repacking), Aux Sable shall tighten the valve's packing gland nuts or their equivalent (*e.g.*, pushers) to:

> a.     the manufacturer's recommended gland nut or packing torque; or

> b.     any appropriate tightness that will minimize the potential for fugitive emission leaks of any magnitude. This practice shall be implemented prior to the valve's exposure (or re-exposure, in the case of repacking) to process fluids.

36.     <u>Installing New Valves</u>.  Except as provided in Subparagraphs 36.a, 36.b, or Paragraph 39, Aux Sable shall ensure that each new valve (other than a valve that serves as the closure device on an open-ended line) that it installs and each Existing Valve that is replaced for any reason in a Covered Process Unit either is a Low-E Valve or is fitted with Low-E Packing.

> a.     Paragraph 36 shall not apply in emergencies or exigent circumstances requiring immediate installation or replacement of a valve where a Low-E Valve or Low-E Packing is not available on a timely basis.  Any such instance shall be reported in the next LP compliance status report.

> b.     Paragraph 36 shall not apply to valves that are installed temporarily for a short-term purpose and then removed (*e.g.*, valves connecting a portion of the Covered Process Unit to a testing device).

37.     <u>Replacing or Repacking Existing Valves that Have Screening Values at or above 500 ppm with Low-E Valves or Low-E Packing</u>.

> a.     <u>Existing Valves Required to Be Replaced or Repacked</u>.  Except as provided in Paragraph 39, for each Existing Valve that has a Screening Value at or above 500 ppm during any monitoring event, but no earlier than 60 Days after the Effective Date of this Consent Decree, Aux Sable shall either replace or repack the Existing Valve with a Low-E Valve or with Low-E Packing in accordance with this Paragraph.

> b.     <u>Timing:  If Replacing or Repacking Does Not Require a Process Unit Shutdown</u>.  If replacing or repacking does not require Process Unit Shutdown, Aux Sable shall replace or repack the Existing Valve by no later than 30 days after the monitoring event that triggers the replacing or repacking requirement, unless Aux Sable complies with the following:

>> (i)     Prior to the deadline, Aux Sable must take all actions necessary to obtain the required valve or valve packing, including all necessary associated materials, as expeditiously as practical, and

19

retain documentation of the actions taken and the date of each such action;

   (ii)    If, despite Aux Sable's efforts to comply with Subparagraph 37.b(i), the required valve or valve packing, including all necessary associated materials, is not available in time to complete the installation within 30 days, Aux Sable must take all reasonable actions to minimize emissions from the valve pending completion of the required replacing or repacking. Examples include:

        *(a)*   Repair;

        *(b)*   More frequent monitoring, with additional repairs as needed; or

        *(c)*   Where practical, interim replacing or repacking of a valve with a valve that is not a Low-E Valve or with packing that is not Low-E Packing; and

   (iii)    Aux Sable must promptly perform the required replacing or repacking after Aux Sable's receipt of the valve or valve packing, including all necessary associated materials.

c.    <u>Timing: If Replacing or Repacking Requires a Process Unit Shutdown</u>. If replacing or repacking requires a Process Unit Shutdown, Aux Sable shall replace or repack the Existing Valve during the first Process Unit Shutdown that follows the monitoring event that triggers the requirement to replace or repack the valve, unless Aux Sable documents that insufficient time existed between the monitoring event and the Process Unit Shutdown to enable Aux Sable to purchase and install the required valve or valve packing technology. In that case, Aux Sable shall undertake the replacing or repacking at the next Process Unit Shutdown that occurs after Aux Sable's receipt of the valve or valve packing, including all necessary associated materials.

d.    Actions Required Pending Replacings or Repackings Pursuant to Subparagraph 37.a–37.c.

   (i)    <u>Actions Required Pursuant to Subsection E</u>: Aux Sable shall not be required to comply with Subsection E (Repairs), pending replacing or repacking pursuant to Subparagraphs 37.a–37.c if Aux Sable completes the replacing or repacking by the date that is no later than 30 days after detecting the leak. If Aux Sable does not complete the replacing or repacking within 30 days, or if at the time of the leak detection Aux Sable reasonably can anticipate that it might not be able to complete the replacing or repacking within 30 days, Aux Sable shall comply with all applicable requirements of Subsection E (Repairs).

20

        (ii)      <u>Actions Required Pursuant to Applicable Regulations</u>: For each Existing Valve that has a Screening Value at or above 500 ppm, Aux Sable shall comply with all applicable regulatory requirements, including repair and DOR, pending replacing or repacking pursuant to Subparagraphs 37.a–37.c.

38.      Provisions Related to Low-E Valves and Low-E Packing.

      a.      <u>Low-E Status Not Affected by Subsequent Leaks</u>.  If, during monitoring or after installation, a Low-E Valve or a valve using Low-E Packing has a Screening Value at or above 500 ppm, the leak is not a violation of this Decree, does not invalidate the "Low-E" status or use of that type of valve or packing technology, and does not require replacing other, non-leaking valves or packing technology of the same type.

      b.      <u>Repairing Low-E Valves</u>.  If, during monitoring after installation, a Low-E Valve or a valve using Low-E Packing has a Screening Value at or above 500 ppm, Paragraphs 26, 27, 29, 30, 31, and 32 shall apply.

      c.      <u>Replacing or Repacking Low-E Valves</u>.  On any occasion when a Low-E Valve or a valve that utilizes Low-E Packing has a Screening Value at or above 500 ppm, Aux Sable shall replace or repack such valve pursuant to the requirements of Paragraph 37.

39.      <u>Commercial Unavailability of a Low-E Valve or Low-E Packing</u>.  Aux Sable shall not be required to utilize a Low-E Valve or Low-E Packing to replace or repack a valve if a Low-E Valve or Low-E Packing is commercially unavailable.  The factors relevant to the question of commercial unavailability and the procedures that Aux Sable must follow to assert that a Low-E Valve or Low-E Packing is commercially unavailable are set forth in Appendix A.

40.      <u>Records of Low-E Valves and Low-E Packing</u>.  Prior to installing any Low-E Valves or Low-E Packing, or if not possible before installation, then as soon as possible after installation, Aux Sable shall obtain from each manufacturer documentation that demonstrates that the proposed valve or packing technology meets the definition of "Low-E Valve" and/or "Low-E Packing."  Aux Sable shall make the documentation available upon request.

41.      Nothing in Paragraphs 36–39 requires Aux Sable to utilize any valve or valve packing technology that is not appropriate for its intended use in a Covered Process Unit.

42.      In each Compliance Status Report due under Section X (Reporting Requirements) of this Decree, Aux Sable shall include a separate section in the Report that: (i) describes the actions it took to comply with this Subsection G, including identifying each piece of equipment that triggered a requirement in Subsection G, the Screening Value for that piece of equipment, and the type of action taken (*i.e.*, replacement, repacking, or improvement, and the date when the action was taken); (ii) identifies any required actions that were not taken and explains why; and (iii) identifies the schedule for any known, future replacements, repackings, improvements, or eliminations.

### H. **Management of Change (Subsection H)**

43.     <u>Management of Change</u>.  Beginning no later than 90 Days after the Effective Date of this Consent Decree, Aux Sable shall ensure that each valve, pump, and connector added to the Covered Process Units at the Facility for any reason is evaluated to determine if it is subject to LDAR regulations.  Aux Sable also shall ensure that each valve, pump, and connector that was subject to the LDAR program is eliminated from the LDAR program if it is physically removed from a Covered Process Unit.  This evaluation shall be a part of Aux Sable's Facility-wide Management of Change protocol.

### I. **Training (Subsection I)**

44.     By no later than 270 Days after the Effective Date of this Consent Decree, Aux Sable shall develop a training protocol (or, as applicable, require its contractor to develop a training protocol for the contractor's employees) and shall ensure that all LDAR Personnel have completed training on all aspects of LDAR, including this LP, that are relevant to the person's duties.  Once per calendar year starting in the calendar year after completion of initial training, Aux Sable shall ensure that refresher training is performed with respect to each employee or contractor; provided, however, that refresher training is not required if an individual's employment at the Facility ceases prior to the end of the calendar year or no longer involves duties relevant to LDAR.  Beginning no later than the Effective Date of this Consent Decree and continuing until termination of this Consent Decree, Aux Sable shall ensure (or as applicable, require its contractor to ensure for the contractor's employees) that new LDAR Personnel are sufficiently trained prior to any field involvement (other than supervised involvement for purposes of training) in the LDAR program.

### J. **Quality Assurance ("QA")/Quality Control ("QC") (Subsection J)**

45.     <u>Daily Certification by Monitoring Technicians</u>.  Commencing by no later than 30 Days after the Effective Date of this Consent Decree, on each day that monitoring occurs, at the end of such monitoring, Aux Sable shall ensure that each monitoring technician certifies that the data collected accurately represents the monitoring performed for that day by requiring the monitoring technician to sign a form that includes the following certification:

> On [insert date], I reviewed the monitoring data that I collected today and to the best of my knowledge and belief, the data accurately represents the monitoring that I performed today.

46.     Commencing by no later than the first full calendar quarter after the Effective Date of this Consent Decree, at times that are not announced to the LDAR monitoring technicians, Aux Sable shall ensure that an LDAR Personnel who does not serve on a routine basis as an LDAR monitoring technician at the Facility, shall undertake the following at the Facility with respect to Covered Equipment and Covered Process Units at the Facility, no less than once per calendar quarter:

> a.     Verify that equipment was monitored at the appropriate frequency;
>
> b.     Verify that proper documentation and sign-offs have been recorded for all equipment placed on the DOR list;

c. Ensure that repairs have been performed in the required periods;

d. Review monitoring data and equipment counts (*e.g.,* number of pieces of equipment monitored per day) for feasibility and unusual trends;

e. Verify that proper calibration records and monitoring instrument maintenance information are maintained;

f. Verify that other LDAR program records are maintained as required; and

g. Observe in the field each LDAR monitoring technician who is conducting leak detection monitoring to ensure that monitoring during the quarterly QA/QC is being conducted as required.

Aux Sable promptly shall correct any deficiencies detected or observed. Aux Sable shall maintain a log that: (i) records the date and time that the reviews, verifications, and observations required by this Paragraph are undertaken; and (ii) describes the nature and timing of any corrective actions taken.

### K. **LDAR Audits and Corrective Action (Subsection K)**

47. <u>LDAR Audit Schedule</u>: Until termination of this Consent Decree, Aux Sable shall ensure that an LDAR audit of all Covered Process Units at the Facility ("LDAR Audit") is conducted once every two years in accordance with the following schedule: for the first LDAR Audit, the LDAR Audit Commencement Date shall be no later than twelve months after the Effective Date of this Consent Decree; for each subsequent LDAR Audit, the LDAR Audit Completion Date shall occur within the same calendar quarter that the first LDAR Audit Completion Date occurred.

48. <u>Requirements Related to Persons Conducting LDAR Audits</u>. For the LDAR Audits to be conducted every two years under this Consent Decree, Aux Sable shall retain a third party with experience in conducting LDAR audits. Aux Sable shall select a different company than the Facility's regular LDAR contractor to perform the LDAR Audit, and Aux Sable may not hire that company as the Facility's regular LDAR contractor prior to termination of this Consent Decree.

49. For each Covered Process Unit, each LDAR Audit shall include: (i) reviewing Aux Sable's compliance with all applicable LDAR regulations; (ii) reviewing and/or verifying the same items that are required to be reviewed and/or verified in Subparagraphs 46.a–46.f; (iii) reviewing whether any pieces of equipment that are required to be in the LDAR Program are not included; and (iv) "Comparative Monitoring" as described in Paragraph 50. LDAR Audits after the first audit also shall include reviewing the Facility's compliance with the LP requirements of this Consent Decree.

50. <u>Comparative Monitoring</u>. Comparative Monitoring during LDAR Audits shall be undertaken as follows:

a. <u>Calculating a Comparative Monitoring Audit Leak Percentage</u>. Covered Types of Equipment shall be monitored in order to calculate a leak

23

percentage for the Covered Process Units. For descriptive purposes under this Section, the monitoring that takes place during an LDAR Audit shall be called "Comparative Monitoring," and the leak percentages derived from the Comparative Monitoring shall be called the "Comparative Monitoring Audit Leak Percentages." Aux Sable shall undertake Comparative Monitoring of the Covered Types of Equipment in the Covered Process Units during each LDAR Audit. In undertaking Comparative Monitoring, Aux Sable shall not be required to monitor every component in each Covered Process Unit.

b. <u>Calculating the Historic, Average Leak Percentage from Prior Periodic Monitoring Events</u>. For each Covered Process Unit, the historic, average Leak percentage from prior periodic monitoring events, broken down by Covered Type of Equipment, shall be calculated. Four complete monitoring periods immediately preceding the Comparative Monitoring shall be used for this purpose. The preceding monitoring periods may comprise a mix of the monitoring periods and frequencies specified in Paragraph 21 or 22.

c. <u>Calculating the Comparative Monitoring Leak Ratio</u>. For each Covered Process Unit, the ratio of the Comparative Monitoring Audit Leak Percentage from Subparagraph 50.a to the historic, average leak percentage from Subparagraph 50.b shall be calculated. This ratio shall be called the "Comparative Monitoring Leak Ratio." If the denominator in this calculation is "zero," it shall be assumed (for purposes of this calculation but not for any other purpose under this Consent Decree or under any applicable laws or regulations) that one leaking piece of Covered Equipment was found in the process unit through routine monitoring during the 12-month period before the Comparative Monitoring.

d. In only the first LDAR audit, Aux Sable shall not be required to undertake Comparative Monitoring on connectors or calculate a Comparative Monitoring Leak Ratio for connectors because of the unavailability of historic, average leak percentages for connectors.

51. <u>When More Frequent Periodic Monitoring is Required</u>. If a Comparative Monitoring Audit Leak Percentage calculated pursuant to Subparagraph 50.a triggers a more frequent monitoring schedule under any applicable federal, state, or local law or regulation than the frequencies listed in either Paragraph 21 or 22, as applicable for the Covered Type of Equipment in that Covered Process Unit, Aux Sable shall monitor the Covered Type of Equipment at the greater frequency unless and until less frequent monitoring is again allowed under the specific federal, state, or local law or regulation. At no time may Aux Sable monitor at intervals less frequently than those listed in the applicable Paragraph in Subsection C (Monitoring Frequency and Equipment) of this Section.

24

52.     Corrective Action Plan ("CAP").

    a.    Requirements of a CAP.  By no later than the date that is 30 days after each LDAR Audit Completion Date, Aux Sable shall develop a preliminary Corrective Action Plan if:  (i) the results of an LDAR audit identify any deficiencies; or (ii) a Comparative Monitoring Leak Ratio calculated pursuant to Subparagraph 50.c is 3.0 or higher *and* the Comparative Monitoring Audit Leak Percentage calculated pursuant to Subparagraph 50.c is greater than or equal to 0.5 percent.  The preliminary CAP shall describe the actions that Aux Sable has taken or shall take to address: (i) the deficiencies and/or (ii) the causes of a Comparative Monitoring Leak Ratio that is 3.0 or higher (but only if the Comparative Monitoring Audit Leak Percentage is at or above 0.5 percent).  Aux Sable shall include a schedule by which actions that have not yet been completed shall be completed.  Aux Sable promptly shall complete each corrective action item with the goal of completing each action within 90 days after the LDAR Audit Completion Date.  If any action is not completed or not expected to be completed within 90 Days after the LDAR Audit Completion Date, Aux Sable shall explain the reason(s) and propose a schedule for prompt completion in the final CAP to be submitted under Subparagraph 52.b.

    b.    Submission of the Final CAP to EPA.  By no later than 120 days after the LDAR Audit Completion Date, Aux Sable shall submit the final CAP to EPA, together with a certification of the completion of each item of corrective action.  If any action is not completed within 90 days after the LDAR Audit Completion Date, Aux Sable shall explain the reasons, together with a proposed schedule for prompt completion.  Aux Sable shall submit a supplemental certification of completion by no later than 30 Days after completing all actions.

    c.    EPA Comment on CAP.  EPA may submit comments on the final CAP to Aux Sable.  Aux Sable shall submit a reply to EPA by no later than 30 Days of receipt of any EPA comments.  Disputes arising with respect to any aspect of a CAP shall be resolved in accordance with the dispute resolution provisions in Section XIII (Dispute Resolution) of this Decree.

**L.  Certification of Compliance (Subsection L)**

53.     Within 180 Days after the initial LDAR Audit Completion Date, Aux Sable shall certify to EPA that, to the signer's best knowledge and belief formed after reasonable inquiry: (i) except as otherwise identified, the Facility is in compliance with all applicable LDAR regulations and the LP requirements of this Consent Decree; (ii) Aux Sable has completed all corrective actions, if applicable, or is in the process of completing all corrective actions pursuant to a CAP; and (iii) all equipment at the Facility that is regulated under LDAR has been identified and included in the Facility's LDAR program.  To the extent that Aux Sable cannot make the

25

certification in all respects, it shall specifically identify any deviations from Items (i)–(iii) in this Paragraph.

**M. Recordkeeping (Subsection M)**

54.     Aux Sable shall keep all records required by this LP, including each LDAR Audit report, to document compliance with the requirements of this LP for at least two years after termination of this Consent Decree.  Upon request by EPA, Aux Sable shall make all such documents available to EPA and shall provide, in electronic format if so requested, all LDAR monitoring data generated during the life of this Consent Decree.

## VII.    ENVIRONMENTAL MITIGATION PROJECTS

55.     Aux Sable shall, in accordance with the terms of this Consent Decree, implement the three environmental mitigation projects included in this Section and Appendix B:  (a) the installation of Ultra-Low NOx Burners and (b) two locomotive projects: (1) the Diesel Engine Repowering Project ("Repowering Project") and (2) the Switcher Locomotive Idle Reduction Project ("Switcher Project").

**A. Ultra-Low NOx Burners for HTF Heaters (H-501A and H-501B) ("ULNB Project")**

56.     Aux Sable shall install Ultra-Low NOx Burners ("ULNBs") on HTF Heaters H-501A and H-501B by no later than the following schedule:  (i) by no later than 15 months from the Date of Lodging, for one heater and (ii) by no later than 18 months from the Date of Lodging, for the other heater.  ULNBs are designed to minimize NOx emissions, and installation of the ULNBs at the Facility will result in annual emissions reductions of NOx, an ozone precursor.

57.     From the Date of Lodging until 12 months following installation of each respective ULNBs as set forth in Paragraph 56, Aux Sable shall maintain and demonstrate compliance with its NOx emission limit of 0.030 pounds per mmBtu for each HTF Heater, as set forth in its Title V permit.  After the 12-month period following installation of each respective ULNBs, Aux Sable shall be required to meet the NOx emission limit set forth in Paragraph 60.

58.     By no later than the installation dates of the ULNBs on the two HTF Heaters set forth in Paragraph 56, Aux Sable shall certify, calibrate, maintain, and operate NOx CEMS on each HTF Heater in accordance with the provisions of 40 C.F.R. § 60.13 that are applicable to CEMS (excluding those provisions applicable only to Continuous Opacity Monitoring Systems) and 40 C.F.R. Part 60, Appendices A and F, and Performance Specification 2 of 40 C.F.R. Part 60, Appendix B.  However, unless a federal or state regulation or a permit condition otherwise requires compliance with 40 C.F.R. Part 60, Appendix F §§ 5.1.1, 5.1.3, and 5.1.4, for these CEMS, Aux Sable may conduct: (1) either a Relative Accuracy Audit ("RAA") or a Relative Accuracy Test Audit ("RATA") once every three years; and (2) a Cylinder Gas Audit ("CGA") each calendar quarter in which a RAA or RATA is not performed.

59.     By no later than the installation dates set forth in Paragraph 56, Aux Sable shall comply with the applicable emission monitoring, recordkeeping, and reporting requirements of 40 C.F.R. §§ 60.48b and 60.49b for each HTF Heater.

60.     Beginning twelve months after the installation of each respective ULNBs as set forth in Paragraph 56, Aux Sable shall comply with a NOx emission limit of 0.019 pounds of NOx per mmBTU for each HTF Heater (H-501A and H-501B) on a 12-month rolling average, rolled monthly.

61.     Beginning January 1, 2020, and annually thereafter on a calendar year basis, Aux Sable shall comply with the annual emission limit of 15.80 tons per year of NOx per HTF heater.

62.     Aux Sable shall retain all records required to support its reporting requirements under this Subsection of the Consent Decree until its termination pursuant to Section XXI (Termination).  Aux Sable shall make such records and all CEMS data and test results available to EPA upon request.

63.     Aux Sable shall certify, as part of its ULNB Project, as set forth in Paragraphs 56 to 62, above and, as part of its Locomotive Projects as set forth in this Section and Appendix B, that:

    a.     Aux Sable is not required to perform the Project by any federal, state, or local law or regulation or by any agreement, grant, or as injunctive relief awarded in any other action in any forum;

    b.     The Project is not a project that Aux Sable was planning or intending to construct, perform, or implement other than in settlement of the claims resolved in the Consent Decree;

    c.     Aux Sable has not received and will not receive credit for the Project in any other enforcement action; and

    d.     Aux Sable will not receive any reimbursement for any portion of the Mitigation Project from any person.  This reimbursement prohibition for the Mitigation Project shall not be construed to preclude cost-sharing under an existing, general long-term commercial sales and cost-sharing agreement between Aux Sable and a third party that became effective on December 31, 2005, for the sale of all natural gas liquids produced by Aux Sable.

## B.  Locomotive Projects: Diesel Engine Repowering Project ("Repowering Project") and Switcher Locomotive Idle Reduction Project ("Switcher Project")

64.     Aux Sable shall implement the Environmental Mitigation Projects ("Projects") described in Appendix B to this Consent Decree in compliance with the approved plans and schedules for such projects and other terms of this Consent Decree.  In implementing the Projects, Aux Sable shall spend no less than $2,000,000 in Project Dollars on the Repowering Project and no less than $1,000,000 on the Switcher Project.

65.     Aux Sable shall maintain, and present to EPA upon request, all documents to substantiate the Project Dollars expended to implement the Projects described in Appendix B, and shall provide these documents to EPA within 30 Days of a request for the documents.

66.     All plans and reports prepared by Aux Sable pursuant to the requirements of this Subsection of the Consent Decree and required to be submitted to EPA shall be made publicly available by Aux Sable without charge.

67.     Aux Sable shall use good faith efforts to secure as much environmental benefit as possible for the Project Dollars expended, consistent with the applicable requirements and limits of this Consent Decree.

68.     In connection with any communication to the public or to shareholders regarding Aux Sable's actions or expenditures relating in any way to the Environmental Mitigation Projects in this Consent Decree, Aux Sable shall include prominently in the communication the information that the actions and expenditures were required as part of a consent decree to resolve allegations that Aux Sable violated the Clean Air Act.

69.     By no later than 60 Days following the completion of each Environmental Mitigation Project required under this Consent Decree (including any applicable periods of demonstration or testing), Aux Sable shall submit to EPA for approval a project completion report that documents the date that the Project was completed, the results achieved by implementing the Project, including the emission reductions and other environmental benefits, and the Project Dollars expended by Aux Sable in implementing the Project.

70.     For the Repowering Project and the Switcher Project, Aux Sable shall comply with the reporting requirements described in Appendix B and the project completion report.

## VIII.   PERMITS

71.     Permits Needed to Meet Compliance Obligations.  Unless expressly stated otherwise in this Consent Decree, in any instance where any compliance obligation under this Consent Decree requires Aux Sable to obtain a federal, state, or local permit or approval, Aux Sable shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

72.     When permits are required, Aux Sable shall complete and submit applications for such permits to allow sufficient time for all legally required processing and review of the permit request, including requests for additional information by the permitting agency. Aux Sable may seek relief under the provisions of Section XII (Force Majeure) of this Consent Decree for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Aux Sable has submitted timely and complete applications and has taken all other actions necessary to obtain all such permits or approvals.  Any failure by Aux Sable to submit a timely permit application for the Facility shall bar any use by Aux Sable of Section XII (Force Majeure) of this Consent Decree, where a Force Majeure claim is based on permitting delays.

73.     Federally-Enforceable Non-Title V Permits to Ensure Survival of Consent Decree Limits and Standards after Termination of Consent Decree.  Aux Sable shall comply with the following in order to ensure that certain limits and standards set forth in this Consent Decree survive termination of the Consent Decree:

28

a.   Prior to termination of this Consent Decree, Aux Sable shall submit a construction permit application(s) to Illinois EPA to incorporate the specific requirements of Paragraph 73.b into federally enforceable non-Title V permits, whether as new permits or revisions to existing permits issued by Illinois EPA pursuant to 35 Ill. Adm. Code Part 201 under the Illinois SIP, in order to ensure that such requirements, including any emission limitation, become and remain an "applicable requirement" as that term is defined in 40 C.F.R. § 70.2, beyond the termination of this Consent Decree.  Following submission of the appropriate application(s), Aux Sable shall cooperate with Illinois EPA by promptly submitting to Illinois EPA all information that it seeks in connection with the permit application following receipt of the application materials.

b.   Aux Sable shall incorporate all of the following requirements of this Consent Decree pursuant to this Paragraph 73:

(i)   Paragraph 12.a (Applicability of 40 C.F.R. Part 60, Subpart OOOO);

(ii)   Paragraph 13 (Merox Off-Gas Incinerators (IN601 and IN602)), including VOC destruction efficiency requirements or the TOC emission reduction requirements;

(iii)  Paragraph 14 (NSPS Subparts NNN and RRR); Paragraphs 56–62 (Mitigation Projects: Ultra-Low NOx Burners for HTF Heaters (H-501A and H-501B)), including NOx emission limits for each HTF Heater; and

(iv)  All of Section IX (Emission Credit Generation).

74.   <u>Title V Permit</u>.  Prior to termination, but by no later than 90 days after issuance of any federally enforceable, non-Title V permit as required under Paragraph 73, Aux Sable shall file an updated Title V Permit renewal application or an administrative amendment or minor modification to the Facility's Title V permit, as appropriate, to incorporate the applicable requirements of such permit into the Title V Permit for the Facility.

75.   When the requirements of this Consent Decree are incorporated into a non-Title V permit applicable to the Facility and then incorporated into the Facility's Title V Permit, these requirements shall also become enforceable pursuant to such permits.

76.   Pursuant to the procedures set forth in Section XVII (Notices), Aux Sable shall provide U.S. EPA with a copy of each application for a federally enforceable permit necessary to implement the requirements of this Consent Decree that is filed after the Effective Date of this Consent Decree, as well as a copy of any permit proposed as a result of such application, to allow for timely participation in any opportunity for public comment.  If, as of the Effective Date of this Consent Decree, Aux Sable has received any permit necessary to implement the requirements of this Consent Decree, then no later than 45 Days after the Effective Date of this Consent Decree, Aux Sable shall submit copies of such permits to U.S. EPA using the procedures set forth in Section XVII (Notices).  U.S. EPA may excuse in writing all or part of

the latter submission if copies of such permits have already been submitted to U.S. EPA prior to the Effective Date of this Consent Decree.

## IX.    EMISSION CREDIT GENERATION

77.    <u>Definition</u>. "CD Emissions Reductions" shall mean any emissions reductions that result from any projects, controls, or any other actions utilized to comply with this Consent Decree.

78.    <u>Prohibitions</u>.  Aux Sable shall neither generate nor use any CD Emissions Reductions as (i) netting reductions; (ii) as emissions offsets; or (iii) to apply for, obtain, trade, or sell any emission reduction credits, including ATUs under ERMS.  Actual emissions for each unit during any two-year period selected by Aux Sable shall be adjusted downward to exclude any portion of the baseline emissions that would have been eliminated as CD Emissions Reductions had Aux Sable been complying with this Consent Decree during that two-year period.

79.    <u>Outside the Scope of the Prohibition</u>. Nothing in this Section IX (Emission Credit Generation) is intended to prohibit Aux Sable from seeking to:

a.    Use or generate emission reductions from emissions units that are covered by this Consent Decree to the extent that the proposed emission reductions represent the difference between CD Emissions Reductions and more stringent control requirements (*e.g.*, emission limits) that Aux Sable may elect to accept for those emissions units in a permitting process;

b.    Use or generate emission reductions from emissions units that are not subject to an emission limitation or control requirement pursuant to this Consent Decree; or

c.    Use CD Emissions Reductions for compliance with any rules or regulations designed to address the non-attainment status of any area (excluding Prevention of Significant Deterioration and non-attainment NSR rules, but including, for example, Reasonably Achievable Control Technology rules) that apply to the Facility; provided, however, that Aux Sable shall not be allowed to trade or sell any CD Emissions Reductions.

80.    <u>Exception to the Prohibition</u>.  Notwithstanding the general prohibition set forth in Paragraph 78 above, Aux Sable may use, in accordance with 35 Ill. Admin. Code Part 203 (and the terms as used and defined therein):  (1) past actual emissions from the HTF Heater H-501A as pre-change actual emissions in determining the increase in actual emissions at that emissions unit resulting from a project consisting solely of installation of ULNBs and NOx CEMS at the HTF Heater H-501A; and (2) past actual emissions from the HTF Heater H-501B as pre-change actual emissions in determining the increase in actual emissions at that emissions unit resulting from a project consisting solely of installation of ULNBs and NOx CEMS at the HTF Heater H-501B.  Utilization of this exception is subject to each of the following conditions:

30

a.   Use of past actual emissions under this Exception to the Prohibition does not extend to any use of past actual emissions in determining the creditable amount of an increase or decrease in actual emissions that are contemporaneous with the above-projects as part of a net emission determination pursuant to 35 Ill. Admin. Code 203.208; and

b.   Aux Sable shall still be subject to all federal and state regulations applicable to Prevention of Significant Deterioration, non-attainment NSR, and/or Minor NSR permitting process.

## X.   REPORTING REQUIREMENTS

81.   Aux Sable shall submit to EPA the following reports:

a.   <u>Initial Compliance Status Report ("Initial Compliance Report")</u>.  By no later than 365 Days after the Effective Date, Aux Sable shall submit to EPA a written, Initial Compliance Report that shall contain information on Consent Decree implementation since the Effective Date.  With the exception of the reporting requirements in Paragraphs 52 and 53, Aux Sable shall include in the Initial Compliance Report information on all reporting obligations set forth in this Consent Decree and its appendices, including:

(i)    <u>Section V (Compliance Requirements)</u>. The status of compliance with Section V, including the information required by:

*(a)*   Paragraph 12 (Applicability of Subpart OOOO and initial connector monitoring);

*(b)*   Paragraph 13 (Merox Off-Gas Incinerators), including (i) any deviations in minimum operating temperature based on the three-hour rolling average as required by Paragraph 13.b; and (ii) any time periods that Aux Sable did not record every 15 minutes as required by Paragraph 13.b; and (iii) the results of any performance testing, as provided in Paragraph 13.c

*(c)*   Paragraph 14 (NSPS Subparts NNN and RRR), including the following for flares: all visible emissions readings, heat content demonstrations, flow rate measurements, exit velocity determinations, records of all periods of operations during which the pilot flame is absent, and, in accordance with EPA's approval of Aux Sable's alternative monitoring request (ADI Determination Control No. 1500084), records required under 40 C.F.R. §§ 60.705(d)(2) and (s), but not records of continuous flare pilot flame monitoring unless requested by EPA;

31

       *(d)*    Paragraph 15 (ERMS);

       *(e)*    Paragraph 16 (Annual Emission Reports); and

       *(f)*    Paragraph 17 (EMP Audit).

(ii)      <u>Section VI (LDAR Program) and Appendix A Reporting Requirements</u>. The status of LP requirements as set forth in Section VI (LDAR Program) and Appendix A, including:

       *(a)*    The number of LDAR Personnel at the Facility (excluding Personnel whose functions involve the non-monitoring aspects of repairing leaks) and the approximate percentage of time each such person dedicated to performing his/her LDAR functions at the Facility;

       *(b)*    An identification and description of any noncompliance with the requirements of Section VI (LDAR Program);

       *(c)*    An identification of any problems encountered in complying with the requirements of Section VI (LDAR Program);

       *(d)*    The list of Existing Valves as required by Paragraph 34;

       *(e)*    The information required by Paragraph 42;

       *(f)*    The information required by Paragraph 46;

       *(g)*    A description of the trainings done in accordance with this Consent Decree;

       *(h)*    Any deviations identified in the QA/QC performed under Section VI (LDAR Program) Subsection J, as well as any corrective actions taken under that Subsection;

       *(i)*    A summary of LDAR audit results including specifically identifying all alleged deficiencies under Section VI (LDAR Program) Subsection K;

       *(j)*    The status of all actions under any CAP that was submitted during the reporting period, unless the CAP was submitted less than one month before the compliance status report; and

       *(k)*    Claims of commercial unavailability in accordance with Paragraph 39 and Appendix A.

(iii)      Section VII (Environmental Mitigation Projects).  The status of the mitigation projects in Section VII (Environmental Mitigation Projects) and Appendix B;

(iv)      Other Reporting Requirements:

*(a)*    The status of completion of milestones, including a compliance table that lists each milestone set forth in this Consent Decree, each milestone's required completion date, and the date Aux Sable completes each milestone;

*(b)*    The status of permits and permit applications as set forth in Section VIII (Permits), including copies of any submitted permit applications, state-proposed permits, and issued permits;

*(c)*    A description of all periods of any claimed Malfunction(s), including the quantity of NOx or VOC emitted, and the dates and duration of each claimed Malfunction, the cause of the Malfunction(s), and an explanation as to how the claimed Malfunction meets the definition of Malfunction under the requirements of this Consent Decree; and

*(d)*    A description of any problems encountered or anticipated, together with proposed solutions.

b.    Subsequent Compliance Status Report ("Annual Compliance Report(s)").  By no later than 365 Days after submission of the Initial Compliance Report as set forth in Paragraph 81.a, and on the same date for every calendar year thereafter until termination of this Consent Decree pursuant to Section XXI (Termination), Aux Sable shall submit a written Annual Compliance Report that shall contain information on implementation of this Consent Decree for the preceding year.  Aux Sable shall include in each Annual Compliance Report:

(i)    The reporting obligations set forth in Paragraph 81.a, except for those requirements in Paragraph 81.a(ii)(*d*); and

(ii)    The status of the mitigation projects in Section VII, Subsection A (Ultra-Low NOx Burners), including (i) the date of installation of the Ultra-Low NOx Burners for each heater as required by Paragraph 56, (ii) all periods of CEMs downtime for each HTF heater; (iii) all periods that each HTF heater did not meet the NOx emission limit set forth in Paragraphs 60, and 61; and (iv) compliance demonstration of the annual NOx emission limit for each HTF heater as required in Paragraphs 61 and 57.

82.     Each report submitted by Aux Sable under this Section shall also include a description of any noncompliance with the requirements of this Consent Decree and an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation.  If Aux Sable violates, or expects that it will violate, any requirement of this Consent Decree, Aux Sable shall notify the United States of such violation and its likely duration, in writing, in a separate written report, within 14 Working Days of the Day Aux Sable first becomes aware of the violation, with an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to minimize such violation.  If the cause of a violation cannot be fully explained at the time the report is due, Aux Sable shall so state in the report.  Aux Sable shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within 30 Days of the initial notification.  Nothing in this Paragraph or the following Paragraph relieves Aux Sable of its obligation to provide the notice required by Section XII (Force Majeure).

83.     All Reports under this Consent Decree shall be submitted to EPA in the manner designated in Section XVII (Notices) of this Consent Decree.

84.     The reporting requirements of this Consent Decree do not relieve Aux Sable of any reporting obligations required by the CAA or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement. The reporting requirements of this Section are in addition to any other reports, plans, or submissions required by other Sections of this Consent Decree.

85.     Whenever any violation of this Consent Decree or of any applicable permits or any other event affecting Aux Sable's performance under this Decree, or the performance of its Facility, may pose an immediate threat to the public health or welfare or the environment, Aux Sable shall notify EPA orally or by electronic transmission as soon as possible, but no later than 24 hours after Aux Sable first knew of the violation or event.  This procedure is in addition to the requirements set forth in the preceding Paragraph.

86.     Each report submitted by Aux Sable under this Section shall be signed by an Aux Sable official (head of those responsible for environmental management and compliance) and include the following certification:

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.  I have no personal knowledge that the information submitted is other than true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

87.     This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

88. The reporting requirements of this Consent Decree do not relieve Aux Sable of any reporting obligations required by the Clean Air Act or its implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

89. Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

90. Approval of Deliverables. After review of any plan, report, or other item that is required to be submitted and approved pursuant to this Consent Decree, EPA shall in writing: (a) approve the submission; (b) approve the submission upon specified conditions; (c) approve part of the submission and disapprove the remainder; or (d) disapprove the submission.

91. If the submission is approved pursuant to Paragraph 90, Aux Sable shall take all actions required by the plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved. If the submission is conditionally approved or approved only in part pursuant to Paragraph 90(b) or (c), Aux Sable shall, upon written direction from EPA, take all actions required by the approved plan, report, or other item that EPA determines are technically severable from any disapproved portions, subject to Aux Sable's right to dispute only the specified conditions or the disapproved portions, under Section XIII (Dispute Resolution).

92. If the submission is disapproved in whole or in part pursuant to Paragraph 90(c) or (d), Aux Sable shall, within 45 days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the plan, report, or other item, or disapproved portion thereof, for approval, in accordance with the preceding Paragraphs. If the resubmission is approved in whole or in part, Aux Sable shall proceed in accordance with the preceding Paragraph.

93. If a resubmitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, EPA may again require Aux Sable to correct any deficiencies, in accordance with the preceding Paragraphs, or may itself/themselves correct any deficiencies, subject to Aux Sable's right to invoke Dispute Resolution and the right of EPA to seek stipulated penalties as provided in the preceding Paragraphs.

94. Any stipulated penalties applicable to the original submission, as provided in Section XI (Stipulated Penalties), shall accrue during the 45 day period or other specified period, but shall not be payable unless the resubmission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Aux Sable's obligations under this Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

## XI.    STIPULATED PENALTIES

95. Late Payment of Civil Penalty. If Aux Sable fails to pay any portion of the civil penalty required to be paid under Section IV (Civil Penalty) when due, Aux Sable shall pay a stipulated penalty of $2,500 per Day for each Day that the payment is late. Late payment of the civil penalty and any accrued stipulated penalties shall be made in accordance with Paragraph 9.

35

96.     <u>Failure to Meet All Other Consent Decree Obligations</u>.  Aux Sable shall be liable for stipulated penalties to the United States for violations of this Consent Decree as specified in this Section unless excused under Section XII (Force Majeure) and subject to Section XIII (Dispute Resolution).  A violation includes failing to perform any obligation required by the terms of this Consent Decree, including any work plan or schedule approved under this Consent Decree, according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

## A.  **Requirements for Applicability of 40 C.F.R. Part 60, Subpart OOOO**

97.     For failure to implement any applicable provision of NSPS Subpart OOOO for Covered Process Units, except for the provisions found in 40 C.F.R. § 60.5400, in violation of Paragraph 12:

| Period of Delay or Noncompliance | Penalty per Violation per Day |
| --- | --- |
| 1st through 15th Day | $500 |
| 16th through 30th Day | $1,000 |
| 31 Days or more | $2,000 |

## B.  **Requirements for Merox Off-Gas Incinerators (IN601 and IN602)**

98.     For failure to comply with the control efficiency standard for either of the Merox Off-Gas Incinerators as set forth in Paragraph 13.a, per incinerator, per Day:

| Period of Delay or Noncompliance | Penalty per Violation per Day |
| --- | --- |
| 1st through 15th Day | $1,000 |
| 16th through 30th Day | $2,000 |
| 31 Days or more | $3,000 |

Provided, however, that stipulated penalties shall not be assessed for any exceedance of the control efficiency standard set forth in Paragraph 13.a to the extent that it is caused by a Malfunction. This provision on Malfunction applies only to the calculation of stipulated penalties and shall not be included in any permit.

99.     For failure to measure or record the average fire box temperature for either of the Merox Off-Gas Incinerators in accordance with the requirements of Paragraph 13.b, per incinerator, per Day:

| Period of Delay or Noncompliance | Penalty per Violation per Day |
| --- | --- |
| 1st through 15th Day | $500 |
| 16th through 30th Day | $1,000 |
| 31 Days or more | $2,000 |

100.    For failure to operate either of the Merox Off-Gas Incinerators at the minimum operating temperature in accordance with the requirements of Paragraph 13.c, per incinerator, per Day:

36

| Period of Delay or Noncompliance | Penalty per Violation per Day |
|---|---|
| 1st through 15th Day | $500 |
| 16th through 30th Day | $1,000 |
| 31 days or more | $2,000 |

Provided, however, that stipulated penalties shall not be assessed for any exceedance of the minimum operating temperature as required by Paragraph 13.c to the extent that such exceedance is caused by a Malfunction. This provision applies only to the calculation of stipulated penalties and shall not be included in any permit.

### C. **Requirements under NSPS Subparts NNN and RRR**

101. For failure to install, maintain, or operate any unit or system in accordance with an applicable Subpart NNN or RRR monitoring or equipment requirement set forth in Paragraph 14.a(i) or 14.b(i):

| Period of Delay or Noncompliance | Penalty per Violation per Day |
|---|---|
| 1st through 15th Day | $500 |
| 16th through 30th Day | $1,000 |
| 31 Days or more | $2,000 |

102. For failure to comply with an applicable Subpart NNN or RRR emissions standard for any unit or system pursuant to Paragraph 14.a(ii) or 14.b(ii):

| Period of Delay or Noncompliance | Penalty per Violation per Day |
|---|---|
| 1st through 15th Day | $1,000 |
| 16th through 30th Day | $2,000 |
| 31 Days or more | $3,000 |

103. For failure to comply with an applicable Subpart NNN or RRR reporting or recordkeeping requirement set forth in Paragraph 14.a(iii) or 14.b(iii) for any unit or system:

| Period of Delay or Noncompliance | Penalty per Violation per Day |
|---|---|
| 1st through 15th Day | $500 |
| 16th through 30th Day | $1,000 |
| 31 Days or more | $2,000 |

### D. **ERMS**

104. For failure to timely submit or submit an accurate and complete ERMS seasonal emissions report to Illinois EPA in accordance with Paragraph 15: $10,000 per year.

### E. **Annual Emission Reports**

105. For failure to timely submit or submit an accurate and complete Annual Emission Report in accordance with Paragraph 16: $10,000 per year.

**F. EMP Audit**

106.    For the failure to retain a third party, have the third party prepare a report, or implement any recommendations made the by third party unless Aux Sable rejects or modifies such recommendations as provided for and in accordance with Paragraph 17:

| Period of Delay or Noncompliance | Penalty per Violation per Day |
|---|---|
| 1st through 15th Day | $750 |
| 16th through 30th Day | $1,000 |
| 31 Days or more | $1,500 |

**G. Requirements under the LDAR Program**

107.    Failure to Meet LP Consent Decree Obligations.  Aux Sable shall be liable for stipulated penalties to the United States for violations of this Consent Decree as specified in Table 2 unless excused under Section XII (Force Majeure) and subject to Section XIII (Dispute Resolution).

**Table 2**

| Violation | Stipulated Penalty | |
|---|---|---|
| 107.a.  Failure to timely develop a Facility-wide LDAR document as required by Paragraph 20 or failure to timely update the document on an annual basis if needed pursuant to Paragraph 20. | Period of Delay or Noncompliance<br>1st through 15th Day<br>16th through 30th Day<br>31 Days or more | Penalty per Violation per Day<br>$300<br>$400<br>$500 |
| 107.b.  Each failure to perform monitoring at the frequencies set forth in Paragraphs 12.b, 21 or, if applicable, Paragraph 22. | $100 per component per missed monitoring event, not to exceed $25,000 per month per Covered Process Unit | |
| 107.c.  Each failure to comply with Method 21 in performing LDAR monitoring, in violation of Paragraph 23. | Monitoring frequency for the component<br><br>Every 2 years<br>Annual<br>Semi-Annual<br>Quarterly<br>Monthly | Penalty per monitoring event per process unit<br><br>$25,000<br>$20,000<br>$15,000<br>$10,000<br>$5,000 |

| Violation | Stipulated Penalty |
|---|---|
| 107.d.  For each failure to use a monitoring device that is attached to a data logger and for each failure, during each monitoring event, to directly electronically record the Screening Value, date, time, identification number of the monitoring instrument, and the identification of technician, in violation of these requirements of Paragraph 23. | $100 per failure per piece of equipment monitored |
| 107.e.  Each failure to transfer monitoring data to an electronic database on at least a weekly basis, in violation of this requirement in Paragraph 23. | $150 per Day for each Day that the transfer is late |
| 107.f.  Each failure to timely perform a first repair as required by Paragraph 26 or 28. For purposes of these stipulated penalties, the term "repair" includes the required remonitoring in Paragraph 28 after the repair attempt; the stipulated penalties in Subparagraph 107.h do not apply. | $150 per Day for each late Day, not to exceed $1,500 per leak |

| 107.g.  Each failure to timely perform a final attempt at repair as required by Paragraph 26 unless not required to do so under Subparagraph 37.d.  For purposes of these stipulated penalties, the term "repair" includes the required remonitoring in Paragraph 28 after the repair attempt; the stipulated penalties in Subparagraph 107.h do not apply. | Equipment type | Penalty per component per Day late | Not to exceed |
|---|---|---|---|
| | Valves, connectors | $300 | $37,500 |
| | Pumps | $1,200 | $150,000 |

| Violation | Stipulated Penalty |
|---|---|
| 107.h. Each failure to timely perform Repair Verification Monitoring as required by Paragraph 27 in circumstances where the first attempt to adjust, or otherwise alter, the piece of Covered Equipment to eliminate the leak was made within five days of detecting a leak and the final attempt to adjust, or otherwise alter, the piece of equipment to eliminate the leak was made within 15 days of detecting a leak. | <table><tr><td>Equipment type</td><td>Penalty per component per Day late</td><td>Not to exceed</td></tr><tr><td>Valves, connectors</td><td>$150</td><td>$18,750</td></tr><tr><td>Pumps</td><td>$600</td><td>$75,000</td></tr></table> |
| 107.i. Each failure to undertake the drill-and-tap method as required by Paragraph 29. | <table><tr><td>Period of Noncompliance</td><td>Penalty per component per Day late</td></tr><tr><td>1st through 15th Day</td><td>$200</td></tr><tr><td>16th through 30th Day</td><td>$350</td></tr><tr><td>31 Days or more</td><td>$500 per Day for each Day over 30, not to exceed $37,500</td></tr></table> |
| 107.j. Each failure to record the information required by Paragraph 30. | $100 per component per item of missed information |
| 107.k. Each improper placement of a piece of Covered Equipment on the DOR list (*e.g.*, placing a piece of Covered Equipment on the DOR list even though it is feasible to repair it without a Process Unit Shutdown) required by Paragraph 26. | <table><tr><td>Equipment type</td><td>Penalty per component per Day on list</td><td>Not to exceed</td></tr><tr><td>Valve, connectors</td><td>$300</td><td>$75,000</td></tr><tr><td>Pumps</td><td>$1,200</td><td>$300,000</td></tr></table> |
| 107.l. Each failure to comply with the requirement in Subparagraph 32.a that a relevant unit supervisor or person of similar authority sign off on placing a piece of Covered Equipment on the DOR list. | $250 per piece of Covered Equipment |
| 107.m. Each failure to comply with the requirements of Subparagraph 32.c(i). | Refer to the applicable stipulated penalties in Subparagraphs 107.f and 107.g above |

| Violation | Stipulated Penalty |
| --- | --- |
| 107.n.  Each failure to comply with the requirements of Subparagraph 32.c(ii). | Refer to the applicable stipulated penalties in Subparagraphs 107.p–107.u below |
| 107.o.  Each failure to comply with the work practice standards in Paragraph 35. | $50 per violation per valve per Day, not to exceed $30,000 for all valves in a Covered Process Unit per quarter |
| 107.p.  Each failure to install a Low-E Valve or a valve fitted with Low-E Packing when required to do so pursuant to Paragraph 36 or 37, except as provided under Paragraphs 36.a, 36.b, or 39. | $20,000 per failure, except as provided in Paragraph 108 below |
| 107.q.  Each failure, in violation of Subparagraph 37.b, to timely comply with the requirements relating to installing a Low-E Valve or Low-E Packing if a Process Unit Shutdown is not required, except as provided under Paragraph 39. | $500 per Day per failure, not to exceed $20,000, except as provided in Paragraph 108 below |
| 107.r.  Each failure, in violation of Subparagraph 37.c, to install a Low-E Valve or Low-E Packing when required to do so during a Process Unit Shutdown, except as provided under Paragraph 39. | $20,000 per failure, except as provided in Paragraph 108 below |
| 107.s.  Each failure to add a piece of Covered Equipment to the LDAR program when required to do so pursuant to the evaluation required by Paragraph 43 (Management of Change). | $300 per piece of Covered Equipment (plus an amount, if any, due under Paragraph 107.b above for any missed monitoring event related to a component that should have been added to the LDAR program but was not) |
| 107.t.  Each failure to remove a piece of Covered Equipment from the LDAR program when required to do so pursuant to Paragraph 43 (Management of Change). | $150 per failure per piece of Covered Equipment |
| 107.u.  Each failure to timely develop a training protocol as required by Paragraph 44 (Training). | $50 per Day late |

| Violation | Stipulated Penalty |
|---|---|
| 107.v. Each failure to perform initial, refresher, or new personnel training as required by Paragraph 44 (Training). | $1,000 per person per month late |
| 107.w. Each failure of a monitoring technician to complete the certification required in Paragraph 45. | $100 per failure per technician |
| 107.x. Each failure to perform any of the requirements relating to QA/QC in Paragraph 45. | $1,000 per missed requirement per quarter |
| 107.y. Each failure to conduct an LDAR audit in accordance with the schedule set forth in Paragraph 47. | Period of Delay or Noncompliance — Penalty per Violation per Day<br><br>1st through 15th Day — $300<br>16th through 30th Day — $400<br>31 Days or more — $500<br><br>Not to exceed $100,000 per audit |
| 107.z. Each failure to use a third party as an auditor; each use of a third-party auditor that is not experienced in LDAR audits; and each use of Aux Sable's regular LDAR contractor to conduct the third-party audit, in violation of the requirements of Paragraph 48. | $25,000 per audit |
| 107.aa. Except for the requirement to undertake Comparative Monitoring, each failure to substantially comply with the LDAR audit requirements in Paragraph 49. | $100,000 per audit |
| 107.bb. Each failure to substantially comply with the Comparative Monitoring requirements of Paragraph 50. | $50,000 per audit |

| Violation | Stipulated Penalty | |
|---|---|---|
| 107.cc. Each failure to timely submit a Corrective Action Plan that substantially conforms to the requirements of Paragraph 52. | Period of Delay or Noncompliance | Penalty per Violation per Day |
| | 1st through 15th Day | $100 |
| | 16th through 30th Day | $250 |
| | 31 Days or more | $500 |
| | | Not to exceed $100,000 per audit |
| 107.dd. Each failure to implement a corrective action within 90 days after the LDAR Audit Completion Date or pursuant to the schedule that Aux Sable must propose pursuant to Subparagraph 52.b if the corrective action cannot be completed in 90 days. | Period of Delay or Noncompliance | Penalty per Violation per Day |
| | 1st through 15th day | $300 |
| | 16th through 30th day | $400 |
| | 31 Days or more | $500 |
| | | Not to exceed $200,000 per audit |
| 107.ee. Each failure to timely submit a Certification of Compliance that substantially conforms to the requirements of Paragraph 53. | Period of Delay or Noncompliance | Penalty per Violation per Day |
| | 1st through 15th day | $100 |
| | 16th through 30th day | $250 |
| | 31 Days or more | $500 |
| | | Not to exceed $75,000 |
| 107.ff. Each failure to substantially comply with any recordkeeping or submission requirement in Paragraph 54 of Subsection M not specifically identified above in this Table 2. | Period of Delay or Noncompliance | Penalty per Violation per Day |
| | 1st through 15th Day | $100 |
| | 16th through 30th Day | $250 |
| | 31 Days or more | $500 |

108. Stipulated Penalties in Lieu of those in Subparagraphs 107.p, 107.q, 107.r.

a. For purposes of this Paragraph, the term "Non-Compliant Valve" means a valve that is either: (i) not a Low-E Valve; or (ii) not fitted with Low-E Packing. The term "Compliant Valve" means a valve that is either: (i) a Low-E Valve; or (ii) fitted with Low-E Packing.

b. The stipulated penalties in Subparagraph 108.c are to be used instead of those in Subparagraphs 107.p, 107.q, or 107.r when a Non-Compliant Valve is installed instead of a Compliant Valve and all of the following requirements are met:

43

(i)      Aux Sable, and not a government agency, discovers the failure involved;

(ii)      Aux Sable promptly reports the failure to EPA;

(iii)      In the report, Aux Sable sets forth a schedule for promptly replacing the Non-Compliant Valve with a Compliant Valve; provided, however, that Aux Sable shall not be required to undertake an unscheduled shutdown of the affected Covered Process Unit in proposing the schedule unless Aux Sable so chooses;

(iv)      Aux Sable monitors the Non-Compliant Valve once a month from the time of its discovery until the valve is replaced with a Compliant Valve and no Screening Values above 100 ppm are recorded;

(v)      Aux Sable replaces the Non-Compliant Valve with a Compliant Valve in accordance with the schedule set forth in 108.b(iii); and

(vi)      Aux Sable demonstrates that in good faith it intended to install a Compliant Valve but inadvertently installed a Non-Compliant Valve.

c.      The following stipulated penalties shall apply under the circumstances in Paragraph 108:

(i)      In lieu of the penalty in Subparagraph 107.p, $2,000 per failure.

(ii)      In lieu of the penalty in Subparagraph 107.q, $50 per day per failure, not to exceed $2,000.

(iii)      In lieu of the penalty in Subparagraph 107.r, $2,000 per failure.

## H. Requirements for Ultra-Low NOx Burners for HTF Heaters (H-501A and H-501B)

109.    For failure to install required control technologies on each heater by the dates specified in Paragraph 56, per heater, per Day:

| Period of Delay or Noncompliance | Penalty per Violation per Day |
|---|---|
| 1st through 30th Day | $1,500 |
| 31st through 60th Day | $2,000 |
| 61 Days or more | $3,000 |

110.    For failure to certify, calibrate, maintain, or operate a NOx CEMS as required by Paragraph 58, per unit, per Day:

| Period of Delay or Noncompliance | Penalty per Violation per Day |
|---|---|
| 1st through 30th Day | $500 |
| 31st through 60th Day | $1,000 |
| 61 Days or more | $2,000 |

111.    For failure to comply with the NOx emission limit required by Paragraphs 60 and 57, per heater, per day:

| Period of Delay or Noncompliance | Penalty per Violation per Day |
|---|---|
| 1st through 15th Day | $1,000 |
| 15th through 30th Day | $2,000 |
| 31 Days or more | $3,000 |

112.    For failure to comply with an applicable emission monitoring, recordkeeping, or reporting requirement as set forth in Paragraph 59, provided, however, that a penalty assessed under this Paragraph 112 related to record-keeping shall not also constitute a penalty under Paragraph 114 of this Consent Decree:

| Period of Delay or Noncompliance | Penalty per Violation per Day |
|---|---|
| 1st through 30th Day | $500 |
| 31st through 60th Day | $1,000 |
| 61 Days or more | $2,000 |

113.    For failure to comply with an annual emission limit as required by Paragraph 61: $20,000 per heater, per year.

114.    For failure to retain or make available records as required by Paragraph 62, provided, however, that a penalty assessed under this Paragraph 114 related to record-keeping shall not also constitute a penalty under Paragraph 112 of this Consent Decree:

| Period of Delay or Noncompliance | Penalty per Violation per Day |
|---|---|
| 1st through 30th Day | $500 |
| 31st through 60th Day | $1,000 |
| 61 Days or more | $2,000 |

I.    **Locomotive Projects**

115.    For failure to undertake or satisfactorily complete any Project in compliance with Section VII Subsection B (Locomotive Projects) and Appendix B of this Consent Decree: per Project, per Day:

| Period of Delay or Noncompliance | Penalty per Violation per Day |
|---|---|
| 1st through 15th Day | $750 |
| 16th through 30th Day | $1,000 |
| 31 Days or more | $1,500 |

**J.  Permit requirements**

116.    For the failure to timely apply for any permit in accordance with the requirements of Section VIII (Permits) of this Consent Decree:  $1,000 per Day per violation.

**K.  Reporting Requirements**

117.    The following stipulated penalties shall accrue per violation per Day for each violation of the reporting requirements of this Consent Decree, including Section X (Reporting Requirements) and Appendix A and B provided, however, that a stipulated penalty for failure to report has not already accrued under this Section XI:

| Period of Delay or Noncompliance | Penalty per Violation per Day |
|---|---|
| 1st through 15th Day | $100 |
| 16th through 30th Day | $250 |
| 31 Days or more | $500 |

**L.  General Requirements**

118.    Any other violation of this Consent Decree not otherwise specified in the stipulated penalties above: $1,000 per violation per Day.

119.    Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

120.    Aux Sable shall pay any stipulated penalty within 30 days of receiving the United States' written demand.

121.    The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due under this Consent Decree.

122.    Stipulated penalties shall continue to accrue as provided in Paragraph 119 during any Dispute Resolution, but need not be paid until the following:

a.    If the dispute is resolved by agreement or by a decision of EPA that is not appealed to the Court, Aux Sable shall pay accrued penalties determined to be owing, together with interest, to the United States within 30 Days of the effective date of the agreement or the receipt of EPA's decision or order.

b.    If the dispute is appealed to the Court and the United States prevails in whole or in part, Aux Sable shall pay all accrued penalties determined by the Court to be

owing, together with interest, within 60 Days of receiving the Court's decision or order, except as provided in subparagraph c, below.

        c.      If any Party appeals the District Court's decision, Aux Sable shall pay all accrued penalties determined to be owing, together with interest, within 15 Days of receiving the final appellate court decision.

123.    Aux Sable shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraph 10, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

124.    The payment of penalties and interest, if any, shall not alter in any way Aux Sable's obligation to complete the performance of the requirements of this Consent Decree.

125.    No amount of the stipulated penalties paid by Aux Sable shall be used to reduce its federal tax obligations.

126.    <u>Non-Exclusivity of Remedy</u>.  Stipulated penalties are not the United States' exclusive remedy for violations of this Consent Decree.  Subject to the provisions of Section XV (Effect of Settlement/Reservation of Rights) of this Consent Decree, the United States expressly reserves the right to seek any other relief it deems appropriate for Aux Sable's violation of this Decree or applicable law, including but not limited to an action against Aux Sable for statutory penalties, additional injunctive relief, mitigation or offset measures, and/or contempt.  However, the amount of any statutory penalty assessed for a violation of this Consent Decree (or a violation of any Consent Decree requirement incorporated into a federally enforceable non-Title V or Title V permit) shall be reduced by an amount equal to the amount of any stipulated penalty assessed and paid pursuant to this Consent Decree.

## XII.    FORCE MAJEURE

127.    "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Aux Sable, of any entity controlled by Aux Sable, or of Aux Sable's contractors, that delays or prevents the performance of any obligation under this Consent Decree despite Aux Sable's best efforts to fulfill the obligation.  The requirement that Aux Sable exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any potential Force Majeure event: (a) as it is occurring; and (b) following the potential force majeure, such that the delay and any adverse effects of the delay are minimized to the greatest extent possible.  "Force Majeure" does not include Aux Sable's financial inability to perform any obligation under this Consent Decree.

128.    If any event occurs or has occurred that may delay or impede the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Aux Sable shall provide notice to EPA Region 5 Air Enforcement by electronic transmission, to R5AirEnforcement@epa.gov, or orally within seven days of when Aux Sable first knew that the event might cause a delay.  Within seven days thereafter, Aux Sable shall provide in writing to EPA an explanation and description of the reasons for the delay; the anticipated duration of the

delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Aux Sable's rationale for attributing such delay to a Force Majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Aux Sable, such event may cause or contribute to an endangerment to public health, welfare, or the environment. Aux Sable shall include with any notice all available documentation supporting the claim that the delay was attributable to Force Majeure. In the written notice, Aux Sable shall specifically reference this Paragraph 128 of the Consent Decree. Failure to comply with the above requirements shall preclude Aux Sable from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Aux Sable shall be deemed to know of any circumstance of which Aux Sable, any entity controlled by Aux Sable, or Aux Sable's contractors knew or should have known.

129.    If EPA agrees that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation. EPA will notify Aux Sable in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

130.    If EPA does not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, or if the parties fail to agree on the length of the delay attributable to the Force Majeure event, EPA will notify Aux Sable in writing of its decision.

131.    If Aux Sable elects to invoke the dispute resolution procedures set forth in Section XIII (Dispute Resolution), it shall do so no later than 30 Days after receipt of EPA's notice. In any such proceeding, Aux Sable shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Aux Sable complied with the requirements of Paragraphs 127 and 128. If Aux Sable carries this burden, the delay at issue shall be deemed not to be a violation by Aux Sable of the affected obligation of this Consent Decree identified to EPA and the Court.

## XIII.    DISPUTE RESOLUTION

132.    Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Aux Sable's failure to seek resolution of a dispute under this Section shall preclude Aux Sable from raising any such issue as a defense to an action by the United States to enforce any obligation of Aux Sable arising under this Decree.

133.    Informal Dispute Resolution. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Aux Sable sends the United States a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal

negotiations shall not exceed 20 Days from the date the dispute arises, unless that period is modified by written agreement. If the Parties cannot resolve the dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within 45 days after the conclusion of the informal negotiation period, Aux Sable invokes formal dispute resolution procedures as set forth below.

134.    Formal Dispute Resolution. Aux Sable shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Aux Sable's position and any supporting documentation relied upon by Aux Sable.

135.    The United States shall serve its Statement of Position within 45 days of receipt of Aux Sable's Statement of Position. The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States. The United States' Statement of Position shall be binding on Aux Sable unless Aux Sable files a motion for judicial review of the dispute in accordance with the following Paragraph.

136.    Aux Sable may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XVII (Notices) of this Consent Decree, a motion requesting judicial resolution of the dispute. The motion must be filed within 10 days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Aux Sable's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

137.    The United States shall respond to Aux Sable's motion within the time period allowed by the Local Rules of this Court. Aux Sable may file a reply memorandum, to the extent permitted by the Local Rules.

138.    Standard of Review. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 133, Aux Sable shall have the burden of demonstrating that it is entitled to relief under applicable principles of law. The United States reserves the right to argue that its position is reviewable only on the administrative record and must be upheld unless arbitrary and capricious or otherwise not in accordance with law.

139.    The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Aux Sable under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 122. If Aux Sable does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XI (Stipulated Penalties).

## XIV.   INFORMATION COLLECTION AND RETENTION

140.    The United States and its representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, to:

      a.      monitor the progress of activities required under this Consent Decree;

      b.      verify any data or information submitted to the United States in accordance with the terms of this Consent Decree;

      c.      obtain documentary evidence, including photographs and similar data; and

      d.      assess Aux Sable's compliance with this Consent Decree.

141.    Until two years after termination of this Consent Decree, Aux Sable shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to Aux Sable's performance of its obligations under this Consent Decree. This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the United States, Aux Sable shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

142.    At the conclusion of the information-retention period provided in the preceding Paragraph, Aux Sable shall notify the United States at least 90 Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States, Aux Sable shall deliver any such documents, records, or other information to EPA. Defendant may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law. If Aux Sable asserts such a privilege, it shall provide the following: (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege asserted by Aux Sable. However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

143.    Aux Sable may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2. As to any information that Aux Sable seeks to protect as CBI, Aux Sable shall follow the procedures set forth in 40 C.F.R. Part 2.

144.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States pursuant to applicable federal laws, regulations, or permits, nor does it limit or affect any duty or obligation of Aux Sable to maintain

documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XV.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

145.    This Consent Decree resolves the civil claims of the United States for the violations alleged in the Complaint filed in this action and the EPA Violation Notices from the date those claims accrued through the Date of Lodging.

146.    The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree.  This Consent Decree shall not be construed to limit the rights of the United States to obtain penalties or injunctive relief under the CAA or implementing regulations, or under other federal laws, regulations, or permit conditions.  The United States further reserves all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, Aux Sable's Facility, whether related to the violations addressed in this Consent Decree or otherwise.

147.    In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, civil penalties, or other appropriate relief relating to the Facility or Aux Sable's violations, Aux Sable shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 145 of this Section.

148.    This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws or regulations.  Aux Sable is responsible for achieving and maintaining complete compliance with all applicable federal, state, and local laws, regulations, and permits; and Aux Sable's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States does not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that Aux Sable's compliance with any aspect of this Consent Decree will result in compliance with provision of the CAA or with any other provisions of federal, state, or local laws, regulations, or permits.

149.    This Consent Decree does not limit or affect the rights of Aux Sable or of the United States against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties not party to this Consent Decree, against Aux Sable, except as otherwise provided by law.

150.    This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party that is not a Party to this Consent Decree.

## XVI.    COSTS

151.    The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States shall be entitled to collect the costs (including attorneys' fees)

incurred in any action necessary to enforce this Consent Decree or to collect any portion of the civil penalty or any stipulated penalties due but not paid by Aux Sable.

## XVII.   NOTICES

152.    Unless otherwise specified in this Decree, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

As to the United States by email:    eescdcopy.enrd@usdoj.gov
Re: DJ # 90-5-2-1-11203


As to the United States by mail:    EES Case Management Unit
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Re: DJ # 90-5-2-1-11203


As to EPA by mail:    Air and Radiation Division
EPA Region 5
77 W. Jackson Blvd. (AE-17J)
Chicago, IL 60604
Attn: Compliance Tracker

and

Office of Regional Counsel
EPA Region 5
77 West Jackson Blvd. (C-14J)
Chicago, IL 60604

For courtesy purposes only, electronic copies by email to:

Loukeris.Constantinos@epa.gov
Palermo.Mark@epa.gov
Olson.Erik@epa.gov


As to Aux Sable:    Dean Hudson
Aux Sable
6155 E. US Route 6
Morris, IL 60450
Dean.Hudson@auxsable.com

and

52

> Jeff White
> Aux Sable
> 6155 E. US Route 6
> Morris, IL 60450
> Jeff.White@auxsable.com

153.     Any Party may, by written notice to the other Parties, change its designated notice recipient(s) or notice address(es) provided above.

154.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XVIII.  EFFECTIVE DATE

155.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XIX.    RETENTION OF JURISDICTION

156.     The Court shall retain jurisdiction over this case until termination of this Consent Decree for the purposes of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections XIII (Dispute Resolution) and XX (Modification), or effectuating or enforcing compliance with the terms of this Decree.

## XX.      MODIFICATION

157.     The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties.  Where the modification constitutes a material change to this Consent Decree, it shall be effective only upon approval by the Court.

158.     Any disputes concerning modification of this Decree shall be resolved pursuant to Section XIII (Dispute Resolution), provided, however, that instead of the burden of proof provided by Paragraph 138, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXI.     TERMINATION

159.     After Aux Sable has completed the requirements of Section V (Compliance Requirements), Section VI (LDAR Program), and Section VII (Environmental Mitigation Projects); has complied with all other requirements of this Consent Decree, including those relating to the Environmental Mitigation Projects in Appendix B; has completed the third LDAR audit required pursuant to Section VI Subpart K (LDAR Audits and Corrective Action); has paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree; and has incorporated all requirements herein into the applicable permitting for the Facility in accordance

with Section VIII (Permits), Aux Sable may serve upon the United States a Request for Termination of this Consent Decree with respect to its Facility. In the Request for Termination, Aux Sable must demonstrate that it has maintained satisfactory compliance with this Consent Decree for the one-year period immediately preceding the Request for Termination. Any Request for Termination shall include all necessary supporting documentation.

160. Following receipt by the United States of Aux Sable's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Aux Sable has satisfactorily complied with the requirements for termination of this Consent Decree. If the United States agrees that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

161. If the United States does not agree that the Decree may be terminated, Aux Sable may invoke dispute resolution under Section XIII (Dispute Resolution) of this Decree. However, Aux Sable shall not seek Dispute Resolution for any dispute regarding termination until 45 days after service of its Request for Termination.

## XXII. PUBLIC PARTICIPATION

162. This Consent Decree shall be lodged with the Court for a period of not less than 30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate. Aux Sable consents to entry of this Consent Decree without further notice and agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified Aux Sable in writing that it no longer supports entry of the Decree.

## XXIII. SIGNATORIES/SERVICE

163. Each undersigned representative of Aux Sable and the Assistant Attorney General for the Environment and Natural Resources Division of the United States Department of Justice (or his or her designee) certify that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

164. This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis. Aux Sable agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXIV. INTEGRATION

165. This Consent Decree constitutes the final, complete, and exclusive agreement and understanding between the Parties with respect to the settlement embodied in this Consent Decree and supersedes all prior agreements and understandings, whether oral or written,

concerning the settlement embodied herein. Other than the deliverables that are subsequently submitted and approved pursuant to this Decree, the Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXV. FINAL JUDGMENT

166. Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court in this action as to the United States and Aux Sable.

## XXVI. APPENDICES

167. The following Appendices are attached to and part of this Consent Decree:

"Appendix A" is the "Factors to Be Considered and Procedures to Be Followed to Claim Commercial Unavailability."

"Appendix B" is "Environmental Mitigation Projects.'"

The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Federal Rules of Civil Procedure 54 and 58.


DATED and entered this _____ day of _____, 2018.


_____

UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FOR THE UNITED STATES OF AMERICA

Date _10/23/18_ _____

_____
Jeffrey H. Wood
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice


Date _10/24/18_ _____

_____
Ashleigh G. Morris
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division

P.O. Box 7611
Washington, D.C. 20044-7611
(202) 616-8834
(202) 616-6584 (fax)


John R. Lausch, Jr.
United States Attorney
Norther District of Illinois

LINDA A. WAWZENSKI
Assistant United States Attorney
Northern District of Illinois
Eastern Division
219 S. Dearborn Street, Fifth Floor
Chicago, IL 60604

We hereby consent to the entry of the Consent Decree in the matter of <u>United States v. Aux Sable Energy Company LP</u>, subject to public notice and comment.

FOR THE U.S. ENVIRONMENTAL
PROTECTION AGENCY

Date 9/19/2018

T. Leverett Nelson
Regional Counsel
U.S. Environmental Protection Agency
Region 5
Chicago, IL

Date 9/19/18

Erik H. Olson
Associate Regional Counsel
U.S. Environmental Protection Agency
Region 5
Chicago, IL

We hereby consent to the entry of the Consent Decree in the matter of <u>United States v. Aux Sable Energy Company LP</u>, subject to public notice and comment.

FOR THE U.S. ENVIRONMENTAL
PROTECTION AGENCY

Date  10/16/18

Susan Parker Bodine
Assistant Administrator
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency

Date  10/12/18

Rosemarie A. Kelley
Director, Office of Civil Enforcement
U.S. Environmental Protection Agency

Date  10/15/18

Phillip A. Brooks
Director, Air Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency

Date  9/10/18

Mark J. Palermo
Attorney-Advisor, Air Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency

We hereby consent to the entry of the Consent Decree in the matter of <u>United States v. Aux Sable Liquid Products LP</u>:

FOR AUX SABLE LIQUID PRODUCTS LP

Date July 30, 2018

Paul Eastman
Managing Director
Aux Sable Liquid Products LP

59

# APPENDIX A

<u>**APPENDIX A**</u>

<u>**Factors to Be Considered and Procedures to Be Followed to Claim Commercial Unavailability**</u>

This Appendix provides the factors to be taken into consideration and the procedures to be followed for Aux Sable to assert that a Low-E Valve or Low-E Packing is "commercially unavailable" pursuant to Paragraph 39 of the Consent Decree.

**I.     <u>FACTORS</u>**

A.     Nothing in this Consent Decree or this Appendix requires Aux Sable to utilize any valve or packing that is not suitable for its intended use in a Covered Process Unit.

B.     The following factors are relevant in determining whether a Low-E Valve or Low-E Packing is commercially available to replace or repack an existing valve:

   1.   Valve type (*e.g.,* ball, gate, butterfly, needle) (Section VI (LDAR Program) of the Consent Decree does not require consideration of a different type of valve than the type that is being replaced);
   2.   Nominal valve size (*e.g.,* 2 inches, 4 inches);
   3.   Compatibility of materials of construction with process chemistry and product quality requirements;
   4.   Valve operating conditions (*e.g.,* temperature, pressure);
   5.   Service life;
   6.   Packing friction (*e.g.,* impact on operability of valve);
   7.   Whether the valve is part of a packaged system or not;
   8.   Retrofit requirements (*e.g.,* re-piping or space limitations); or
   9.   Other relevant considerations.

C.     The following factors may also be relevant, depending upon the process unit or equipment where the valve is located:

   10.   In cases where the valve is a component of equipment that Aux Sable is licensing or leasing from a third party, valve or valve packing specifications identified by the lessor or licensor of the equipment of which the valve is a component; and
   11.   Valve or valve packing vendor or manufacturer recommendations for the relevant process unit components.

61

**II.     PROCEDURES THAT AUX SABLE SHALL FOLLOW TO ASSERT
         COMMERCIAL UNAVAILABILITY**

      A.      Aux Sable shall comply with the following procedures if it seeks to assert commercial unavailability under Paragraph 39 of the Consent Decree:

      1.      Aux Sable must contact a reasonable number of vendors of valves or valve packing that Aux Sable, in good faith, believes may have valves or valve packing suitable for the intended use taking into account the relevant factors listed in Section I (Factors) of this Appendix.

      a.      For purposes of this Consent Decree, a reasonable number of vendors presumptively shall mean no less than three.

      b.      If fewer than three vendors are contacted, the determination of whether such fewer number is reasonable shall be based on Factors (10) and (11) or on a demonstration that fewer than three vendors offer valves or valve packing considering Factors (1)–(9).

      2.      Aux Sable shall obtain a written representation from each vendor, or equivalent documentation, that a particular valve or valve packing is not available as "Low-Emissions" from that vendor for the intended conditions or use.

      a.      "Equivalent documentation" may include e-mail or other correspondence or data showing that a valve or valve packing suitable for the intended use does not meet the definition of "Low-E Valve" or "Low-E Packing" in the Consent Decree or that the valve or packing is not suitable for the intended use.

      b.      If the vendor does not respond or refuses to provide documentation, "equivalent documentation" may consist of records of Aux Sable's attempts to obtain a response from the vendor.

      3.      Each compliance status report required by Section VI (LDARProgram) and Section X (Reporting Requirements) of the Consent Decree shall identify each valve that Aux Sable otherwise was required to replace or repack, but for which, during the time period covered by the Report, Aux Sable determined that a Low-E Valve and/or Low-E Packing was not commercially-available.  Aux Sable shall provide a complete, written explanation of the basis for its claim of commercial unavailability, including, as an attachment to the compliance status report, all relevant documentation.  This report shall be valid for a period of twelve months from the date of the report for the specific valve involved and all other similar valves, taking into account the factors listed in Section I (Factors) of this Appendix.

### III.    OPTIONAL EPA REVIEW OF AUX SABLE'S ASSERTION OF COMMERCIAL UNAVAILABILITY

A.      At its option, EPA may review an assertion by Aux Sable of commercial unavailability.  If EPA disagrees with Aux Sable's assertion, EPA shall notify Aux Sable in writing, specifying the Low-E Valve or Low-E Packing that EPA believes to be commercially available and the basis for its view that such valve or packing is appropriate taking into consideration the Factors described in Section I (Factors) of this Appendix.  After Aux Sable receives EPA's notice, the following shall apply:

1.      Aux Sable shall not be required to retrofit the valve or valve packing for which it asserted commercial unavailability (unless Aux Sable is otherwise required to do so pursuant to another provision of the Consent Decree).

2.      Aux Sable shall be on notice that EPA will not accept a future assertion of commercial unavailability for:  (i) the valve or packing that was the subject of the unavailability assertion; and/or (ii) a valve or packing that is similar to the subject assertion, taking into account the Factors described in Section I (Factors) of this Appendix.

3.      If Aux Sable disagrees with EPA's notification, Aux Sable and EPA shall informally discuss the basis for the claim of commercial unavailability.  EPA may thereafter revise its determination, if necessary.

4.      If Aux Sable makes a subsequent commercial unavailability claim for the same or similar valve or packing that EPA previously rejected, and the subsequent claim also is rejected by EPA, Aux Sable shall retrofit the valve or packing with the commercially available valve or packing unless Aux Sable is successful under Subsection III.B below.

B.      Any disputes under this Appendix first shall be subject to informal discussions between Aux Sable and EPA for a period not to exceed 30 Days before Aux Sable shall be required to invoke the Dispute Resolution provisions of Section XIII of the Consent Decree.  Thereafter, if the dispute remains, Aux Sable shall invoke the Dispute Resolution provisions of Section XIII.

# APPENDIX B

# APPENDIX B

## Environmental Mitigation Projects

In accordance with Section VII (Mitigation Projects) of the Consent Decree, Aux Sable shall implement and secure the environmental benefits of the Environmental Mitigation Projects described below.

## A. Locomotive Diesel Engine Repowering Project ("Repowering Project")

1. Consistent with the requirements of Section C of this Appendix and with Section VII Subsection B (Locomotive Projects) of this Consent Decree, Aux Sable shall repower two or more Tier 0 or lower switch locomotive engines that operate within the Chicago Non-Attainment Area for National Ambient Air Quality Standards ("NAAQS") for ozone (smog) ("Repowering Project"). The Chicago Non-Attainment Area is the Chicago-Naperville, IL-IN-WI Non-Attainment Area for 8-Hour Ozone (2008) ("Chicago Ozone Non-Attainment Area") and includes the greater Chicago area including Grundy County where the Facility is located, and the northwest Indiana counties of Lake and Porter. Repowering for purposes of the Consent Decree refers to replacing the existing engine(s) with an engine or engines certified to the EPA Tier 3 or more stringent locomotive emissions standards and includes the conversion of two existing Tier 0 locomotives into a mother-slug configuration consisting of (i) one "mother" unit certified to EPA Tier 3 or more stringent locomotive standards and (ii) one "slug" unit without an engine. The Repowering Project will reduce emissions and fuel consumption, resulting in annual emission reductions of NOx, VOC, PM, and $CO^{2E}$ within the Chicago Ozone Non-Attainment Area. Aux Sable shall submit to EPA a proposal for carrying out the Repowering Project. This proposal shall describe how Aux Sable will meet each of the following Repowering Project requirements:

    a.    At a minimum, no less than two locomotives will be repowered for operation in the Chicago Ozone Non-Attainment Area. This includes identification of the owner and/or operator, as applicable, of each locomotive, each locomotive's age and location at the time of conversion, its power rating, whether it is to be used as a line haul or switcher locomotive, its actual or estimated number of operating hours per year, and its actual or estimated fuel burned per year; and a description of how the Repowering Project will result in environmental benefits, including NOx, VOC, PM, and $CO_2$ emission reductions within the Chicago Ozone Non-Attainment Area;

    b.    Aux Sable shall spend no less than $2,000,000 in Project Dollars on this Repowering Project. Subject to Paragraph A(3) below, Aux Sable may claim no more than 65% of the cost of the Repowering Project, as set forth in the project proposal as creditable against Aux Sable's obligation under this Paragraph A. Aux Sable may seek the remaining sums for the Repowering Project from the owner and/or operator, as applicable, of the locomotive to be repowered;

    c.    Aux Sable shall obtain a certification from the owner and/or operator, as applicable, of each locomotive proposed for inclusion in the Repowering

Project and the supporting evidence demonstrating that, prior to repowering, the locomotive was expected to have remained in use for no less than 15 years from the date projected for repowering;

d. Aux Sable shall obtain certification from the owner and/or operator, as applicable, and the supporting evidence, demonstrating that each of the Tier 0 or lower switch locomotive engine to be repowered is permanently destroyed (or arranged for the permanent destruction of) after each such locomotive has been repowered;

e. The project proposal shall include the proposed schedule under which the engine repowerings and permanent destruction will occur within the Completion Date set forth in Paragraph A(2) below; and

f. Aux Sable shall obtain and provide to EPA an agreement by the owner and/or operator, as applicable, of each locomotive to be repowered to grant the EPA access to its property and to provide information to EPA upon request for the purpose of confirming Aux Sable's compliance with this Consent Decree.

2. <u>Completion Date</u>: Aux Sable shall complete the Repowering Project by no later than 30 months from the Effective Date.

3. If Aux Sable is unable to reach agreement with enough owners or operators that will cost share the remainder of costs set forth in Paragraph A(1), Aux Sable may transmit to EPA, in writing for EPA approval, a request to allow a greater per locomotive cost percentage to be creditable against Aux Sable's obligation to expend at least $2,000,000 in Project Dollars. With this transmittal, Aux Sable shall provide a summary of the proposals it made, the costs per locomotive for which it seeks credit, the number of replacements projected to occur, and the owners or operators to which it intends to offer the reduced cost share. Aux Sable shall also certify that it was unable to secure an adequate number of locomotive engine repowerings using the owner/operator cost share allowed under Paragraph A(1)(b) above.

**B. <u>Switcher Locomotive Idle Reduction Project ("Switcher Project")</u>**

1. Consistent with the requirements of Section C of this Appendix and Section VII Subsection B (Locomotive Projects) of this Consent Decree, Aux Sable shall (a) outfit 25 or more switcher locomotives with equipment necessary to enable use of a layover heating system and (b) install a layover system infrastructure consisting of 12 or more wayside stations, power lines, poles, transformers, and power distribution panels installed at two or more railyards and/or rail hubs within the Chicago Ozone Non-Attainment Area ("Switcher Project"). The Switcher Project will result in reduced idling time and therefore reduced fuel usage and reduced emissions of PM, $NO_X$, and VOCs in an urban environment within the Chicago Ozone Non-Attainment Area. Aux Sable shall submit to EPA a proposal for carrying out the Switcher Project. This proposal shall describe how Aux Sable will meet each of the following Switcher Project requirements:

a. At a minimum, 25 switcher locomotives will be outfitted with equipment for use in a layover heating system and 12 wayside stations, power lines, poles,

transformers, and power distribution panels will be installed in two or more railyards and/or rail hubs in the Chicago Ozone Non-Attainment Area. This includes identification of each railyard where a switcher station or wayside station will be installed; the number of switcher locomotives to be outfitted and the estimated cost for each; the number of switcher stations to be installed and the estimated cost for each; the owner and/or operator, as applicable, of each affected locomotive and proposed switcher station; the actual or estimated number of idling hours per year reduced per locomotive; and a description of how the Switcher Project will result in environmental benefits, including a reduction of NOx, VOC, PM, and $CO_2$ within the Chicago Ozone Non-Attainment Area;

b.   Aux Sable shall spend no less than $1,000,000 in Project Dollars on this Switcher Project;

c.   Aux Sable shall obtain a certification from the owner and/or operator, as applicable, of each switcher locomotive proposed for inclusion in the Switcher Project and the supporting evidence demonstrating that the locomotive will use the switcher stations in accordance with the owner/operator operating procedures;

d.   The project proposal shall include the proposed schedule under which each layover heating system and proposed switcher station will be installed and commence operation within the Completion Date set forth in Paragraph B(2) below; and

e.   Aux Sable shall obtain and provide to EPA an agreement by the owner and/or operator, as applicable, of each switcher locomotive and affected railyard to grant the EPA access to its property and to provide information to EPA upon request for the purpose of confirming Aux Sable's compliance with this Consent Decree.

2.   Completion Date:  Aux Sable shall complete the Switcher Project above by no later than 30 months from the Effective Date.

## C. Overall Schedule and Budget

1.   Within 180 Days from the Effective Date, Aux Sable shall submit its Repowering Project and Switcher Project proposals to EPA for review and approval pursuant to Paragraphs 90–94 (Approval of Submittals) of the Consent Decree for completing the Projects listed in Parts A and B of this Appendix in accordance with the deadlines established in this Appendix.

2.   Upon approval by EPA of the proposal(s) required by this Appendix, Aux Sable shall complete the approved Project(s) according to the approved proposal(s).  Nothing in this Consent Decree shall be interpreted to prohibit Aux Sable from completing the Project ahead of schedule.

3.      No greater than 15% of the Project Dollars shall go towards administrative support and outreach costs associated with implementation of the Repowering Project or the Switcher Project.

4.      Any funds designated for a specific Project that are left unspent, or are projected to be left unspent, at the Project's completion, may be redirected by Aux Sable, after consultation with and approval by EPA, to the other Project listed in this Appendix B.

5.      In accordance with the requirements of this Appendix and Section X (Reporting Requirements), Aux Sable shall include in its Initial Compliance Status Report and each Subsequent Compliance Status Report a description of the progress of each Project and the Project Dollars expended on each Project to date.

6.      Project Completion Report: In accordance with the requirements of this Appendix and Paragraph 69 of this Consent Decree, by no later than 90 days following the completion of each Project, Aux Sable shall submit to EPA a project completion report for that Project ("Project Completion Report").  The Project Completion Report shall include the following:

   a.      A detailed timeline of all completed activities for the Project;

   b.      A breakdown of the total costs incurred by Aux Sable to implement the Project;

   c.      A description of any significant problems that occurred during implementation of the Project and how they were overcome; and

   d.      The results of implementation of the Project, including the estimated emission reductions (including NOX, VOC, PM, and $CO_2$, as applicable) and other environmental benefits to the Chicago Ozone Non-Attainment Area.

If EPA concludes based on the Project Completion Report or subsequent information provided by Aux Sable that a Project has been performed and completed in accordance with the Consent Decree, then EPA will approve completion of the Project for purposes of the Consent Decree.